Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )    File No. SF-04082-A
                               )    AMENDED 9-5-2018
                               )          9-10-2018
TESLA MOTORS, INC.             )    CONFIDENTIAL

WITNESS:    Elon Musk
PAGES:      1 through 283
PLACE:      44 Montgomery Street
            Suite 2800
            San Francisco, California
DATE:       Wednesday, August 29, 2018

      The above-entitled matter came on for hearing,
pursuant to notice, at 9:17 a.m.

            Diversified Reporting Services, Inc.
                  (202) 467-9200

Page 2

```
 1    APPEARANCES:
 2
 3
 4    On behalf of the Securities and Exchange Commission:
 5         WALKER NEWELL, ESQ.
 6         STEVEN D. BUCHHOLZ, ESQ.
 7         E. BARRETT ATWOOD, ESQ.
 8         BRENT SMYTH, ESQ.
 9         44 Montgomery Street, 28th Floor
10         San Francisco, California 94104
11         [(b)(6); (b)(7)(C)]
12         newellw@sec.gov
13         buchholzs@sec.gov
14
15
16         CHERYL L. CRUMPTON, ESQ.
17         [(b)(6); (b)(7)(C)]
18         100 F Street, N.E.
19         Washington, D.C. 20549
20         (202) 551-5000
21         crumptonc@sec.gov
22
23
24
25
```

```
 1    APPEARANCES(CONT.):
 2
 3    On behalf of the Witness:
 4
 5        STEVEN FARINA, ESQ.
 6        DANE BUTSWINKAS, ESQ.
 7        Williams & Connolly
 8        725 Twelfth Street, N.W.
 9        Washington, D.C. 2005
10        (202) 434-5000
11        sfarina@wc.com
12
13
14
15        TERENCE M. HEALY, ESQ.
16        ROEL C. CAMPOS, ESQ.
17        Hughes Hubbard &  Reed
18        1775 I Street, N.W. Suite 600
19        Washington, D.C 20006
20        (202) 721-4600
21        terence.healy@hugheshubbard.com
22
23
24
25
```

Page 4

1    APPEARANCES(CONT):

2

3    On behalf of the Witness(cont.):

4        BRADLEY J. BONDI, ESQ.

5        Cahill Gordon & Reindel, LLP

6        1990 K Street, N.W. Suite 950

7        Washington, D.C. 20006

8        (202) 862-8900

9        bbondi@cahill.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1    APPEARANCES(CONT.):

2

3    Also Present:

4        (b)(6),(b)(7)(C)                 Video Operator

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C O N T E N T S
2
3
4    WITNESS:                                    EXAMINATION
5    Elon Musk                                       12
6
7
8    EXHIBITS                    DESCRIPTION        IDENTIFIED
9
10     1    SEC form 1662                            10
11
12     2    Deposition Subpoena                      14
13
14     3    Subpoena for Tesla Motors                18
15
16     4    Subpoena for documents                   24
17
18     5    Printout of tweets                       69
19
20     6    Printout of tweets                       71
21
22     7    August 7th blog post                     79
23
24     8    August 13 blog post                      83
25

1                          C O N T E N T S  (CONT.)

2

3

4

5    EXHIBITS            DESCRIPTION                    IDENTIFIED

6

7        9  Calendar invitation                         106

8

9       10  Spreadsheet                                  165

10

11      11  Email, Bates stamp 59230                     186

12

13      12  Phone records                                198

14

15      13  August 7th tweet                             223

16

17      14  August 7th tweet                             238

18

19      15  August 8th tweet                             239

20

21

22

23

24

25

1                       C O N T E N T S(CONT.)

2

3

4    EXHIBITS      DESCRIPTION                              IDENTIFIED

5

6      16   August 7th tweet                                  248

7

8      17   Calendar invitation                               274

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2                      (SEC Exhibit No. 1 was marked

3                          for identification.)

4            VIDEO OPERATOR:  Here begins DVD No. 1 in the

5    testimony of Elon Musk in the investigation by the U.S.

6    Securities and Exchange Commission in the Matter of:

7    Tesla Motors, Inc., File SF-04082-A

8            Today's date is August 29th, 2018.  The time on the

9    video monitor is 9:17.  The video operator today is (b)(6),(b)(7)(C)

10   (b)(6),(b)(7)(C) employed by Behmke Reporting and Video Services, Inc.,

11   subcontracted by Diversified Reporting Services, Inc.

12           This video investigation is taking place at 44

13   Montgomery Street, Suite 2800, San Francisco.  The court

14   reporter today is (b)(6),(b)(7)(C)             Certified Shorthand

15   Reporter, contracted by Behmke Reporting and Video

16   Services, Inc., and subcontracted by Diversified Reporting

17   Services.

18           Counsel, please voice identify yourselves for the

19   record.

20           MR. FARINA:  Steve Farina, Williams and Connolly,

21   on behalf of the witness.

22           MR. HEALY:  Terence Healy, Hughes Hubbard & Reed,

23   LLP, on behalf of the witness.

24           MR. CAMPOS:  Roel Campos, Hughes Hubbard & Reed,

25   on behalf of the witness.

1          MR. BONDI:  Brad Bondi, Cahill, Gordon &

2  Reindel on behalf of the witness and the company.

3          MR. BUTSWINKAS:  Dane Butswinkas, Williams and

4  Connolly, on behalf of Mr. Musk.

5          MR. NEWELL:  I'm Walker Newell, Securities and

6  Exchange Commission.  With me are Steven Buchholz, Cheryl

7  Crumpton, Barrett Atwood and Brent Smyth, and with us via

8  the video is (b)(6),(b)(7)(C)

9          Mr. Musk, please raise your right hand.

10  Whereupon,

11                          ELON MUSK

12  was called as a witness and, having been first

13  duly sworn, was examined and testified as follows:

14                          EXAMINATION

15          BY MR. NEWELL:

16      Q     Please state your full name and spell it for the

17  record.

18      A     Elon Reeve Musk, E-L-O-N, R-E-E-V-E, M-U-S-K.

19      Q     We're going to do a little redux of what we just

20  did for the record again.  So, apologies for the

21  redundancy.

22          Again, my name is Walker Newell.  With me are

23  Steven Buchholz, Cheryl Crumpton, Barrett Atwood, Brent

24  Smyth and (b)(6);(b)(7)(C) on video from Washington, D.C.  We're

25  officers of the Commission for purposes of this

1    proceeding.

2              This is an investigation by the United States

3    Securities and Exchange Commission in the matter of Tesla

4    Motors, Inc., to determine whether there have been

5    violations of certain provisions of the federal securities

6    laws.

7              However, the facts developed in this investigation

8    might constitute violations of other federal, or state,

9    civil or criminal laws.

10             Prior to the opening of the record, you were

11   provided with a copy of the formal order of investigation

12   and a supplemental formal order of investigation in this

13   matter.  Those will be available for you to review

14   throughout the course of the proceeding.

15             Have you had an opportunity to review the formal

16   orders?

17       A    May I take an opportunity to review it again?

18       Q    Absolutely.

19             And then there's a second one as

20   well if you want to take a quick look.

21             MR. FARINA:  Thank you.  That's the supplement.

22             THE WITNESS:  All right.  Thank you.

23             BY MR. NEWELL:

24       Q    Have you had an opportunity to review the formal

25   orders?

1      A    You're referring to these?

2      Q    Yes.  The first two documents.  And just to be

3  clear for the record, the document you were just reviewing --

4      A    General rules.

5      Q    -- has been previously marked as Exhibit 1.  I'm going

6  to ask you if you've had an opportunity to read that

7  exhibit now.  Sounds like you have.

8      A    Yes.

9      Q    Do you have any questions about the exhibit

10  you just reviewed?

11      A    I do not.

12      Q    Okay. Mr. Musk, are you represented by counsel

13  today?

14      A    I'm sorry.

15          I forget that even though it's video-taped

16  there's also a written thing, which, hence the clarification,

17  sort of a puzzle -- why it's being videoed.

18      Q    And we'll go through some ground rules about just

19  how to create a clear record.

20          It's a bit unnatural, I know.  Let's go through

21  these preliminaries --

22      A    Sure.

23      Q    -- and we'll get there.

24          Are you represented by counsel today?

25      A    Yes, I am.

1    Q   And again, sorry for the redundancy, but I'd ask

2  counsel to again identify themselves for the record, one by one.

3        MR. FARINA:  Steve Farina, Williams and Connolly.

4        MR. HEALY:  Terence Healy, Hughes Hubbard & Reed.

5        MR. CAMPOS:  Roel Campos, Hughes Hubbard & Reed.

6        MR. BONDI:  Brad Bondi, Cahill Gordon &

7  Reindel on behalf of Mr. Musk, and Tesla.

8        MR. BUTSWINKAS:  Dane Butswinkas, Williams and

9  Connolly.

10       MR. NEWELL:  Thanks.

11       BY MR. NEWELL:

12    Q   Mr. Musk, you may be represented by counsel who

13  also represents other persons involved in the commission's

14  investigation.

15       This multiple representation presents a

16  potential conflict of interest if one client's interests

17  are or may be adverse to anothers.  If you are represented

18  by counsel who also represents other persons involved in

19  the investigation, the Commission will assume that you and

20  counsel have discussed and resolved all issues concerning

21  possible conflicts of interest.

22       The choice of counsel and the responsibility

23  for that choice is yours.

24    A   Yes.

25       MR. NEWELL:  Please mark this as EM Exhibit 2.

1    Here you go.

2                    (SEC Exhibit No. 2 was

3                    marked for identification.)

4              BY MR. NEWELL:

5         Q    Mr. Musk, I'm handing you what appears to be a

6    copy of a testimony subpoena.  It's been marked as EM

7    Exhibit 2.

8         A    Mm-hmm.

9         Q    Is this a copy of the subpoena you're appearing

10   pursuant to here today?

11        A    Yes, I believe so.

12        Q    So let's move on to -- and if you could just set that

13   aside.  But generally speaking, we're going to keep --

14   looks like your counsel will help you keep things just --

15        A    The documents, sure.

16        Q    -- kind of at hand; we may refer back to certain

17   things.

18             A few -- a few brief things to go over

19   before we get started substantively here.

20             Have you ever given testimony under oath in a

21   proceeding like this before?

22        A    I mean, not before, the government's, but I've done

23   depositions in civil cases.

24        Q    Civil depositions?

25        A    Yeah, yeah.

```
 1        Q      About how many?
 2        A      (b)(6); (b)(7)(C)
 3        Q      (b)(6); (b)(7)(C)
 4   (b)(6); (b)(7)(C)
 5        A      (b)(6); (b)(7)(C)
 6        Q      This is similar to a deposition; a little bit
 7   different.  It's investigative testimony.  Just a few
 8   baseline things.  As we discussed a bit earlier, the court
 9   reporter is transcribing everything we say, so it's
10   important that we both speak clearly.
11        A      Sure.
12        Q      Try to speak slowly.  I often fail at this
13   myself.  Try to speak loudly and just make our remarks
14   clear.
15        A      Got it.  Absolutely.
16        Q      Please, no gestures, anything like that --
17        A      For sure.
18        Q      -- because can't get it on the written record.
19        A      Understand.
20        Q      The oath you just took has the same effect as if
21   you were testifying in court --
22        A      Sure.
23        Q      -- and it carries the same
24   penalty for perjury.  It's a crime to knowingly present
25   false information in this investigation.
```

1              Do you understand that?

2        A    I do.

3        Q    If you don't understand a question, or if it's a

4    bad question, which I've been guilty of on numerous

5    occasions, just ask me to rephrase it if you don't understand

6    it.

7        A    Sure.

8        Q    If you don't -- if you do answer a

9    question, we're going to assume you understood it.

10       A    Yeah.

11            MR. FARINA:  Elon --

12            THE WITNESS:  Should I be answering these or just

13    acknowledging them or --

14            MR. FARINA:  The one thing that's important as

15    we go forward through the day, is that -- let him finish

16    his question and then --

17            THE WITNESS:  Okay.  Wait for a pause.

18            MR. FARINA:  That way, she can take down what's

19    going on.

20            THE WITNESS:  My apologies.

21            MR. NEWELL:  I was just getting to that piece,

22    but thanks for fronting it.

23            THE WITNESS:  If I'm making it difficult for our

24    stenographer at some point, please let me know.

25            BY MR. NEWELL:

1    Q    That's probably the most difficult part, is trying

2    not to speak over one other.  So I'm going to do my best.

3         I would ask that we just give each other a

4    beat at each finished statement, and make sure that there's

5    nothing more forthcoming.

6    A    Sure.

7    Q    I appreciate it.

8         Again, we control the record today.  So we'll

9    decide when to take breaks, but we will be reasonable, and

10   we want to accommodate reasonable breaks.  And so just let

11   us know if you need a break, and we'll take one.  We just

12   won't take breaks while there's a question pending.

13   A    Yes.

14   Q    Is there any reason today that you can't give

15   full, complete, and truthful testimony?

16   A    No.

17   Q    Are you taking any medications or other

18   substances that would affect your memory or ability to

19   testify truthfully?

20        (b)(6); (b)(7)(C)

21   Q    Thank you.

22        What did you do to prepare for testimony

23   today?

24   A    I -- I reviewed documents last night with

25   counsel, and that's pretty much it.

1      Q      Other than conversations you had with counsel,

2  did you speak to anyone else about the substance of your

3  testimony today?

4      A      No.

5      Q      Anyone tell you how to testify, setting aside

6  conversations with counsel?

7      A      Did anyone to tell me to testify?  Sorry.

8      Q      How to testify.

9      A      Oh, no, no.

10            MR. NEWELL:  Let's mark this EM Exhibit 3.

11                  (SEC Exhibit No. 3 was

12                  marked for identification.)

13            MR. NEWELL:  Mr. Musk, I'm handing you a document

14  that's been marked as EM Exhibit 3.   It appears to be a

15  document subpoena to Tesla, Inc.

16            Take your time to review it, and let me know when

17  you've had a chance.

18            THE WITNESS:  Well, "concerning" is broad.

19            BY MR. NEWELL:

20      Q      Do you recognize this document?

21      A      No.

22      Q      Have you ever seen it before?

23      A      No.  But I was just remarking on the definition of

24  "concerning" being quite broad.

25      Q      You -- you --

1        A    Sorry.  Defining the word "or" to mean "and/or".

2    And the word "and" also means "and/or".

3            Sorry.  The masculine gender includes the female

4    gender.  Okay.  Yeah.

5            MR. FARINA:  Elon, Page 4 -- do you want to

6    direct him to Page 4 to the list of documents?

7            BY MR. NEWELL:

8        Q    We'll just get a record, Mr. Musk.  Do you have

9    any recollection of seeing this document before today?

10       A    No.  No.

11       Q    Okay; well, let's move on to --

12       A    I'm sorry -- some of these definitions,

13   given that they are contrary to the standard English

14   meaning of the words, I think maybe I should spend a

15   moment just understanding them, because it is interesting

16   that it defines words differently than one would use in the

17   common vernacular.

18       Q    Sure.  So I'm not going to have any more

19   questions on that exhibit at this time, given that you

20   haven't seen it before.  If you want to spend some more

21   time with it, that's fine.  We do have a long day, so.

22       A    Yeah, yeah.  Absolutely.

23            Just, you know, when something says like

24   the word "or" has been redefined to mean "and/or" --

25   and "and" is defined to mean "and/or" as well --

1    is unusual.  And I've not seen that before.  All right.

2    Thank you.

3         Q    We can set that aside for now, since you've never

4    seen the document itself.

5              Do you recall around the time of the date of that

6    subpoena in Exhibit 3, Mr. Musk, which was August 7th,

7    being -- receiving any type of preservation requests in

8    connection with this investigation?

9         A    Yes.

10        Q    Do you remember what day you received that

11   request?

12        A    Not offhand, no.

13        Q    Sometime around August 7th?

14        A    Yes.

15        Q    Did you do anything personally to make sure that

16   materials weren't lost or inadvertently deleted after you

17   received that request?

18        A    I did not, no.

19        Q    Did you delete any materials that might be

20   responsive to that August 7th subpoena after you received

21   the preservation request?

22        A    So, not that I can recall.  I do not think

23   so.

24        Q    And did you at some point, after receiving that

25   preservation notice, tender devices, like laptops and

1    phones that you used for Tesla business, for imaging?

2        A    Yes.

3        Q    Do you remember when those devices were collected

4    from you?

5        A    I'm not sure of the exact date, but shortly

6    thereafter.

7        Q    Sometime after August 7th; you're not sure of the

8    exact date?

9        A    Yes.

10       Q    Do you recall whether it was the next day or a

11   week later, anything more specific?

12       A    I think it was within a few days.  Some might have

13   been immediate; I'm not sure.

14       Q    What specific devices did you provide to be

15   imaged?

16       A    I provided my phone and several computers.

17       Q    And by your phone, is that (b)(6); (b)(7)(C)

18       A    (b)(6); (b)(7)(C)

19       Q    (b)(6); (b)(7)(C)    you were currently using at the time

20   that you received the preservation request?

21       A    (b)(6); (b)(7)(C)

22       Q    Do you have -- strike that.

23            At the time you received the request, did

24   you use multiple phones?

25       A    (b)(6); (b)(7)(C)

Page 22

1    Q    Just that [(b)(6); (b)(7)(C)]            that you provided to be

2    imaged?

3    A    Yes.

4    Q    Was it an [(b)(6); (b)(7)(C)]

5    A    Yeah, it is.

6    Q    What about other devices?

7    MR. FARINA:  The laptops, you mean?

8    MR. NEWELL:  Yeah.  Let's start with laptops.

9    THE WITNESS:    [(b)(6); (b)(7)(C)]

10   [(b)(6); (b)(7)(C)]

11

12

13

14   BY MR. NEWELL:

15   Q    [(b)(6); (b)(7)(C)]

16   A    I don't have one.

17   Q    Do you have additional SIM cards for your phone,

18   or just one?

19   A    [(b)(6); (b)(7)(C)]

20   Q    Have you ever used burner or disposable phones in

21   the past?  Let's say, in July or August of 2018?

22   A    [(b)(6); (b)(7)(C)]

23   Q    [(b)(6); (b)(7)(C)]

24   [(b)(6); (b)(7)(C)]

25   A    [(b)(6); (b)(7)(C)]

Page 23

1          MR. FARINA: (b)(6); (b)(7)(C)            and you all

2    received a copy of the phone log two days ago.

3          MR. NEWELL:  Thanks.

4          THE WITNESS:  Of course, being -- (b)(6); (b)(7)(C)

5    (b)(6); (b)(7)(C)

6          BY MR. NEWELL:

7      Q    And this is a good opportunity to just try --

8    I'm obviously pausing in the middle of my questions.

9          If you could just give me a moment

10   to make sure I finish, and you hear the

11   question mark, I'd appreciate it.

12         I know it's not natural.  So I apologize

13   in advance.

14     A    Sure.

15     Q    Any other times in July or August of 2018 that

16   you recall (b)(6); (b)(7)(C)

17     A    No. (b)(6); (b)(7)(C)

18   (b)(6); (b)(7)(C)                                      --

19     Q    So that's the term I use.

20     A    Okay.

21     Q    -- so I apologize for

22   that.  How would you characterize (b)(6); (b)(7)(C)

23     A    (b)(6); (b)(7)(C)

24   (b)(6); (b)(7)(C)

25

1    b)(6); (b)(7)(C)

2    Q    (b)(6); (b)(7)(C)

3    b)(6); (b)(7)(C)                                                            ?

4    A    (b)(6) (b)(7)(C)                                                   .

5            MR. NEWELL:  This is Exhibit 4, please.

6                (SEC Exhibit No. 4 was

7                marked for identification.)

8            BY MR. NEWELL:

9        Q    Handing you a document, Mr. Musk, that's been marked

10    as EM Exhibit 4; it appears to be a subpoena for documents.

11            Take your time to review that, and let me know

12    when you're ready to discuss it.

13            MR. FARINA:  With respect to identifying and producing

14    documents responsive to both subpoenas, Mr. Musk has

15    worked through counsel, including my firm, and counsel for

16    the company.  So I don't know that Mr. Musk has actually

17    seen this before, but he has been involved in gathering

18    and producing documents through his counsel.

19            MR. CAMPOS:  He's worked with Hughes Hubbard as

20    well for documents.

21            THE WITNESS:  All right.

22            BY MR. NEWELL:

23        Q    Have you seen that document before?

24        A    No.

25        Q    Mr. Musk, have you tendered to the staff all

```
1    documents called for by Exhibit 4?

2         A    I believe so.

3         Q    Were any documents called for by the subpoena not

4    produced for any reason other than privilege?

5         A    No.

6         Q    Do you know of any documents responsive to Exhibit 4,

7    but not produced, that were in your possession at a prior

8    time, or that were lost, destroyed, or otherwise disposed

9    of?

10        A    No.

11        Q    Did you provide the SEC staff with a copy of the

12   voluntary background questionnaire in this matter?

13             MR. FARINA:  He has not.

14             BY MR. NEWELL:

15        Q    Just a couple of quick high-level background

16   questions.

17             What's your date of birth?

18        A    (b)(6);(b)(7)(C)

19        Q    And where were you born?

20        A    Pretoria, South Africa.

21        Q    Could you give us a very quick, please, high-

22   level walk-through of your educational history, post high

23   school?

24        A    I was -- I went to Queen's University in Canada;

25   I was there for two years.  Transferred to the University of
```

1    Pennsylvania.   I completed a dual undergraduate degree in

2    Physics and Economics at the Wharton School, and then came

3    out to California to do a Ph.d in Applied Physics and Empirical

4    Sciences at Stanford, but ended up putting that on hold to

5    start an internet company.

6        Q    Any particular focus in your economics degree at

7    Wharton?

8        A    (b)(6); (b)(7)(C)

9        Q    Did you take courses addressing Corporate Finance when

10   you were at Wharton?

11       A    (b)(6); (b)(7)(C)

12       Q    Corporate Law?

13       A    (b)(6); (b)(7)(C)

14       Q    Not Corporate Law, specifically?

15       A    (b)(6); (b)(7)(C)

16       Q    Any training --

17       A    (b)(6); (b)(7)(C)

18       Q    Any training in investment banking?

19       A    (b)(6); (b)(7)(C)    I met a lot of future

20   investment bankers who convinced me not to have a career

21   in that direction.

22       Q    Let's turn to your role at Tesla today.  I'm going to

23   use the term "Tesla" to refer to Tesla, Inc.  I know

24   that's not much of a shorthand, but just so the record is

25   clear, if I refer to "Tesla", you understand I'm referring to the

1    entity, Tesla, Inc.?

2        A    Yes.

3        Q    I'll do a couple of those throughout the day

4    today.  I know it's ponderous, but it's just good for a

5    clean record.

6        A    No problem.

7        Q    What's your current role at Tesla?

8        A    I am the CEO of the company, although I'm

9    considering changing my title.

10       Q    What are you considering changing your title to?

11       A    Nothing.  Quite literally.

12       Q    Could you expand on that?

13       A    No.  I just think -- there's too much focus on

14   titles.  And I think that we have all these titles, like

15   Chairman, and CEO, and sort of all these titles; and people

16   get too focused on titles, and then everyone wants a title.  And so

17   I think the best title is no title.

18       Q    Are you also currently Chairman of the Board of

19   Directors at Tesla?

20       A    Yes.

21       Q    Are you also considering changing your role in

22   that respect?

23       A    Yes, I -- well, I'm considering just not having a

24   title there either.

25       Q    So that -- would that entail remaining involved in

Page 28

1  board meetings, as a voting member of the board, but not having

2  the same title?

3     A    The title of Chairman is somewhat of an honorific, and

4  has little in the way of de facto value.  So --

5           MR. FARINA:  To be clear, I don't think he was

6  talking about changing his function in any respect, just

7  the title.

8           MR. NEWELL:  Understood.  Yeah

9           UNIDENTIFIED SPEAKER:  And let me -- let's just ask, along

10  with changing the title, were you considering any changes to

11  functions?

12          THE WITNESS:  No.

13          MR. NEWELL:  Any other --

14          THE WITNESS:  I just think people are too concerned about

15  titles.

16          BY MR. NEWELL:

17     Q    Recognizing your view on titles, any other titles

18  that you currently hold at Tesla?

19     A    I hope not.  I don't think so.

20     Q    Are you a co-founder of Tesla?

21     A    Well, yeah.  But that's not really a title.

22     Q    How about with respect to engineering?  Are you ever

23  referred to as Head of Engineering, or something to that

24  effect?

25     A    Well, I think I somewhat embarrassingly called

1   myself Chief Product Officer, or something like that.  That was

2   in the vestiges of the past; it's one of the tragic

3   titles.

4       Q    **Not currently, though?  It's not still in effect?**

5       A    I think it might be, unfortunately.

6       Q    **When did you first become involved in Tesla?**

7       A    Umm -- well, so the origins are interesting.

8   The -- at some point there should be some accurate

9   recounting of this.

10          But in 2003, when I had lunch with J.B. Straubel

11  and another fellow, who was -- whose name

12  I'll remember in a moment -- but he's quite famous in space.

13  And he -- he's the one that requested the meeting.

14          And in the course of the meeting in 2003, we got

15  to the subject of electric vehicles.  And I mentioned that

16  my Ph.D. at Stanford would have been in high-energy,

17  high energy density, electric -- electric energy storage,

18  for electric vehicles.  Essentially trying

19  to develop advanced ultra-capacities in these electric

20  vehicles, in order to commercialize electric vehicles and

21  make them more -- and have long-range, and fast charging.

22          Is this too fast?  Is this okay?

23          THE COURT REPORTER:  It's all right.

24      A    And so J.B. suggested that I have a test drive of

25  the T-0 vehicle from -- that was made by AC Propulsion,

1  which is a small -- sort of a small engineering shop in

2  Southern California.

3          And so I had a test drive of the T-0, which was a

4  sports car that had essentially the properties of what

5  related to the Tesla with the Roadster, where it had about

6  a 250-mile range, a zero to 60 time was under four seconds.

7  And -- yeah.  So it was sort of, improve upon the concept

8  prototype.

9          And I talked to Tom Gage and Al Cocconi at AC

10  Propulsion and tried to convince them to commercialize the

11  T-0 and saying the world needed to see what electric cars

12  were capable of.

13          And despite my best efforts, I could not convince

14  them to commercialize the T-0.  So they were just not interested

15  in going beyond this sort of small engineering shop.

16          So after a few months of trying to convince them

17  to do that, "If you guys are not going to, to recreate a

18  productized commercial version of the T-0, then would you

19  mind if I did that?"  And they said "Sure."

20          And it's important to note that the T-0, while it

21  was a two-seater electric sports car, it also didn't have

22  any doors or air bags, or any safety features, and it was

23  extremely expensive to make.  On a one off basis, it was

24  like half a million dollars.

25          So there's quite a big gap between a prove the

1    concept prototype and a car that meets all of the regulatory

2    requirements, and is safe and reliable, and doesn't cost

3    half a million dollars.

4            So when I suggested that to Tom Gage,

5    he said, "Well, there are two other teams that are

6    interested in doing this as well." I never met the other

7    team, but the first -- the one team he did introduce me to was

8    Martin Everhart, Rod Topney, and Ian Wright.

9            THE COURT REPORTER:  What's the last name?

10           THE WITNESS:  Wright, with a W.

11           THE COURT REPORTER:  The first name?

12           THE WITNESS:  Oh, Ian.  I-A-N.

13    A    So they didn't have anything except a business

14    plan, which involved commercializing the AC Propulsion

15    T-0.  And I thought -- I was running SpaceX at the time --

16    this was maybe a way for me to advance the course of

17    electric vehicles, without having to run two companies.

18    So, that didn't work out, obviously.  I think, like,

19    to some degree, it's sort of like a case of, you know,

20    you can't have your cake and eat it too.

21           Whenever you try to do something and avoid hard

22    work, good things do not come from that.  Or it needs too much

23    work.

24           So I thought I would combine forces with Mark,

25    Martin, and Ian, and then bring in J.B. rather than just

1  create a separate company with J.B. and me.  And then --

2           MR. FARINA:  And at this point --

3           THE WITNESS:  Maybe I put

4  a little more detail in -- but I mean, I -- you know,

5  it's interesting.

6           MR. NEWELL:  Yeah.

7           THE WITNESS:  I mean, how much detail do you

8  want?

9           BY MR. NEWELL:

10      Q    We appreciate -- we appreciate the

11  background.  Let's -- let's move along though,

12  because we have a long day and a long, long set

13  of questions.

14      A    Sure.

15      Q    We appreciate that.

16           Did Tesla at some point engage in an initial

17  public offering?

18      A    Yes.

19      Q    When was that?

20      A    I know that date well because it was (b)(6);(b)(7)(C)

21  It was June 28th, 2010.

22      Q    Has Tesla remained a publicly-traded company

23  since that time, until today?

24      A    Yes.

25      Q    It files periodic reports with the SEC?

1      A    Yes.

2      Q    And do you sign those reports as the company's CEO?

3      A    I do.  Is it legally the president, or actually the

4   CEO that's the head?  I'm not sure if that's --

5   I think technically it's the president, or something

6   like that, but yeah, the head of

7   the company.

8      Q    Roughly what percentage of Tesla's outstanding

9   common stock do you currently own sitting here today?

10     A    Approximately [(b)(6), (b)(7)(C)] percent.

11     Q    You mentioned SpaceX a moment ago.  Briefly,

12  what's your role at SpaceX?

13     A    Similar.  So I am the CEO and Chief Engineer,

14  Chief Designer of the rockets.  It's really pretty similar

15  in both companies.  I drive the technical direction of the

16  product.  So I'm the overall Head of Engineering or Design,

17  and I -- and also run the company.

18     Q    Do you have roles at other companies as well?

19     A    Yes.  But they are -- the time allocation is minor.

20  So I own some little companies.

21     Q    Could you please just list them for us, just --

22  you don't need to unpack what you do at each, or what the

23  companies are, but just a quick list of companies that you

24  play a role in today.

25     A    Sure.  Yeah.  Well, I have the Boring Company;

1    which digs tunnels, bores tunnels.

2         And that's a real fun company.  I have to say,

3    the enjoyment to grief ratio is very good there so far.

4         THE COURT REPORTER:  I'm sorry.  "It's a fun

5    company.  I have to say" --

6         THE WITNESS:  The enjoyment to grief ratio is

7    quite good, for now at least.  Famous last words.

8    So that's digging tunnels, and selling bizarre

9    merchandise.  And then there's Neuralink, which is --

10   where the goal is to help solve brain injuries,

11   and you know, strokes, dementia, Parkinson's.

12   There's a whole range of things.  Epilepsy.  And using

13   computer chips to be able to do that.

14        And this is a bit esoteric, but in the

15   longer-term view to potentially achieving

16   symbiosis with artificial intelligence, which

17   could ultimately --

18        THE COURT REPORTER:  I'm sorry, I lost your --

19   "to potentially" --

20        THE WITNESS:  Achieving symbiosis with

21   artificial intelligence, which could be

22   important for, on an existential level, for civilization.

23      Q    Are any of your other companies publicly traded,

24   setting aside Tesla?

25      A    No.

1      Q    Do you have an email address at Tesla.com?

2      A    Yes.

3      Q    At SpaceX as well?

4      A    Yes.

5      Q    Any other company email addresses?

6      A    Just Neuralink, just those -- those three for

7  companies, yeah.

8      Q    How do you --

9      A    I haven't followed with a Boring address.

10     Q    How do you differentiate between use of those email

11  addresses?  Are you good about using only the Tesla.com address

12  to discuss Tesla, and likewise for SpaceX and Neuralink?

13     A    Yes, there may be occasional mistakes, but almost

14  always, I try to be quite careful about specificity of

15  each company.

16     Q    How are you able to accomplish that on your

17  device?

18     A    Actually, the phone is pretty good.

19  Essentially, if someone emails me from Tesla,

20  it's automatically going to initiate a an email -- the reply

21  will automatically come from my Tesla address.

22  Likewise, if I send an email to somebody working at Tesla, it will

23  default to sending from my Tesla address.

24     Q    What methods do you use to communicate about

25  Tesla business?

1    A   To the public, you mean?

2    Q   Internally, with other Tesla employees?

3    A   (b)(6); (b)(7)(C)

4    Q   By phone as well?

5    A   (b)(6); (b)(7)(C)

6  (b)(6); (b)(7)(C)

7    Q   Sorry.  Maybe the question was unclear.  I'm

8  asking globally any communications --

9    A   (b)(6); (b)(7)(C)

10  (b)(6); (b)(7)(C)

11  (b)(6); (b)(7)(C)

12

13

14    Q   Anything else, any internal messaging systems at

15  Tesla, like Jabber, or something like that, that you use to

16  message folks at Tesla?

17    A   (b)(6); (b)(7)(C)

18  (b)(6); (b)(7)(C)

19    Q   What about other messaging applications?

20    A   (b)(6); (b)(7)(C)

21  (b)(6); (b)(7)(C)

22    Q   What is (b)(6); (b)(7)(C)

23    A   (b)(6); (b)(7)(C)

24  (b)(6); (b)(7)(C)

25    Q   Do you remember when you (b)(6); (b)(7)(C)

Page 37

1    A    I    (b)(6); (b)(7)(C)

2    (b)(6); (b)(7)(C)

3    (b)(6); (b)(7)(C)

4    Q    (b)(6); (b)(7)(C)

5    A    (b)(6); (b)(7)(C)

6    Q    (b)(6); (b)(7)(C)

7    A    (b)(6); (b)(7)(C)

8    (b)(4)

9    (b)(4)

10   (b)(4)    (b)(6); (b)(7)(C)

11   (b)(6); (b)(7)(C)

12   (b)(6); (b)(7)(C)

13   Q    (b)(6); (b)(7)(C)

14   (b)(6); (b)(7)(C)    (b)(6); (b)(7)(C)

15   A    (b)(6); (b)(7)(C)

16   (b)(6); (b)(7)(C)
17
18
19
20

21   Q    (b)(6); (b)(7)(C)

22   A    (b)(6); (b)(7)(C)    (b)(6); (b)(7)(C)

23   (b)(6); (b)(7)(C)

24   (b)(6); (b)(7)(C)

25   Q    (b)(6); (b)(7)(C)



Page 38

1   A   (b)(6); (b)(7)(C)   (b)(4)

2   (b)(4)

3   Q   (b)(6); (b)(7)(C)   (b)(4)

4   (b)(4)

5   A   (b)(4)

6   Q   (b)(6); (b)(7)(C)   (b)(4)

7   (b)(4)

8

9   (b)(6); (b)(7)(C)

10   Q   (b)(6); (b)(7)(C)   (b)(4)

11   (b)(4)

12   A   (b)(6); (b)(7)(C)

13   Q   (b)(4)

14   A   (b)(6); (b)(7)(C)

15   (b)(6); (b)(7)(C)

16

17

18

19

20   Q   (b)(6); (b)(7)(C)

21   (b)(6); (b)(7)(C)

22

23

24

25   (b)(4)



Page 39

```
 1       A    (b)(4)

 2       Q    (b)(4)

 3  (b)(4)

 4  (b)(4)

 5       A    (b)(4)

 6       Q

 7       A    (b)(4)

 8  (b)(4)

 9

10       Q    (b)(4)

11       A    (b)(4)

12       Q    Is it your understanding that if  (b)(4)

13  (b)(4)

14

15       A    (b)(4)

16       Q                                      (b)(4)

17  to   (b)(4)

18       A    (b)(4)

19  (b)(4)                                      (b)(4)

20  (b)(4)

21

22

23

24

25       Q    (b)(4)
```

1    (b)(4)

2        A    (b)(4)

3        Q    Go ahead.  Sorry.

4        A    I mean, there's only one -- I know I'm not

5    supposed to do this, but there's only one communication I

6    recall relating at all to the take-private, which was Todd

7    Maron sending me a note saying --

8            MR. FARINA:  Don't, don't, don't -- you shouldn't

9    disclose the contents of the communication.

10           THE WITNESS:  Okay.

11           MR. FARINA:  Or at least give us a chance to

12   intervene.

13           So Todd is the company's general counsel?

14           THE WITNESS:  Yes.  Yes.

15           MR. FARINA:  Okay.  We can talk about that

16   at a break before --

17           MR. BUCHHOLZ:  I have some follow-up.

18           MR. FARINA:  Yes, go ahead.

19           BY MR. BUCHHOLZ:

20       Q    Were you seeking legal advice, or was he

21   providing legal advice in that communication?

22       A    Yes.  It was just one -- one note, yes.

23       Q    Okay.  Then, we don't want it.

24       A    It may -- it may be privileged.  I don't know.

25   But it's not for -- not -- yeah, it's not like -- it

```
1    was just --
2              MR. HEALY:  Let the lawyers decide that.
3              BY MR. NEWELL:
4         Q    What was the date of that communication?
5         A    I'm not sure exactly.  But early August.
6              BY MR. BUCHHOLZ:
7         Q    Is it helpful if we put the August 7 day of the
8    tweets out there?  Do you think it was --
9         A    Just, it was prior to that, yes.
10        Q    Okay.
11        A    It informed the tweets;
12   so that's why I think it may be relevant.
13             MR. FARINA:  Okay.
14   Why don't we talk about that at a break,
15   and we can always come back to it?  How's that?
16             THE WITNESS:  Yeah.
17             BY MR. BUCHHOLZ:
18        Q    [(b)(4)]
19   [(b)(6); (b)(7)(C)]
20        A    [(b)(4); (b)(6); (b)(7)(C)]
21   [(b)(6); (b)(7)(C)]
22             BY MR. NEWELL:
23        Q    And for the record, who are Mr. Teller and [(b)(6); (b)(7)(C)]
24        A    Sam Teller is my Chief of Staff, and [(b)(6);(b)(7)(C)] is --
25   not sure what [(b)(6),(b)(7)(C)] is, he is [(b)(6);(b)(7)(C)] on the --
```

1    he's just part of my executive office, considered

2    like essentially (b)(6),(b)(7)(C) effectually.

3        Q     What's his last name?

4        A     (b)(6),(b)(7)(C) I believe.

5        Q     What do you recall discussing (b)(6); (b)(7)(C) with

6    Mr. Teller and/or (b)(6),(b)(7)(C)

7        A     Yeah, I do want to emphasize that very little was

8    discussed at all.  (b)(4)

9    (b)(4)

10

11

12

13       Q     So this is the same (b)(4) related discussion that you

14   were referencing earlier?

15       A     Yeah.

16       Q     Anyone else involved in that (b)(6); (b)(7)(C) conversation,

17   apart from you, Mr. Teller, and (b)(6),(b)(7)(C)

18       A     I don't think so.

19       Q     How long did that conversation last (b)(6); (b)(7)(C) in

20   terms of calendar time?

21       A     It was very brief.

22       Q     A week, a month, a day?

23       A     Maybe a few weeks.  But this was very, very little, and

24   yeah, it was unrelated to this matter.

25             BY MR. BUCHHOLZ:

1    Q    About when was that?  What time period?

2    A    Probably June, yeah.

3    Q    June of this year?

4    A    I think so.

5    BY MR. NEWELL:

6    Q    Is it appropriate to talk [(b)(6); (b)(7)(C)] in

7    context of the contacts, like you would have on your phone,

8    for phone numbers?  Is that what you have [(b)(6); (b)(7)(C)] as well?

9    A    [(b)(6); (b)(7)(C)]

10   [(b)(6); (b)(7)(C)]

11   Q    [(b)(6); (b)(7)(C)]

12   [(b)(6); (b)(7)(C)]

13   A    Yeah.

14   Q    So all of your phone contacts were available to

15   you [(b)(6); (b)(7)(C)] when you were using it?

16   A    Yes, yes.

17   Q    Can you recall communicating with anyone else at

18   Tesla, apart from what we've already discussed [(b)(6); (b)(7)(C)]

19   about any topic?

20   A    No.

21   BY MR. BUCHHOLZ:

22   Q    How long was the [(b)(6); (b)(7)(C)]

23   after what period of time?

24   A    I don't recall.  I don't.

25   Q    Did you do the settings for it, or have

Page 44

1    someone else help you do the settings?

2        A    I think Sam may have just set the setting, but

3    I'm not sure.

4        Q    And just to be clear, so if you use "Sam", you

5    giving us "Teller"?

6        A    Sam Teller, Sam, yeah.

7        Q    That's fine; just so we're clear.

8            MR. NEWELL:   Setting --

9            THE WITNESS:   I mean, typically, there was

10   was very little [(b)(6),(b)(7)(C)]   It's

11   not like there was, you know, a ton of communication.

12   There was very little on it.

13           BY MR. NEWELL:

14       Q    Setting aside the communication that you were

15   just referencing with [(b)(6),(b)(7)(C)] not asking for the

16   substance of that communication, or the substance of any

17   previous communications with [(b)(6),(b)(7)(C)] But did you have

18   any previous communications with [(b)(6),(b)(7)(C)] [(b)(6),(b)(7)(C)]

19   before August 2018?

20       A    I don't recall any communications.

21       Q    The first one you recall is in that August 2018

22   time frame, but before August 7th?

23       A    Yes.

24           MR. BUCHHOLZ:   How did you know that he used

25   [(b)(6),(b)(7)(C)]

Page 45

1              THE WITNESS:  I didn't.  I was actually quite

2    surprised to see a note from him (b)(6); (b)(7)(C)

3              MS. CRUMPTON: (b)(6); (b)(7)(C)

4    (b)(6); (b)(7)(C)

5              THE WITNESS: (b)(6); (b)(7)(C)

6    (b)(6); (b)(7)(C)

7

8              BY MR. NEWELL:

9         Q    What about any other messaging applications?

10   I'll give you a couple examples, to orient you on what I'm

11   talking about.  Applications like Whatsapp, WeChat;

12   analogous applications.  Did you ever use anything like that to

13   discuss Tesla?

14        A    (b)(6); (b)(7)(C)

15   (b)(6); (b)(7)(C)

16             THE COURT REPORTER:  That would be?

17             THE WITNESS:  Unwise.

18        A    I did have (b)(6); (b)(7)(C) installed, but I

19   actually have not used it in years.  And I don't use

20   (b)(6); (b)(7)(C)  because (b)(6); (b)(7)(C)

21   (b)(6); (b)(7)(C)

22        Q    Wicker?

23        A    (b)(6); (b)(7)(C)

24        Q    Any other messaging applications that you can

25   recall using to discuss Tesla?

1      A    No.

2      Q    Let's turn to your use of social media.  What

3   social media accounts do you currently have, sitting here

4   today?

5      A    I have Twitter.

6      Q    No others?

7      A    Correct.

8           THE COURT REPORTER:  I'm sorry, Counsel.  No --

9           MR. NEWELL:  I said, "No others?"

10          BY MR. NEWELL:

11      Q    Did you have an Instagram account at one point?

12      A    Yeah.  It's embarrassing.  This is -- (laughing).

13      Q    Why is it funny?

14      A    Why is it funny?  Well, there's just -- yeah,

15   I just don't -- (b)(7)(C)

16   (b)(7)(C)                You know, I think it sort of

17   gives us a false impression of people having

18   these amazing lives, when in fact they can be quite

19   miserable.  And it then creates unhappiness, because people

20   compare their life to the apparent life of others, and

21   then they feel bad.  And I think it may actually contribute

22   to an increase in the suicide rate, which is terrible.

23   And so I didn't like it, and deleted it.

24      Q    When did you delete it?

25      A    About a week ago.

1      Q      And do you remember when you started using it,

2    roughly?

3      A      Yeah.  Right in the beginning, when it was a floater

4    for Twitter, it used to be like, you know, you'd have an

5    edge up on Twitter; it was like a plug-in. And it was like,

6    you know, it was the first -- I was one of the first

7    people to use it, actually.  So I took snapshots of like

8    the few photos that I care about, and then I deleted it.

9      Q      Did you have access to a beta version or something

10   at teh outset of Instagram?

11     A      Kind of -- close to it, an early version.

12   Literally, beta.  It was like, very early.

13   You can't even get those filters anymore.

14     Q      It sounds like you used it for several years, up

15   until your deletion of it in the recent past?

16     A      I used it infrequently.  I mean, I had it, I think, for

17   six -- six or six and a half years.  And in that entire

18   time, probably did an average of one post a month or

19   something like that.

20     Q      Did you ever use the private messaging or direct

21   messaging feature on Instagram at any time?

22     A      Actually I only realized about a year ago that

23   there was one.  But it was entirely for personal reasons, and

24   generally involved sending some Instagram picture to

25   somebody else, with, you know, "LOL" or something.

1       Q       You did use it, but just for purely personal

2    reasons?

3       A       Yeah, that is --

4       Q       No use of it with Tesla?

5       A       -- true.

6       Q       Sorry to cut you off there.

7       A       Sorry.

8       Q       Go ahead.

9       A       It was entirely frivolous.

10      Q       Any connection between the events surrounding the

11   tweets you sent on August 7th of this year, and your

12   deletion of Instagram over the last couple weeks?

13      A       No, not at all.

14      Q       Let's talk about Twitter now.  When did you first

15   sign on for Twitter?

16      A       Well, technically, I first signed up for Twitter when

17   it was very tiny.  I think it only had a few thousand

18   users.  And a friend of mine was the -- was one of the lead

19   Series A investors in Twitter, and I signed up.  And then

20   people just kept talking about what kind of latte they had

21   at Starbucks.  So then I was like, "This is ridiculous," and

22   deleted my Twitter, because it just seemed like nonsense.

23           And then somebody else took over

24   my Twitter handle and started posting things in

25   my name.  But I kind of ignored Twitter until about

1    that time.  So about probably -- when was it -- 2011 or '10 or

2    something.

3            And a friend of mine suggested that Twitter would be

4    a good way to talk directly to the public and bypass the

5    media.  Obviously, a double-edged sword.  But I thought,

6    well, this could be a good way to not always have what I want

7    to say filtered through the lens of a journalist.

8        Q    It was around the time Tesla went public that you

9    decided to resume your use of Twitter?

10       A    Close.  It was unrelated to -- well, it's

11   really from a press standpoint.  As a means

12   of counteracting press.  But yeah, around that time.

13       Q    What is your Twitter handle?

14       A    Elon Musk.

15       Q    Have you ever used any other Twitter handles?

16       A    No.

17       Q    You don't have access to any other Twitter handles?

18       A    No.

19       Q    Between the time you resumed your use of Twitter,

20   to the present day, has anyone else had access to your

21   Twitter account?

22       A    I don't think so.

23       Q    Anyone else have your password?

24       A    No.

25       Q    You ever ask anyone to write a tweet

1    directly on your behalf?

2        A    No.

3        Q    Did you begin using Twitter to discuss Tesla

4    around the time that you resumed your use of Twitter in 2010

5    or 2011?

6        A    In the beginning, I'm not sure what -- I don't

7    think -- I think I was just tweeting nonsense.

8        Q    Lattes and the like?

9        A    Umm -- I was torturing people with my terrible

10    sense of humor.

11        Q    More of a social pastime than a --

12        A    Yes.

13        Q    -- method of communicating

14    information about your company?

15        A    Yes.

16        Q    When did that change?

17        A    Well, I'm not sure it has, entirely.  It's still --

18    you know -- whimsical, bad humor interspersed with talk of

19    SpaceX and Tesla and Boring Company and Neuralink and

20    Opening Eye -- I forgot to mention Opening Eye.

21        Q    It's another of your companies?

22        A    Sort of.  It's a non-profit.  I'm not on the board

23    or anything.

24        Q    Let me -- let me try and ask the question a little bit

25    differently.

1          Was there a point in time at which you began

2    discussing Tesla more frequently on Twitter?

3          A    I think it would have been two or three years

4    ago.  Not more than four years ago.

5          Q    Somewhere between 2014 and 2016?

6          A    Yeah.

7          Q    You recall an uptick in your use of Twitter to

8    discuss Tesla?

9          A    Yes.

10         Q    Can you a trace that to any specific or

11   precipitating event or events?

12         A    Yeah.  The -- there was a blatantly false review

13   in the New York Times about this terrible test drive that a

14   journalist had in our car, where he fundamentally

15   misrepresented the test drive and flat out lied, which we

16   were able to determine from the car log, since it was our

17   car he was driving.

18         We had full access to logs, including everything

19   the car did.  And his entire story was a piece of fiction;

20   and so we pointed that out.

21         Q    Was that a Model S test drive?

22         A    It was.

23         Q    Do you recall approximately when that review came

24   out?

25         A    I think 2013 or 2014 or something; something like that.

1      Q    And this is the event that sticks out in your

2    mind as starting --

3      A    Yes.

4      Q    -- the process whereby you used Twitter more

5    frequently to discuss Tesla?

6      A    Yeah, essentially to try to --

7    to try to combat what I saw as a

8    misrepresentation of Tesla in the media.

9      Q    How often, on average, do you use Twitter to

10   discuss Tesla?

11     A    Hmm.  I think it varies quite a lot.

12   So it could be -- anywhere -- maybe once a week

13   or something like that on average.  But then there's times

14   when there's a lot more tweets than that.

15     Q    It varies over time?

16     A    Yeah, I think there can be a week could go by with no

17   mention of Tesla, and then a day, there could be a day where

18   there's a great deal of it.

19     Q    Let's take ourselves outside the time frame of

20   August 2018.  So any time prior to August 2018.  When

21   you've used Twitter to discuss Tesla in the past, what

22   capacity were you speaking in?

23          MR. FARINA:  Do you understand what he means by

24   that?

25          THE WITNESS:  Do you mean, was I speaking as the

1    CEO of Tesla or --

2            BY MR. NEWELL:

3        Q    What was your understanding of the capacity in

4    which you were speaking, when you were tweeting about Tesla

5    prior to August 2018?

6        A    I felt I was sort of speaking as the leader of the

7    company.

8        Q    Does that mean CEO?

9        A    Yes, I guess.

10           MR. FARINA:  Are you at a convenient point and

11   switching subjects?  Want to take a break?

12           MR. NEWELL:  Yeah, absolutely.  We've been going about an

13   hour.  I did want to stay on the subject for a moment.

14   If folks need a break now, we can return back to it.

15   For efficiency's sake, though, it might be better

16   to just take another five to ten

17   minutes instead.  But if anyone needs

18   a break, we could stop now.

19           THE WITNESS:  Five to ten minutes is okay.

20           MR. FARINA:  Okay.  Are you okay?

21           THE WITNESS:  Yeah.  No problem.

22           MR. NEWELL:  Let us know if we go on too long,

23   and you need to stop.

24           BY MR. NEWELL:

25       Q    Do you routinely confer with others at Tesla

1    before posting information about Tesla on Twitter?

2        A    No.

3        Q    Do you routinely confer with counsel at Tesla before

4    posting information about Tesla on Twitter?

5        A    No.

6        Q    Have you ever consulted with others at Tesla

7    before posting information about Tesla on Twitter?

8        A    I mean, occasionally I've asked Sam, "What do you

9    think?  What do you think of this tweet?"

10       Q    Mr. Teller?

11       A    Yes.

12       Q    Sorry.  We'll stipulate that "Sam" refers to Mr.

13   Teller --

14       A    Yes.

15       Q    -- for the remainder of today's testimony.

16   If you start talking about another Sam, we'd just

17   ask you to tell us who you mean.

18            Under what circumstances do you get Mr. Teller's

19   take, before posting a tweet?

20       A    Well, if he happens to be there and I'm not too

21   certain about the tweet, I'll ask Sam, "What do you

22   think?"  Most of the time, I do not ask anyone.

23       Q    Prior to August 2018, were you aware of any Tesla

24   policy addressing your use of Twitter?

25       A    Yes.  There's -- well, yes, there's, I believe,

1  a disclosure, in our corporate documents, that I use

2  Twitter.

3       Q    You're referring to a disclosure in SEC filings

4  that indicates your Twitter account is a source of company

5  information?

6       A    Yes.

7       Q    What about -- setting that disclosure aside, what

8  about Tesla corporate policies?  Are you aware of any

9  Tesla corporate policies in effect prior to August of 2018

10 that addressed your use of Twitter in any way?

11      A    No.

12      Q    So no formal policy regarding your use of Twitter

13 at Tesla during that time frame?

14      A    I'm not aware of a formal policy.

15      Q    What about informal policies; anything that comes

16 to mind?

17      A    Not really.

18      Q    Have you blocked users on Twitter in the past?

19      A    Yes.

20      Q    Have those users included journalists?

21      A    In some cases.  Very few.  But I've actually gone

22 back and unblocked a bunch of them.  It is better to just mute

23 them.  Because then they use the block feature; they

24 get all -- they're all excited about that.

25           Mute is way better.  They can still

1   see my tweets, but I can't see theirs.

2        Q    Have you ever used Twitter's direct messaging

3   feature?

4        A    Yes.

5        Q    Ever used that to discuss Tesla?

6        A    No.

7        Q    Can't recall any instances in which you did that?

8        A    I cannot recall any instances where I did that.

9        Q    Have you ever discussed Tesla by using the reply

10  feature on Twitter, to reply to other users' posts, that

11  they originated as --

12       A    Yes.

13       Q    -- distinct from posts that you posted

14  originally, you're now replying to?  Do you

15  understand what I'm saying?

16       A    Yeah.

17       Q    You have used the replies feature in that way

18  to discuss Tesla?

19       A    Yes.

20            MR. NEWELL:  Okay.  I think it's a good

21  opportunity take that break.  Let's go off the record.

22            VIDEO OPERATOR:  Going off the record.  The time

23  is 10:22.

24            (Recess taken.)

25            VIDEO OPERATOR:  We are back on the record.  The

```
 1   time is 10:35.
 2            BY MR. NEWELL:
 3        Q    Mr. Musk, on the break, did you have any
 4   substantive discussions with the SEC?
 5        A    No.
 6        Q    So we just discussed -- before going back on the
 7   record, you had asked whether we could share with you what all
 8   of our roles are.  I'm happy to do that.  I
 9   just wanted to do it on the record.
10        A    Oh, sure.  Yeah.
11        Q    And so, we'll do that now.  I'm a
12   staff attorney here with the SEC at San Francisco.
13   And I can let everyone else introduce themselves.
14            MS. CRUMPTON:  Sure; I'm Cheryl Crumpton.  I am
15   a trial counsel and a supervisor in the SEC's D.C. office.
16            MR. ATWOOD:  I'm Barrett Atwood.  I'm a trial
17   attorney here in the San Francisco office.
18            MR. SMYTH:  My name is Brent Smyth. I'm a Senior
19   Counsel in the Division of Enforcement,
20   in the San Francisco office.
21            THE WITNESS:  Okay.
22            (b)(6);(b)(7)(C)    I'm (b)(6);(b)(7)(C)    I'm (b)(6);(b)(7)(C)
23   (b)(6);(b)(7)(C)          in D.C.
24            MR. NEWELL:  And then Steven Buchholz, who
25   will come back in shortly, is an assistant
```

1  director here in the SEC San Francisco office.

2          THE WITNESS:  Okay.

3          MR. NEWELL:  A supervisor.

4          THE WITNESS:  All right.  Sounds good.  Cool.

5          BY MR. NEWELL:

6      Q    All right.  I'll turn to a different topic.

7  Let's move away from Twitter for a moment.

8          Do you think that Tesla has been unfairly

9  targeted by short sellers?

10     A    Unfairly -- umm, yes, unfair in the sense that

11  I think they are incorrect, and that they are frequently sending

12  information to the press, or publishing it on Twitter or

13  other social media, that I feel is false.

14     Q    Can you give us some examples of areas in which

15  short sellers are disseminating information about Tesla

16  that you think is false?

17     A    (b)(4)

18  (b)(4)

19

20

21

22

23

24

25     Q    Anything else in the realm of

1    areas of false information that you believe are

2    being disseminated about Tesla by short sellers?

3         A    Let's see.

4              Well, they are frequently on television saying

5    that Tesla is a fraudulent company.  That I am a fraud and

6    liar.  I do not believe these are true.  Yes.  They also

7    say that our stock should be worth zero.  There's a long

8    list.

9         Q    So some of your disputes with them include their

10   characterization of Tesla's financial condition?

11        A    Well, yes.  They've claimed that we have fraudulent

12   accounting multiple times, when that is not true.

13        Q    Would you say that short seller pressure on Tesla

14   has increased over time?

15        A    Yes.  The objective numbers are very high.

16   There's, I believe, something on the order of 11 or 12

17   billion dollars of short position officially against

18   Tesla.  This does not count synthetic shorts or possible

19   illegal shorting, which would suggest that number is

20   higher, possibly on the order of 15 billion.

21        Q    Setting aside the actual magnitude of short

22   positions, would you say that the other activities of

23   short sellers, like disseminating information you believe

24   to be false about Tesla has increased over time?

25        A    Yes.

1    Q    Can you pinpoint the genealogy of when you think
2    that began to increase, or has it been a steady increase
3    since the time Tesla's been a public company?
4    A    Yeah.  So, from the moment that Tesla went public, even
5    before it was really legally possible to short sell Tesla
6    stock, they seemed to have found ways to do so.  For the
7    first year or two, this was not too much of a problem.
8         It became pretty extreme around the first quarter
9    of 2013.  Very extreme.  To the degree that the days to
10   cover, I think, was on the order of 30.  This is
11   essentially incredibly difficult, almost impossible to
12   cover your short position.  And I pointed this out to them
13   in the media a few times, that this is really unwise to
14   have this level of shorting.
15        I recommended they do not short Tesla, for
16   their own good.  It's like, too crazy.
17   Q    What about over the past year?  Would you say that
18   the level of intensity concerning short seller
19   dissemination of information you believe to be false about
20   Tesla has increased?
21   A    Over the past two years, I would say it has
22   increased, yes.
23   Q    Past two years?
24   A    Yeah.  This has increased -- you can see the
25   objective number, or the dollar value of the short

1   positioning against Tesla, has increased dramatically.  And

2   proportionate with that dollar value increase, the

3   negative propaganda has roughly matched that increase in

4   short position.

5       Q    Why do you think that Tesla is -- well, strike

6   that.

7            Do you think that Tesla is targeted to a greater

8   degree than other public companies by short sellers?

9       A    Objectively, it is.  The dollar value of the short

10  position against Tesla, on a sustained basis, is the

11  largest short position against almost any company in the history

12  of the American stock market.

13      Q    Why do you think that is?

14      A    Maybe I should talk to them more.  They do not

15  believe that it is possible for Tesla to do what it is

16  doing.  They think that there is no way for a new car

17  company to prosper when faced with competition that is far

18  greater and has vastly more resources.  And they do not believe it

19  is possible for us to execute as we have executed.  And they

20  have held this opinion for a long time, and they have been

21  proven wrong for many years.  So it does seem strange that

22  they would not change their opinion.

23      Q    Do you think if Tesla continues to execute, they'll

24  go away eventually?

25      A    That was my theory.  After 2013 -- in 2013 we had --

1   the short sellers generally felt we were going to go

2   bankrupt right around early 2013.

3            And, in fact, we were able to

4   achieve a small profit in the first quarter of 2013.

5            This was contrary to all their expectations.  I

6   (b)(4)

7

8

9

10

11

12

13

14

15            The thing that they weren't expecting in Q-1 of

16   2013 was that we would actually be able to rally the

17   entire company, and get about half of the quarters -- we'd

18   only -- there were two weeks left in the quarter, and we'd

19   only delivered half of all the vehicles we were supposed

20   to deliver in that quarter.  So they were expecting a

21   massive revenue shortfall and a massive loss.

22            I reorganized the company, and everyone's job was

23   delivering cars, from the design studio, human resources,

24   legal, the general counsel, everyone.  Me too.  Two weeks

25   solid, delivering cars.  We had made the cars.  We had

1    customers, we just needed to get the cars to customers.

2          They were not expecting a reorganization of the

3    company of that nature.  And in the space of two weeks, we

4    doubled our deliveries to customers.

5      Q    **Circling back to the question I asked earlier,**

6    **let me put a different spin on it.**

7          **It sounds like you're not sure whether Tesla's**

8    **continuing to execute will cause short sellers to go away**

9    **at this point, fair to say?**

10     A    Fair to say.  Historically, since the short

11   sellers have been on our case for eight years, even though

12   I expect us to be profitable, and cash flow positive this

13   quarter, probably next, and hopefully going into the

14   future, at least to some degree of positive cash flow and

15   minor profitability, that should, you know, really be

16   quite destructive to the short thesis, because that

17   thesis is contrary to that.

18         They say we'll never make a profit and we'll have

19   to raise massive amounts of money, and if we cannot do that,

20   we will definitely die.

21         So that would break -- that would break

22   the short thesis, at least, you know -- at least

23   at least mostly break the short thesis.

24         That said, I don't think they will go away.

25   They will just come back every year and say this time

1    they're right.

2        Q    **Given that, is there anything else you plan to do**

3    **to try to limit their impact on Tesla going forward?**

4        A    I'm not sure what to do, actually.  They do cause

5    a lot of brand damage.  Because, independent of outright

6    false information, they are extremely good at amplifying

7    any real negative information.  So, if there's, for

8    example, a car accident, even though every year in the

9    United States 40,000 people die in car accidents -- if

10   there's an accident in a Tesla, it's front page news, even

11   if nobody is even injured.  This is crazy.

12                And this is because when that happens, they --

13   they engage their PR agencies, and they send --

14                THE COURT REPORTER:  They engage their --

15                THE WITNESS:  They engage their PR agencies.

16                THE COURT REPORTER:  Thank you.

17       A    And they send this to every media

18   outlet, in the most inflammatory way possible.  I -- the media

19   tells me this.  It's not -- I'm not speculating.

20                And they amplify it on social media.

21   And, you know, if there's a Tesla car fire,

22   although you're literally ten times less likely --

23   ten times less likely to have a fire in a Tesla

24   than in a gasoline car, they'll try to

25   create the impression that Teslas have a fire risk.

1          Nobody has even burned a finger in a Tesla, ever.

2     Zero fire injuries, ever.  But you wouldn't know that from

3     reading the news.  You wouldn't know that our car still

4     has the lowest probability of injury, Model S.

5     Actually, technically, the Model 3 is about to be the

6     best.  About to be slightly better.  The Model 3 -- the Model S

7     has the lowest probability of injury of any --

8               THE COURT REPORTER:  I'm sorry.  S?

9               THE WITNESS:  The model, the model S --

10              THE COURT REPORTER:  Uh-huh.

11              THE WITNESS:  -- has the lowest probablility of

12    injury of any car ever tested by NTSA.

13        A     And the Model X is number two.  And the Model 3 will

14    soon be number one by half a percent, a small number.  So

15    you wouldn't know that this is the safest car --

16    this is the safest car that's ever made,

17    because you just constantly read about Tesla

18    accidents.

19              And there will be some outrageous thing, where,

20    where someone will, as it happens, crash into a fire

21    truck, or at 70 miles an hour, walk away with no injuries

22    or in one case a broken ankle -- a sprained ankle, it

23    wasn't even broken -- a sprained ankle.  And what's remarkable

24    about that is they walked away from a 70-mile-an-hour

25    impact into an essentially immovable object.  You could not

1    survive in any other car.  That's the thing:

2    let alone no injuries; you could not survive.

3         Q    Fair to say you've used Twitter to discuss short

4    sellers in the past?

5         A    A little bit.

6    If I may add some color commentary there?  The

7    people who think -- who most think I'm obsessed about the

8    short sellers, are the short sellers.

9         Q    Are you familiar with an Internet blogger,

10   goes by the pseudonym (b)(6),(b)(7)(C)

11        A    Yes.

12        Q    How did you become familiar with that blogger?

13        A    It was hard not to.  It was like --

14             He wrote a series of carefully crafted pernicious

15   articles on Seeking Alpha, and --

16             THE COURT REPORTER:  On Seeking?

17             THE WITNESS:  On Seeking Alpha.

18             THE COURT REPORTER:  Mm-hmm.

19        A    And they would apparently show

20   up in my Google alerts.  And then he had a very active

21   social media presence.

22             He is, in my opinion, quite an evil person.

23        Q    Do you know whether he's still blogging about

24   Tesla today?

25        A    I bet he is.  Yes, I would say with certainty --

1  I don't know, but I would say with certainty -- like, if you ask

2  me to place a bet, I would place that bet on a thousand to

3  one that he is, yes.

4      Q    Are you aware of publicly available news reports

5  indicating that you reached out to his employer to ask

6  that he cease blogging about Tesla?

7      A    Yes.

8          MR. FARINA:  You -- okay.

9          MR. NEWELL:  Just asking whether Mr. Musk is

10  aware of those reports.

11         THE WITNESS:  (Witness nods head.)

12         BY MR. NEWELL:

13     Q    Do you know anything about facts underlying those

14  reports, if they're true?

15     A    As usual, he misrepresented the situation.  So on

16  Twitter, he was saying that this guy's name is (b)(6);(b)(7)(C)

17  (b)(6);(b)(7)( that he is (b)(6);(b)(7)(C)                    for (b)(6);(b)(7)(C)

18  (b)(6);(b)(7)(C)              of (b)(6);(b)(7)(C)

19         This was like, quite a surprising thing to me.  I

20  did not actually think this could be --

21  this seemed very strange, because

22  (b)(6);(b)(7)(C)         had purchased several Teslas over the years

23  and had spoken positively about Tesla.

24         This seemed inconsistent with what (b)(6);(b)(7)(C)

25  (b)(6);(b)(7)(C)            was saying.

1           So I sent a text to [(b)(6);(b)(7)(C)] saying -- asking

2    who -- is this guy -- do you know this guy?

3           And do you agree with what he is saying?

4           And then [(b)(6);(b)(7)(C)] looked

5    into it, and he did not agree with what [(b)(6);(b)(7)(C)] was

6    saying.  And he had no idea that this was going on, and he was

7    quite outraged, and asked him to stop.

8           Because obviously, if somebody

9    is [(b)(6);(b)(7)(C)] and is espousing these views

10   that are completely contrary to the principal, then people

11   will think, these are the views of the principal -- this is

12   not right.

13   Q    Any other instances that you can recall where you

14   reached out to folks connected in any way with Tesla short

15   sellers to complain about what you perceived to be

16   negative false information being disseminated about Tesla?

17   A    I sent emails to -- this also is like something,

18   I can put it they were saying that there was this guy,

19   who was [(b)(6);(b)(7)(C)] who was saying

20   all sorts of crazy negative stuff about Tesla.

21   And so I sent a note to [(b)(6);(b)(7)(C)] asking "Is

22   this guy your employee?  Is your employee blogging about,

23   making all these like, outrageous statements about Tesla?"  And he

24   looked into it and said "No, it's [(b)(6);(b)(7)(C)]

25   Q    Any others who you remember in that area?

1        A    No.  It just seemed a bit -- you know, (b)(6);(b)(7)(C)      would

2    be on pretty tenuous ground.  You know, dirty trick

3    campaigns, you know, are not good.

4            MR. NEWELL:  Please mark this as EM Exhibit 5.

5                (SEC Exhibit No. 5 was

6                marked for identification.)

7            BY MR. NEWELL:

8        Q    I'm handing you, Mr. Musk, a document

9    that's been marked as EM Exhibit 5.  It appears

10   to be a printout of a tweet.

11           Do you recognize this document?

12       A    I do, yeah.

13       Q    Did you write this tweet on or about May 4, 2018?

14       A    Yes.

15       Q    What is a short burn?

16       A    A short burn is where there's a sudden rise in

17   the stock price that causes shorts to have to cover their

18   losses, and it can cause them to lose lots of money.

19       Q    You wrote, and I'm quoting from the exhibit,

20   "Short Burn of the Century Coming Soon."

21           What did you think would cause the short

22   burn to come when you wrote this tweet?

23       A    Tesla reaching cash flow positive -- Tesla

24   reaching the goal of 5,000 Model 3's per week, and

25   then shortly thereafter, it being profitable and cash flow

1    positive.

2        Q    Those were events in your mind when you wrote this

3    tweet --

4        A    Yeah.

5        Q    That was your expectation, that Tesla stock

6    price would increase, when those events transpired?

7        A    Yes.

8        Q    Do you remember writing another tweet around June

9    of 2018, referencing a short position?

10           MR. FARINA:  Do you have a copy of something you

11   want to show him?

12           MR. NEWELL:  We're just asking for Mr. Musk's

13   recollection.  We can certainly look at a document

14   if he doesn't recall.

15           THE WITNESS:  A document would be helpful.

16           MR. NEWELL:  EM Exhibit 6, please.

17                  (SEC Exhibit No. 6 was

18                  marked for identification.)

19           BY MR. NEWELL:

20       Q    I'm giving you another document.  It's been marked EM

21   Exhibit 6.  It appears to be another printout of a tweet.

22       A    Mm-hmm.  Yes.

23       Q    Do you recognize that document?

24       A    Yes.

25       Q    Did you write that tweet?

1           A    Yes.

2           Q    Quoting from the the document:

3                "They have about three weeks

4    before their short position explodes."

5                Do you see that?

6           A    Yes.

7           Q    What was that referencing?

8           A    Reaching -- Tesla reaching 5,000

9    Model 3s per week.

10               THE COURT REPORTER:  I'm sorry, can I have that again?

11               THE WITNESS:  Tesla a reaching production rate of

12   5,000 Model 3s per week.

13          Q    Sounds like this one was more specific-targeted

14   on, or focused on, the production goal?

15          A    Yes.

16          Q    Whereas the previous one we just reviewed was

17   related to both the financial goals and the production goal?

18          A    Yes, the -- yes.  But the shorts were just very tenuous.

19   They're very -- I should state, not tenuous, very tenacious,

20   in hanging on to their thesis that Tesla is

21   going to go bankrupt.

22               And so amazingly, despite reaching

23   5,000 vehicles per week, they still thought their

24   original thesis was -- held water.

25          Q    Why not just wait until the news about Tesla

Page 72

1    reaching its goal became public, and let that impact

2    the stock price?

3        A    I think, in retrospect, that would have been the

4    smarter move.

5        Q    Let's situate ourselves in time in the month of

6    August 2018.  So this month.

7             Did you, at some point in August, send an email to

8    Tesla's Board of Directors with an offer to take Tesla

9    private?

10       A    Yes.  Not in this month -- was it this month?

11            MR. FARINA:  He can show you the document to

12   refresh your recollection.

13            THE WITNESS:  Okay.  Yeah.  It may have been

14   this --

15            MR. FARINA:  He'll show you the document.

16            THE WITNESS:  Yes, yes, it was, actually.

17   Just barely this month.

18            BY MR. NEWELL:

19       Q    I'll represent to you it's August 2nd;

20   and we can bring out that document, and you can

21   look at it and tell me if I'm wrong.  But

22   I want to go without documents for a moment here.

23            Do you recall sending an offer to the Tesla Board of

24   Directors via email?

25       A    Yes.

1     Q    In what capacity were you speaking when you sent

2   that email to the Tesla Board of Directors?

3     A    As effectively a buyer.  But it's, I mean,

4   there is -- not in the normal sense of a take private,

5   being a leveraged buyout, where shareholders are squeezed out.

6          So it's a buyer -- it's a buyer

7   of those who did not wish to remain private,

8   but not a buyer of the company as a whole.

9          MR. FARINA:  You said a buyer for those who do

10  not wish to remain private.

11         THE WITNESS:  Sorry, sorry, buyer for those who

12  do not wish to remain with the company when it is

13  private.

14         So a buyer technically, but not -- a buyer

15  only if people really did not want to be part of the

16  company when it was private.

17         BY MR. NEWELL:

18    Q    Were you acting in your capacity as Tesla's CEO

19  when you sent the offer to the board?

20    A    No.

21    Q    Do you recall attending a board meeting or board

22  call on August 3rd, 2018?

23    A    Yes.

24    Q    Were you acting in your capacity as Tesla's CEO

25  on that board call specifically?

1      A     You know, obviously one has multiple

2    hats in these situations.

3           So there may be moments where it would have been

4    me as Tesla's CEO, and moments with me as a Tesla --

5    as the proposed buyer.

6           Because obviously I run the company, and I'm the

7    buyer. I cannot be two people. It's very difficult to

8    be two people explicitly. But I try to do that, but --

9      Q     Can you recall any specific instances during the

10   August 3rd board meeting where you put on the CEO hat and

11   instances where you put on the buyer hat?

12     A     I guess the CEO hat would be answering questions

13   about -- operationally about the company. And buyer hat would be

14   answering questions about the take private.

15     Q     Did you answer questions operationally about the

16   company during that board meeting?

17     A     I think so, yeah. Just generally about what's

18   the status of the company, where things are.

19     Q     Were those discussions in the context of a

20   discussion about the going private transaction involving

21   Tesla?

22     A     I'm sorry, could you clarify the question?

23     Q     Was the August 3rd board meeting a special board

24   meeting?

25     A     Yes.

1          Q          Was it convened in response to your offer to the

2    board?

3          A          Yes.

4          Q          Was there any general discussion that you can

5    segregate from discussions surrounding the going private

6    transaction you proposed at that August 3rd board meeting?

7          A          I'm not sure I fully understand how to answer

8    the question.

9                      You know, this -- there's -- generally -- in that

10   board meeting I do recall answering questions about the

11   current status and progress of the company, and I also

12   recall answering questions about the potential idea of

13   going private.

14         Q          Okay.  I'm just trying to understand what your

15   belief was at the time of that meeting.  It sounds like

16   your testimony is that when you're answering questions or

17   discussing operational issues at Tesla, you were wearing

18   your CEO hat but not your buyer hat.  When you were

19   answering questions about your offer, you were wearing

20   your buyer hat but not your CEO hat; is that right?

21         A          Essentially, yes.

22         Q          In the context of those --

23         A          Sorry, (b)(6); (b)(7)(C)

24   (b)(6); (b)(7)(C)

25         Q          I have a similar thing.  Would you like to take a

1    quick break?

2         A    It's okay, but thanks for offering.

3         Q    Still on the topic of that August 3rd board

4    meeting, based on your understanding, was your CEO hat off

5    at the times you were speaking as a buyer during that

6    meeting?

7         A    Yes, I think so.

8         Q    You, at some point on August 7, 2018, wrote a

9    series of tweets about the potential of going private

10   investment -- excuse me.

11            Strike that.

12            At some point in the day on August 7, 2018, did

13   you write a series of tweets about a going private

14   transaction involving Tesla?

15        A    Yeah.

16        Q    When you wrote those tweets, what capacity were

17   you speaking in?

18        A    As a buyer.

19        Q    Did you have your CEO hat on when making those

20   statements?

21        A    I don't think so.

22        Q    Do you recall that a blog post was made public on

23   Tesla's website on August 7th concerning a going private

24   transaction?

25        A    Yes.

1      Q    Was that blog post derived from an email that you

2 had previously written to Tesla employees?

3      A    Yes, I believe so.  Derived from -- yeah.

4        I mean, I'm not sure -- they're close, yeah.

5      Q    Did you authorize that blog post to be published

6 on Tesla's website?

7      A    Yes.

8      Q    And in what capacity were you speaking in that

9 blog post?

10        MR. FARINA:  Hang on.  Are you -- hang on.  Hang on

11 a second.  Are you asking him whether he thought that at the

12 time, what was his thinking at the time, or are you asking

13 him now, sitting here today, in what capacity he thinks he

14 was acting?

15        MR. NEWELL:  Throughout, I've been -- and if this

16 is unclear, we can go back and revisit each of these --

17 asking what his understanding was at the time he posted

18 the statements.

19        MR. FARINA:  Okay.

20        THE WITNESS:  Okay.

21        BY MR. NEWELL:

22      Q    Well, let me just ask you, Mr. Musk, does that

23 change any of your prior answers?

24      A    I don't think so.

25      Q    Okay.

```
 1          MR. BONDI:  If I may, I'll assert an objection to
 2   these questions, in that they're calling for a legal determination.
 3   Mr. Musk isn't an attorney; so in terms of what capacity he may be
 4   speaking, he's just answering in terms of his understanding as
 5   a non-attorney.  Moreover, I think when you get to
 6   questions about which hat is he wearing when, he is the CEO, and he
 7   has remained the CEO of the company, as he's testified.
 8          So in later instances, I think we're going to
 9   have to parse those out a bit and then have some discussions
10   about privilege.
11          BY MR. NEWELL:
12      Q    You can answer.
13          MR. FARINA:  Why don't you repeat the question.
14          MR. NEWELL:  Of course.
15          BY MR. NEWELL:
16      Q    In your remarks in that August 7 blog post that was
17   published on Tesla's website, what was your understanding,
18   at the time of the post, of the capacity in which you were
19   speaking?
20      A    Umm, may I see the blog post?  Yeah -- just to
21   make sure that I am -- I'm trying to be as precise as
22   possible.
23          MR. NEWELL:  Please mark this as EM Exhibit 7.
24              (SEC Exhibit No. 7 was
25              marked for identification.)
```

1          BY MR. NEWELL:

2     Q    Mr. Musk, you've just been handed what's been marked

3  as EM Exhibit 7.  It appears to be a copy of an August 7th

4  blog post.

5     A    Right.

6     Q    Do you recognize that?  Is that the blog post

7  we've been discussing?

8     A    Yes.  So I think this blog post was in the

9  context of me as the buyer, if you will.  Although as

10  mentioned, I think it's sort of an important distinction

11  that this take private is different from the vast majority

12  of take privates, in that --

13          THE COURT REPORTER:  I'm sorry.  The rest of the --

14          THE WITNESS:  I'm sorry?

15          THE COURT REPORTER:  Go ahead.

16          MR. FARINA:  The vast majority of take privates.

17          THE WITNESS:  Yeah, the vast majority of take privates

18  generally involve an attempt by the buyer to obtain a very

19  large percentage of the company's stock by obtaining a

20  loan or through other means.  And this was not one of

21  those.  This was simply a desire to have -- this was

22  just what and I expressly said this, is I'd have

23  the same shareholder base, but not be publicly traded.

24          And so the notion of buying, in a sense, would not

25  necessarily be the same as it would typically be, in a take

1    private.

2            BY MR. NEWELL:

3        Q    How did that affect your understanding of the

4    capacity that you were acting in when you wrote that --

5    rather, on your publication of the blog post?

6        A    Yeah, I still wrote this from the standpoint of a

7    "buyer", in quotes.  I'll speak louder.

8            I sort of wrote this from a standpoint of a buyer, (b)(6); (b)(7)(C)

9    (b)(6); (b)(7)(C)

10       Q    At the time that you wrote the email that

11   underpinned that blog post, your hope was to not

12   make any additional equity investment in Tesla personally?

13       A    My hope was that all shareholders would remain with the

14   company, even if we are not publicly traded.

15       Q    Did anyone help you draft the language of that

16   blog post?

17       A    Yeah.  That would be Todd Maron.

18       Q    Anyone else at the company?

19       A    There may have been others, but I don't know who

20   they would have been.

21           MR. BUCHHOLZ:  Did Mr. Ajuja participate in the

22   preparation?

23           THE WITNESS:  He -- there's a good chance he did.

24   But I don't know what contributions he made, if any.

25           BY MR. NEWELL:

1      Q    What did you discuss with Mr. Maron about the
2   substance of this blog post, before it was published?
3            MR. FARINA:  Mr. Maron is obviously the general
4   counsel of Tesla.  I'm going to defer to company counsel
5   about the assertion of privilege over communications between you
6   and company counsel.  But I'm going to caution you not to
7   disclose privileged information unless it's authorized by
8   the company.
9            MR. BONDI:  I'm going to echo that.  That goes to
10  the heart of the attorney-client privilege of the
11  company.  Mr. Maron's involvement was with
12  respect to an email from Mr. Musk to employees of the
13  company, that ultimately got posted as a blog post.
14  Accordingly, any advice that Mr. Maron, in conjunction
15  with others, gave to Mr. Musk would be privileged to the
16  company's attorney-client privilege.  So we're going to instruct
17  the witness not to answer.
18            MS. CRUMPTON:  Mr. Musk just testified that he wrote
19  this blog post from the perspective of a potential counterparty to
20  Tesla, and not as the CEO of Tesla.
21            MR. BONDI:  This is going to employees.  This is
22  an email from Mr. Musk's Tesla email account, to other
23  Tesla personnel, Tesla employees, communications to Tesla
24  employees from a CEO.  And the advice with respect to
25  those communications are going to be privileged.  We're

1   asserting the privilege, and you can move on.

2           MS. CRUMPTON:  I think that's fine for now.  I think

3   we need to have a further conversation about that, because I

4   don't think that position is supported by case law.

5           MR. BONDI:  We believe it is.

6           MS. CRUMPTON:  We can discuss it off the record.

7           THE WITNESS:  I should be clear --

8           MR. FARINA:  There is no question pending.

9           THE WITNESS:  Okay.

10          BY MR. NEWELL:

11      Q   Let's move on from that question that was just

12  posed Mr. Musk, which counsel for the company and also

13  counsel for you, from Cahill, has instructed you not to

14  answer.

15          Did you have any discussions with Mr. Ahuja

16  outside of discussions with Mr. Maron about the substance of

17  that blog post?

18      A   I don't recall any conversations.

19          MR. FARINA:  What about with (b)(6),(b)(7)(C)

20          THE WITNESS:  It's possible there was some email

21  exchanges but not -- not of any substance.

22          BY MR. NEWELL:

23      Q   And by (b)(6),(b)(7)(C) for the record, we're referring to

24  (b)(6),(b)(7)(C)

25      A   Yes.

Page 83

1      Q      Who is [(b)(6); (b)(7)(C)] at Tesla?

2      A      [(b)(6); (b)(7)(C)]

3      Q      Do you recall that Tesla issued a blog post on

4   August 13th, 2018, about a potential going private

5   transaction?

6      A      Yes.

7      Q      I want to ask you a few questions about that.

8   Would you prefer to see the document itself?

9      A      Yes.

10          MR. NEWELL:  Let's mark this as EM Exhibit 8.

11              (SEC Exhibit No. 8 was

12              marked for identification.)

13          BY MR. NEWELL:

14     Q      Do you recognize Exhibit 8, Mr. Musk?

15     A      Yes.

16     Q      Is this the blog post that was published on

17   Tesla.com on August 13th, 2018?

18     A      Yes.

19     Q      Looks like it's phrased in the first person.

20   There's a lot of instances of the word I, and I'm in

21   there.

22          Do you see that?

23     A      Yes, it's like -- that's really bothered me

24   actually, because it's bad grammar, and obnoxious

25   generally to use "I" so frequently.

1      Q    Same question we've been asking you about prior
2   statements regarding the going private transaction.
3           Were you speaking in your individual capacity as
4   a buyer when you authorized the publication of this blog
5   post?
6      A    Yes.
7      Q    Were you also speaking in your capacity as
8   Tesla's CEO?
9      A    No.
10     Q    Setting aside discussions with counsel, did you
11  have any discussions about the substance of this blog post
12  with anyone before it was published?
13     A    Umm, I don't think so, no.
14     Q    Did anyone help you draft it?
15     A    Counsel, yeah.  I generally write my own blogs;
16  so it's not as though -- I mean, the point worth making
17  I've written many blogs over the years, I don't need
18  somebody else to write something for me.  When I see like
19  the taking Tesla private, these are fundamentally my words,
20  not somebody putting words in my mouth.
21     Q    What about editing help?
22     A    You know, certainly getting suggestions on
23  things -- corrections, additions.  This is fundamentally
24  just a statement of the facts, and I think quite an accurate one.
25     Q    Without asking you to disclose -- strike that.

1          When you said you discussed the August 13th blog

2   post with counsel, what counsel were you referencing?

3       A    That would be Steve Rosenblum, I think, primarily

4   Steve.  I think this did go past Todd Maron's company counsel as

5   well.  I'm not sure of everyone who saw it.

6          BY MR. BUCHHOLZ:

7       Q    So were you seeking legal advice from Mr. Maron

8   in your personal capacity, in connection with your blog post?

9       A    No.

10      Q    What do you recall discussing with Mr. Maron?

11         MR. FARINA:  I'm going to -- let's take a break,

12  or let's stop.  Mr. Maron is company counsel.  Company is

13  asserting a privilege over communications between you and

14  company counsel.  I'm going to let Mr. Bondi speak to

15  that, but you should respect -- as your lawyer, I'm advising

16  you to respect the privilege determinations made by the counsel

17  for the company.

18         Do you have anything to add?

19         MR. BONDI:  I do.

20         This blog post came in response and

21  following a communication with the Director of Corporation

22  Finance at the SEC, and a letter that the Director

23  of Corporation finance wrote to the company.

24  And in his letter he said in our call we note --

25         MS. CRUMPTON:  Mr. Bondi, I'm sorry to interrupt you.

1  At this point you're sort of testifying.  So could we have this

2  discussion off the record? I don't think there's a

3  need to have this in the transcript.

4        MR. BONDI:  I'd like to put it in the transcript,

5  because I think it's important.  The Director of

6  Corporation Finance wrote in his letter,

7  quote, in our call we noted that the company should

8  consider sharing its understanding of these matters and

9  informing Tesla investors whether the statements of Mr.

10  Musk are in his capacity as CEO of Tesla or in some other

11  capacity, such as a prospective bidder.

12        We ask that the company should -- whether the

13  company consider whether providing such clarity would be

14  consistent with the company's obligations to maintain

15  effective disclosure controls and procedures.

16        This announcement, which was posted on the

17  company's blog, was any review from the general counsel

18  and involvement of the general counsel was  in keeping with

19  those disclosure controls and obligations of the company

20  that (b)(6),(b)(7)(C) noted in his letter.  And so any involvement of the

21  general counsel and any advice given of the general

22  counsel in conjunction with any announcement on 8/13

23  would be privileged.  It would be the company's

24  attorney-client privilege, and I would instruct

25  the witness not to answer.

1          Moreover there's also work a product objection as

2     well, because of the fact that an SEC investigation was

3     already underway concerning the disclosure.

4          BY MS. CRUMPTON:

5          Mr. Musk, was this blog post created in

6     anticipation of litigation?

7          MR. FARINA:  I don't know that he's in a position

8     to answer that.  He certainly had lawyers at the time who

9     were advising him, and any communications with Mr. Musk

10    during that time period about the possibility of

11    litigation or the investigation would clearly be

12    privileged.  So all of his information he would have on

13    that subject would have come from lawyers.

14         MS. CRUMPTON:  Putting aside what you may have discussed

15    with a lawyer, did you contemplate litigation when you

16    drafted this blog post?

17         MR. FARINA:  I don't know how he can answer that,

18    setting aside the information he received from counsel.

19         THE WITNESS:  The answer is very obvious.  Tesla

20    is in constant litigation.  We are constantly sued for

21    frivolous purposes.  For example, this absurd 5,000 car

22    per week thing, which the judge just ruled against.

23         BY MR. BUCHHOLZ:

24    Q    Okay.  You did testify that you were not seeking

25    any legal advice from Mr. Maron in connection with

1    **preparing and posting the blog post, correct?**

2        A    Which blog post are you referring to?

3        Q    **The August 13th blog post.**

4        A    I think we're in sort of a semantic debate here.

5    I would defer to my counsel to --

6            MR. FARINA:  I think --

7            MR. BUCHHOLZ:  We're just trying to understand who

8    the person is seeking legal advice in connection with

9    the objection the company is making.

10           MR. FARINA:  Understood.  But if Mr. Musk is

11   receiving -- is receiving legal advice from Mr. Maron and

12   he's receiving legal advice from Mr. Maron in part because

13   of the need for the company to make certain disclosures,

14   then all of that would be encompassed within the

15   privilege.  I believe that's the company's position.

16           Mr. Musk is obviously not a lawyer, and I, you

17   know, I don't want him to get tripped up here because he's

18   not a lawyer.

19           There's been an assertion of the privilege.  I

20   think the record is pretty clear on that.  I don't know

21   that Mr. Musk has anything that he can add to that, not

22   being a lawyer.  Obviously, this is going to have to be

23   sorted out at some point.

24           BY MR. BUCHHOLZ:

25       Q   Did Mr. Maron ever represent you personally

1   during this time period that we're discussing?

2         MR. FARINA:  As opposed to representing him --

3   Mr. Musk and the company in Mr. Musk's capacity as an

4   officer of the company?

5         MR. BUCHHOLZ:  Correct.  That's the question.

6         THE WITNESS:  Did he ever represent me

7   personally, independent of the company?

8         MR. BUCHHOLZ:  Yes.

9         THE WITNESS:  I don't believe so.

10        BY MR. NEWELL:

11  (b)(6);(b)(7)(C)

12

13

14

15

16

17

18

19

20

21

22        BY MR. BUCHHOLZ:

23    Q   With regard to the August 13th blog post, was it

24   your understanding that Mr. Maron was providing you legal

25   advice in connection with your role in the company?

1          MR. FARINA:  I don't know that he could have an

2    understanding other than from communications with Mr.

3    Maron, which would be privileged.  So in order for him to

4    answer that, he would have to reveal privileged

5    communications.

6          In other words -- Mr. Maron is explaining why

7    he's providing legal advice.  That would be in a

8    privileged communication.

9          MR. NEWELL:  We're asking for what's in Mr. Musk's

10   mind.

11         MR. FARINA:  I think what's in Mr. Musk's mind is

12   the product of what he's told by his lawyers at least on

13   these types of matters.

14         MR. BUCHHOLZ:  We're not asking for a legal

15   determination from Mr. Musk.  Just a personal

16   understanding.  He's acknowledged he had different hats.

17   Did he have an understanding that Mr. Maron was providing

18   him legal advice in connection with Tesla and the blog

19   post.

20         MR. FARINA:  If that understanding is informed by

21   legal advice that he received either from Mr. Maron or

22   from any other lawyer, then the substance of that

23   communication is privileged, and I do not want him to

24   disclose it.

25         Now, we can take a break, and I can see if

1   there's a way to cut through this, but I do not want him

2   disclosing privileged information.  We do not want to

3   effect a waiver.

4          MR. NEWELL:  Just one more question, Mr. Farina;

5   understand where this ends.  Is it

6   your position if Mr. Musk at any point in time

7   historically had a conversation with an attorney that affected

8   his understanding of whether or not he was asking for legal

9   advice in the context of these discussions, then that conversation

10  would thereby be privileged?

11         MR. FARINA:  I don't think I've made a statement

12  that is that broad, nor do I need to.

13         But if Mr. Maron provided Mr. Musk

14  legal advice in connection with this blog post, then that legal

15  advice is what would inform Mr. Musk's answer to your questions;

16  then he should not be disclosing legal advice by answering the

17  question.  Again, I'm not asserting his personal privilege, I'm

18  defending the witness and protecting the company's assertion

19  of its privilege.

20         If the company at some point chooses to waive the

21  privilege, that's between the company and you folks.

22         Sitting here today representing the witness, I'm

23  just ensuring that the company's assertion of privilege is

24  respected by Mr. Musk, because Mr. Musk is still the CEO

25  of Tesla.

1          THE WITNESS:  Yeah, I can say -- my recollection

2    and my --

3          MR. FARINA:  You know what, you really shouldn't

4    speak to this if the communications are privileged.  We

5    can take a break, we can talk about it.  Happy to do that.

6          THE WITNESS:  Without specifics to whether it's

7    privileged or not, my recollection is that Todd Maron was

8    extremely rigorous about representing the company and not

9    me as an individual, as buyer.  If what you're getting at

10   is are you concerned whether there was -- Mr. Maron

11   representing me when he should have been representing the

12   company, I do not think that is the case.  I am -- he's

13   extremely ethical, and throughout this process,

14   represented the company.

15          MR. FARINA:  Why don't we take a break.

16          MR. NEWELL:  Sure.  Let's go off the record.

17          VIDEO OPERATOR:  Off the record.  The time is

18   11:29.

19          (Recess taken.)

20          VIDEO OPERATOR:  We're back on the record.  The

21   time is 11:43.

22          BY MR. NEWELL:

23     Q    Mr. Musk, during the break, you did ask the SEC

24   if any of us visited the Tesla facility, and invited us to come in

25   the future.  Other than that conversation, which we didn't

1    respond to, any conversations substantively you had with

2    the SEC staff off the record?

3         A    No.

4         Q    Thanks.

5         A    Sorry.

6         Q    Before the break we were asking you a series of

7    questions concerning conversations you may have had with

8    Mr. Maron, company counsel. Your counsel advised you not

9    to answer, an acknowledgment of company counsel's assertion

10   of privilege.

11            Are you taking your counsel's advice not to

12   answer those questions?

13        A    Yes. I think -- yes. Yes.

14            MR. FARINA:  Okay.

15            BY MR. NEWELL:

16        Q    Let's take a look at, for another moment, the

17   August 13th blog post, which is Exhibit 7, I believe. I'm

18   sorry. Exhibit 8. The blog post, Exhibit 8.

19            MR. FARINA:  Are you done with Exhibit 7?

20            MR. NEWELL:  We can set that aside for now.

21   Thanks.

22        Q    I want to direct your attention, Mr. Musk, to one

23   portion of the exhibit, toward the bottom of the first

24   page. I'll just quote: "To be clear, when I made the

25   public announcement, just as with this blog post, and all

1    other discussions I've had on this topic, I'm speaking for

2    myself as a potential bidder for Tesla."

3              Do you see that?

4        A    Sorry, where?

5        Q    It's toward the bottom of the first page of the

6    exhibit.

7        A    Yeah.

8        Q    Under the heading, "Why did I make a public

9    announcement?"

10       A    Yes.

11       Q    Is that statement accurate?

12       A    I think it is, yes.

13       Q    Any discussions that you had, starting from the

14   time that you sent your offer to the board, through the

15   time that you discontinued consideration of a going private

16   transaction at Tesla, where you were not speaking for

17   yourself as a potential bidder for Tesla but were speaking in

18   another capacity?

19             MR. FARINA:  Talking about public statements?

20             MR. NEWELL:  This is referencing discussions. I'm

21   using the language of the blog post.  So any discussions.

22             MR. FARINA:  So the language of the blog post -- okay.

23   You're referring to the last sentence?

24             MR. NEWELL:  I'm referring to the phrase I read,

25   "all other discussions I've had on this topic."