**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JIGSAW PRODUCTIONS, INC.**<br><br>        Plaintiff,<br><br>    v.<br><br>**U.S. SECURITIES AND EXCHANGE COMMISSION**<br><br>        Defendant. | Civil Action No. 24-cv-2358 (TSC) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
<u>PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Adam A. Marshall
Gunita Singh
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
Email: amarshall@rcfp.org
Email: gsingh@rcfp.org

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ............................................................................iii

INTRODUCTION AND SUMMARY OF ARGUMENT................................................ 1

BACKGROUND.......................................................................................... 4

    A.    Elon Musk ...................................................................................... 4

    B.    The SEC's investigation..................................................................5

    C.    Plaintiff's Request & Lawsuit .........................................................6

LEGAL STANDARDS ...................................................................................7

ARGUMENT ..............................................................................................8

I.    Defendant is improperly withholding the testimonial video of Musk in violation of FOIA's foreseeable harm provision. ....................................... 8

    A.    Defendant's foreseeable harm arguments in support of withholding the Musk video are quintessentially speculative and fatally generic....................................................................................10

    B.    No foreseeable harm would flow from disclosure of the SEC's video of Elon Musk.......................................................................... 19

        1.    Musk is an omnipresent public figure......................................... 19

        2.    The United States Government has repeatedly published videos and images of Musk, conceding he has no privacy interests in such information.......................................................... 29

II.    Defendant has failed to comply with FOIA's segregability mandate. ............ 31

CONCLUSION ......................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Am. C.L. Union v. Dep't of Just.*,
  655 F.3d 1 (D.C. Cir. 2011) ........................................................................ 9

*Am. Oversight v. Gen. Servs. Admin.*,
  311 F. Supp. 3d 327 (D.D.C. 2018) .......................................................... 30

*Amiri v. Nat'l Sci. Found.*,
  664 F. Supp. 3d 1 (D.D.C. 2021). ............................................................. 28

*Campbell v. Dep't of Just.*,
  164 F.3d 20 (D.C. Cir. 1998) ...................................................................... 7

*Cannon v. District of Columbia*,
  717 F.3d 200 (D.C. Cir. 2013) .............................................................. 1, 30

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
  840 F. Supp. 2d 226 (D.D.C. 2012) ...................................................... 18, 19

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just*,
  978 F. Supp. 2d 1 (D.D.C. 2013) .......................................................... 25, 26

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014) ................................................................ 31

*Ctr. for Investigative Reporting v. Customs & Border Prot.*,
  436 F. Supp. 3d 90 (D.D.C. 2019) ............................................................ 11

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ..................................................................................... 7

*Dep't of Def. v. Fed. Lab. Rels. Auth.*,
  510 U.S. 487 (1994) ................................................................................... 13

*Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
  489 U.S. 749 (1989) ............................................................................... 7, 13

*Dep't of Just. v. Tax Analysts*,
  492 U.S. 136 (1989) ..................................................................................... 7

*Ecological Rts. Found. v. EPA*,
  541 F. Supp. 3d 34 (D.D.C. 2021) ............................................................ 27

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
    18 F.4th 712 (D.C. Cir. 2021)....................................................................... 20

*Friends of Animals v. Bernhardt*,
    15 F.4th 1254 (10th Cir. 2021) ............................................................ 27, 35

*Fund for Const. Gov't v. Nat'l Archives & Recs. Serv.*,
    656 F.2d 856 (D.C. Cir. 1981) ............................................................. 20, 21

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) ....................................................................................... 16

*Hum. Rts. Def. Ctr. v. U.S. Park Police*,
    126 F.4th 708 (D.C. Cir. 2025)............................................................ *passim*

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988) ......................................................................................... 16

*Johnson v. Exec. Off. for U.S. Att'ys*,
    310 F.3d 771 (D.C. Cir. 2002) ...................................................................... 31

*Jud. Watch, Inc. v. Dep't of Just.*,
    365 F.3d 1108 (D.C. Cir. 2004) .................................................................... 10

*Jud. Watch, Inc. v. Dep't of Just.*,
    1:24-cv-00700-TJK, ECF No. 66 (May 20, 2025) ...................................... 15

*Juul Labs, Inc. v. FDA*,
    731 F. Supp. 3d 46 (D.D.C. 2024) ............................................................... 15

*Kimberlin v. Dep't of Just.*,
    139 F.3d 944 (D.C. Cir. 1998) ...................................................................... 20

*Knight First Amend. Inst. v. CIA*,
    11 F.4th 810 (D.C. Cir. 2021)....................................................................... 31

*Lardner v. Dep't of Just.*,
    No. Civ.A.03–0180(JDB), 2005 WL 758267 (D.D.C. Mar. 31, 2005) ......... 26

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ........................................................................ 7

*Leopold v. Dep't of Just.*,
    94 F.4th 33 (D.C. Cir. 2024)................................................................... 10, 32

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ...................................................................... 31

iv

*Mil. Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) ...................................................................... 31

*Multi Ag Media LLC v. Dep't of Agric.,*
   515 F.3d 1224 (D.C. Cir. 2008) ...................................................................... 9

*N.Y. Times Co. v. NASA,*
   920 F.2d 1002 (D.C. Cir. 1990) ................................................................ 13, 14

*N.Y. Times Co. v. NASA,*
   782 F. Supp. 628 (D.D.C. 1991) .................................................................. 14

*Nat'l Ass'n of Retired Fed. Emps. v. Horner,*
   879 F.2d 873 (D.C. Cir. 1989) ...................................................................... 9

*Nation Mag., Wash. Bureau v. U.S. Customs Serv.,*
   71 F.3d 885 (D.C. Cir. 1995) ................................................................. 20, 26

*Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.,*
   85 F. Supp. 3d 1074 (N.D. Cal. 2015) ......................................................... 19

*Playboy Enters., Inc. v. Dep't of Just.,*
   516 F. Supp. 233 (D.D.C. 1981) .................................................................. 19

*Reps. Comm. for Freedom of the Press v. FBI,*
   3 F.4th 350 (D.C. Cir. 2021)............................................................... *passim*

*Savage v. Dep't of Just.,*
   No. CV 22-2477 (JEB), 2024 WL 2880438 (D.D.C. June 7, 2024) ................ 11, 32

*Sedaghatdoust v. Blinken,*
   735 F. Supp. 3d 1 (D.D.C. 2024) ................................................................. 29

*United States v. Alvarez,*
   567 U.S. 709 (2012) ................................................................................... 18

*United States v. Askew,*
   529 F.3d 1119 (D.C. Cir. 2008) .................................................................. 13

*United States v. Dionisio,*
   410 U.S. 1 (1973) ...................................................................................... 13

*Weisberg v. Dep't of Just.,*
   705 F.2d 1344 (D.C. Cir. 1983) .................................................................... 7

*Woodall v. Walt Disney Co.,*
   No. CV 20-3772-CBM(Ex), 2024 WL 5337348 (C.D. Cal. Nov. 1, 2024) ............... 30

**Statutes:**

5 U.S.C. § 552 ................................................................................................ *passim*

**Other Authorities:**

@elonmusk, X (Nov. 3, 2024, 9:19 AM) ............................................................ 1

Aaron Rupar (@atrupar), Bluesky (Apr. 30, 2025, 12:45 PM) .................................. 30

Brian New, et al., *Deepfakes of Elon Musk Are Contributing to Billions of
    Dollars in Fraud Losses in the U.S.*, CBS News Texas (Nov. 24, 2024).............. 18

Jigsaw, *Film & TV*, https://www.jigsawprods.com/film-tv/ (last visited June
    11, 2025) ................................................................................................ 6

Press Release, U.S. Sec. & Exch. Comm'n, *Elon Musk Settles SEC Fraud
    Charges; Tesla Charged with and Resolves Securities Law Charge* (Sept.
    29, 2018) .............................................................................................. 28

S. Rep. No. 114-4 (2015) ............................................................................. 11

Todd Spangler, *Joe Rogan Again Had the No. 1 Podcast on Spotify for* 2024,
    Variety (Dec. 4, 2024) ............................................................................. 22

**Rules:**

Fed. R. Civ. P. 56 ........................................................................................ 7

Fed. R. Evid. 201 ...................................................................................... 1, 30

## INTRODUCTION AND SUMMARY OF ARGUMENT

*"There should be no need for FOIA requests.  All government data should be default public for maximum transparency."*

— Elon Musk, November 3, 2024[1]

This Freedom of Information Act lawsuit is brought by award-winning documentary film company Jigsaw Productions, Inc., which is currently producing a documentary about Elon Musk.  Only one record and one legal question is at issue in the parties' instant cross-motions for summary judgment: will Musk's "privacy" interests be harmed by the release a video of him answering questions from the government about his business dealings, when the government has already released a transcript of that same video?  Musk's statements and actions, official publications of the United States Government, and common sense all compel this question be answered with a resounding no.

Musk is the world's wealthiest person and, until earlier this month, served as a senior United States Government official whose visage dominates the public sphere in broadcasts from the Oval Office to the cover of TIME magazine.  For decades he has sought public attention through all manner of interviews and stunts: from smoking a joint on a videotaped podcast[2] to brandishing a chainsaw on stage at a

---

[1]     @elonmusk, X (Nov. 3, 2024, 9:19 AM), archived at https://perma.cc/CSB6-FQY6.

[2]     See Singh Decl. ¶ 15 at 2:10:33.  Plaintiff requests that the Court take judicial notice of the content of each and every video and social media posting cited herein, as well as those cited in the concurrently filed Singh Declaration.  Judicial notice of such material is proper pursuant to Federal Rule of Evidence 201. *Cf. Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of website).

televised political conference,[3] videos of Musk have been viewed hundreds of millions of times across the globe.[4]  And as Musk has ascended into the highest levels of public service, the United States government <u>itself</u> has published lengthy videos of him for all the world to see.  *See infra* Section I.B.2.  To put it simply, neither the government nor Musk can seriously argue he maintains a privacy interest in visual depictions of his person or the sound of his voice.

Nonetheless, the government claims here that releasing even a <u>single second</u> of video showing Musk answering questions about his businesses—testimony taken by Defendant Securities and Exchange Commission ("Defendant" or "SEC")—would harm Musk's "privacy" under FOIA Exemptions 6 and 7(C).  That contention is farcical.  The video at issue was made as part of an investigation that resulted in the SEC filing a public lawsuit against Musk alleging violations of securities law; he later paid $20,000,000 in civil penalties to settle the case.[5]  And as the SEC well knows, the subject matter of the questions and answers in the video in question are not of a private nature: they range from the banal (Musk stating "I am the CEO" of Tesla),[6] to discussing his tweets,[7] to repeating answers he has given in public interviews, *see infra* Section II.  Indeed, the video of Musk at issue, concerning wholly non-private matters, sharply contrasts with troves of publicly available video of Musk discussing

---

[3]     Singh Decl. Ex. F.
[4]     *See, e.g.*, *infra* pp 20–22.
[5]     Pl.'s SMF ¶ 17.
[6]     Singh Decl. Ex. E, at Tr. 27:7–8.
[7]     *Id*. at Tr. 48, 50, 52–53.

topics many would deem of a private nature.  *Compare* Singh Decl. Ex. E *with* Singh Decl. ¶¶ 2–117, 127.

To speed the resolution of this case, Plaintiff does not, for the purposes of its cross-motion, challenge the withholding of the visual depiction or voice of any other third party (such as videographers, attorneys, SEC staff, or Samuel Teller); the government may freely redact the images and sounds of such persons.  Nor does Plaintiff challenge the withholding of any portion of Musk's SEC interview that was redacted in the transcripts provided to Plaintiff.  In other words, Plaintiff <u>only</u> challenges the SEC's withholding of video and audio of (i) Musk, for which (ii) the SEC has already provided the corresponding unredacted transcript.

In order to further expedite resolution of this matter, Plaintiff focuses its legal challenge on the fact that the SEC has not—and cannot—satisfy FOIA's foreseeable harm standard or its corresponding segregability requirement.  5 U.S.C. § 552(a)(8)(A)(i); *id.* § 552(a)(8)(A)(ii).  The foreseeable harm standard requires the government to demonstrate it "reasonably foresees that disclosure would harm an interest protected by" an exemption, *id.*, an "independent and meaningful burden" which cannot be satisfied by "mere speculative or abstract fears," *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (cleaned up).  Although the privacy inquiry for Exemptions 6 (and presumably 7(C)) "overlap" with the foreseeable harm analysis, *see Hum. Rts. Def. Ctr. v. U.S. Park Police*, 126 F.4th 708, 716 (D.C. Cir. 2025), the government's inability to satisfy the latter standard cuts to the heart of this matter, and is the simplest way to resolve the parties' dispute.  As

discussed herein, that is because no "privacy" harm would flow from the release of Musk's image and voice, especially when the transcript of such video has already been released. The government's claims to the contrary beggar belief and are easily disproven by the record.

As government data, the SEC's video should, as Musk himself has stated, be released to the "public for maximum transparency." Accordingly, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment and grant Plaintiff's Cross-Motion for Partial Summary Judgment.

## BACKGROUND

A.   <u>Elon Musk</u>

Until early June 2025, Elon Reeve Musk served as a senior advisor to President Trump. Pl.'s SMF ¶ 1. He is the wealthiest person in the world and an internationally recognized businessman, known for co-founding PayPal, founding SpaceX, being the CEO of Tesla, Inc. ("Tesla"), and acquiring Twitter (now X). *Id.* ¶¶ 5–8. In 2021, he was named TIME Magazine's Person of the year, *id.* ¶ 9. From January 2025 to at least May 2025, Musk was a Special Government Employee. *Id.* ¶¶ 10, 1.

Earlier this year, Musk was appointed as head of President Trump's Department of Government Efficiency, *id.* From attending and presenting at the President's televised cabinet meetings, *id.* ¶ 11 to being a regular subject of the United States Government's social media pages, *id.* ¶ 12, to frequently submitting to interviews with the press and world-renowned podcasters, *id.* ¶ 14, Musk's presence in both the public and private sectors looms large.

B.    <u>The SEC's investigation</u>

On September 27, 2018, Defendant filed a complaint in the Southern District of New York against Elon Musk in his capacity as the CEO of Tesla. Pl.'s SMF ¶ 15. The complaint alleged that on August 7, 2018, Musk made false and misleading statements regarding taking Tesla, a publicly traded company, private. *Id*. Musk resolved the suit by paying Defendant $20,000,000 civil penalties. *Id*. ¶ 17. The court oversaw the distribution of such funds to investors based on their losses on shares of the Tesla common stock purchased between August 7, and August 8, 2018. *Id*. The case concluded with a publicly available settlement agreement. *Id*. ¶ 16; Decl. of Mark Tallarico ¶ 8, ECF No. 18-3.

Musk has discussed the suit with the press. For example, Musk told Leslie Stahl on 60 Minutes that where his "tweets" carry a probability of causing movements within the stock market they are now subject to supervisory review as part of the aforementioned case settlement, and that he "does not respect the SEC." *See* Pl.'s SMF ¶ 18.

As part of the SEC's investigation, it took videotaped investigative testimony of Musk on August 29, 2018 in San Francisco. Pl.'s SMF ¶ 21. Musk was represented during the testimony by counsel at Williams and Connolly, Hughes Hubbard and Reed, LLP, and Cahill, Gorden & Reindel. Singh Decl. Ex. E, at Tr. 9–10. The interview started at approximately 9:17 AM and ended at approximately 6:30 PM. Singh Decl. Ex. E.

C.    <u>Plaintiff's Request & Lawsuit</u>

Plaintiff Jigsaw Productions ("Plaintiff" or "Jigsaw") is an award-winning documentary film, non-fiction television, and podcast production company. Its past work includes *Enron: the Smartest Guys in the Room* (2005), *Taxi to The Dark Side* (2007), *Going Clear: Scientology and the Prison of Belief* (2015), *Steve Jobs: The Man in the Machine* (2015), *The Inventor: Out for Blood in Silicon Valley* (2019), *Citizen K* (2019), and *Kingdom of Silence* (2019).[8] Jigsaw is currently producing a documentary film about Musk. *See* Second Joint Status Report at 2, ECF No. 10 ("2d JSR").

On February 21, 2024, Plaintiff submitted a FOIA request to the SEC (the "Request"). Pl.'s SMF ¶ 19. The Request sought records generated as part of the SEC's above-mentioned investigation into Tesla, as identified by File Number SF-04082-A. *Id.* ¶ 20. Defendant initially denied the Request in full. Compl. ¶¶ 18–20. Plaintiff administratively appealed that determination, *id.* ¶ 21, and filed this lawsuit on August 14, 2024, *see* Compl.

Following commencement of litigation, Plaintiff voluntarily and substantially narrowed the scope of the Request. *See* 2d JSR at 2. Following a status conference before the Court on January 7, Defendant issued a production on March 18, 2025 of a 281-page transcript (with redactions) of Musk's August 29, 2018 testimony given to SEC officials as part of its investigation, but withholding the corresponding video in its entirety.[9] Pl.'s SMF ¶¶ 21–22.

---

[8]    *See* Jigsaw, *Film & TV*, https://www.jigsawprods.com/film-tv/ (last visited June 11, 2025).

[9]    The SEC also released another 314 pages of largely unredacted testimony of Samuel Teller; Plaintiff does not seek the corresponding video of that testimony.

On May 9, 2025, Defendant moved for summary judgment. *See* ECF No. 18.

## LEGAL STANDARDS

FOIA was enacted to create an enforceable right of "access to official information long shielded unnecessarily from public view." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). As the Supreme Court has explained, the "core purpose" of FOIA is to increase "public understanding of the operations or activities of the government." *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989) (citation omitted).

Summary judgment may be entered in favor of the government in a FOIA action only if the agency "show[s] that there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester." *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1350 (D.C. Cir. 1983); Fed. R. Civ. P. 56(a). To meet that burden, the agency must establish that it has fully discharged its statutory obligations, including that its withholdings are proper under one or more of FOIA's enumerated exemptions. *Campbell v. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999); 5 U.S.C. § 552(a)(4)(B). "Consistent with the Act's goal of broad disclosure," FOIA's exemptions must be narrowly construed, *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989), and an agency's affidavits in support of its withholdings must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).

To justify a withholding, in addition to demonstrating that an exemption applies, the agency must also demonstrate that it "reasonably foresees that disclosure would harm an interest protected by" the cited exemption, or that disclosure is prohibited by law.  5 U.S.C. § 552(a)(8)(A)(i).  The foreseeable harm provision also contains an independent segregability requirement that requires agencies to "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and to "take reasonable steps necessary to segregate and release nonexempt information[.]" 5 U.S.C. § 552(a)(8)(A)(ii).

## ARGUMENT

## I.    Defendant is improperly withholding the testimonial video of Musk in violation of FOIA's foreseeable harm provision.

The SEC has invoked Exemptions 6 and 7(C) to withhold the entirety of the video of Musk's testimony before the agency, even though the record is clear no harm would flow from its disclosure.  The SEC's foreseeable harm showing is fatally generic and speculative, making outlandish arguments that, if accepted, would prevent the release of any video of any person, no matter their public nature or how senior they are in government.  The agency's privacy-based arguments are refuted by Musk's unusually public nature, alongside the efforts both he and the United States Government have made to inject his countenance into the public sphere.  Accordingly, because the SEC has not satisfied and cannot satisfy FOIA's foreseeable

harm requirement, it must produce the video of Musk's investigative testimony.[10]

FOIA Exemption 6 applies to "personnel and . . . similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6). Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes" to the extent that their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C). With respect to Exemption 6, the D.C. Circuit has made clear that there is a "presumption in favor of disclosure [that] is as strong as can be found anywhere in the Act." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). Given the "presumption of openness inherent in FOIA," *Campbell*, 164 F.3d at 33, both Exemptions 6 and 7(C) permit withholding only if "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest," *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989); *Am. C.L. Union v. Dep't of Just.*, 655 F.3d 1, 12 (D.C. Cir. 2011).

To lawfully withhold records under FOIA, an agency must show—in addition to demonstrating that an exemption applies—that it "reasonably foresees that disclosure would harm an interest protected by" the cited exemption, or that disclosure is prohibited by law. 5 U.S.C. § 552(a)(8)(A)(i); *see also Leopold v. Dep't of*

---

[10]    As noted *supra*, Plaintiff only seeks the portions of the video testimony of Musk that correspond to the unredacted portions of the transcript released by the SEC; Plaintiff does not challenge the withholding of portions of the video that correspond to redacted segments of the transcript, nor does Plaintiff challenge the withholding of depictions of persons other than Musk.

*Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (stating that the foreseeable harm provision applies to "all exemptions, except Exemption 3" of FOIA); *see also id.* at 38 (noting that Congress crafted "nine exemptions that are to be narrowly construed and, apart from Exemption 3, subject to the foreseeable harm requirement").

For the purposes of foreseeable harm and Exemption 6, the D.C. Circuit has noted that the "analysis required by the . . . foreseeable-harm rule is much the same as the analysis . . . conducted in [determin]ing that [an agency] fail[s] to make the reasonably detailed showing that disclosure would compromise a substantial privacy interest required by" the exemption itself. *U.S. Park Police*, 126 F.4th at 716. Thus, while the question of "whether a record falls within an exemption and whether nondisclosure of that record is permissible under the . . . foreseeable harm standard are 'distinct, consecutive inquiries,'" for the purposes of Exemption 6 "those formally distinct inquiries substantively overlap." *Id.* (citing *Leopold*, 94 F.4th at 37).

Plaintiff addresses the foreseeable harm analysis for Exemptions 6 and 7(C) in tandem herein because (i) Defendant has asserted both exemptions to withhold the entirety of the Musk testimonial video, and (ii) the D.C. Circuit "has deemed the privacy inquiry of Exemptions 6 and 7(C) to be essentially the same," *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1125 (D.C. Cir. 2004).

A. <u>Defendant's foreseeable harm arguments in support of withholding the Musk video are quintessentially speculative and fatally generic.</u>

When an agency proffers "claims of foreseeable harm [that] consist of 'general explanations' and 'boiler plate language,'" such a showing "do[es] not satisfy the

foreseeable-harm requirement." *Ctr. for Investigative Reporting v. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (citation omitted)). "Whether under Exemption 6, or alternatively under the [foreseeable harm standard], 'speculative or abstract fears'" are not "sufficient to justify withholding the [records] at issue." *U.S. Park Police*, 126 F.4th at 716–17 (quoting S. Rep. No. 114-4, at 2 (2015)). *Accord Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (foreseeable harm provision cannot be satisfied by "mere speculative or abstract fears" (cleaned up)). "Nor may the government meet its burden with generalized assertions." *Savage v. Dep't of Just.*, No. CV 22-2477 (JEB), 2024 WL 2880438, at *8 (D.D.C. June 7, 2024).

Here, Defendant offers quintessentially generalized allegations of harm and speculation to withhold Musk's testimonial video, ignoring the particular facts of his person and this case. For example, the SEC states that "releasing the video . . . would result in unwarranted harm to privacy interests that individuals maintain in preventing the dissemination of video recordings of the[m]," and "infringe privacy interests related to the appearance and sound of individuals." Def.'s Mem. at 14. But even if some individuals might have a privacy interest in videos of themselves in some situations, that has no bearing on whether those same privacy interests apply to Musk in the video at issue here. The SEC has failed to provide the connective tissue required by the foreseeable harm standard: it has not articulated "the link between the specified harm and specific information contained in the material withheld." *U.S. Park Police*, 126 F.4th at 717; *accord Reps. Comm. For Freedom of the Press*, 3 F.4th

at 369 (same, quoting H.R. Rep. No. 391, at 9).  Accordingly, its generic argument does not suffice.

The SEC also claims that "[t]he body language, tone, inflection, and pauses captured on video testimony are distinct" from what a transcript can capture, suggesting that this distinction is sufficient grounds to withhold the requested video. Def.'s Mem. at 8.  But once again, even assuming, *arguendo*, this might be true as to some videos and some individuals and some situations, the SEC points to no specifics, whatsoever, from the video <u>at issue here</u> to demonstrate that there is anything sensitive or personal that could have any bearing on <u>Musk's</u> purported privacy interests.  Indeed, it is hard to see how the agency could make such a showing given the transcript reflects a conversation with Musk that is utterly banal.  *See, e.g.*, Singh Decl. Ex. E, at Tr. 72, 129, 140 (transcript excerpts comprising prosaic musings about the possibility of Tesla going private, interspersed with opinions about Red Bull and jokes about unwieldly acronyms); *compare to* Tallarico Decl. (containing no particularized references to the video's contents that would justify withholding). Because Defendant's argument lacks any specificity it fails the foreseeable harm standard.  *U.S. Park Police*, 126 F.4th at 717; *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369.

That the SEC has already released most of the transcript of Musk's testimony, and all of the portions for which Plaintiff seeks the corresponding video, only confirms the generic nature of the agency's argument.  There is no mystery or private nature to what Musk said during his interview—it is public for anyone to see.  Singh Decl

Ex. E.  Thus, as the Supreme Court has noted, while the "content of a specific conversation" might be private, "the physical characteristics of a person's voice, its tone and manner . . . are constantly exposed to the public." *United States v. Dionisio*, 410 U.S. 1, 14 (1973) (holding there was no interest protected by the Fourth Amendment in requiring an exemplar voice recording).  *Accord United States v. Askew*, 529 F.3d 1119, 1139 (D.C. Cir. 2008) (en banc) (recounting that in *Dionisio*, the Supreme Court determined that "no individual can have a reasonable expectation of privacy in the physical characteristics of his tone of voice").  When the contents of Musk's interview have been revealed in a verbatim, certified transcript, he has no "reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world."  *Id.* (quoting *Dionisio*, 410 U.S. at 14).[11]

The government's citation to *N.Y. Times Co. v. NASA*, 920 F.2d 1002 (D.C. Cir. 1990) (en banc), a pre-foreseeable harm case, falls flat.  As an initial matter, the SEC's assertion regarding the holding of *NASA* is misleading.  In particular, the agency claims in its brief that the "D.C. Circuit found that an audio recording of astronauts aboard the *Challenger* shortly before the space shuttle exploded could be withheld even though the transcript of the recording had already been publicly released."  Def.'s Mem. at 8.  That is false.  The <u>only</u> issue decided by the Circuit Court in *NASA*

---

[11]    While an inquiry into privacy for the purposes of the Fourth Amendment is not necessarily coterminous with the concept of privacy under FOIA's exemptions, the Supreme Court has looked to constitutional caselaw to inform its privacy analysis in the FOIA context.  *See Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. at 762; *Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 501 (1994).

was whether the tapes at issue fell within the threshold test for Exemption 6, not what privacy interest was implicated by the tapes, how strong those interests were, or whether the tapes could be withheld.  *See NASA*, 920 F.2d at 1004; *id.* at 1009 ("Whether disclosure of the Challenger tape in this case would constitute a clearly unwarranted invasion of privacy, we do not know and cannot discern on the record before us").

In any case, the SEC's proffered comparison between audio of the astronauts aboard the *Challenger* moments before it exploded, and a video of the world's richest person answering questions from the SEC in connection with potential securities fraud, is entirely inapposite.  Audio that might reveal the "thoughts and feelings [of the astronauts] at the very moment of their deaths," *id.* at 1009–10, is, to put it mildly, of a different nature than a video of a CEO musing about whether he should change his title.  *See* Singh Decl. Ex. E, at Tr. 27:13–17 (Musk stating "I just think – there's too much focus on titles. And I think that we have all these titles, like Chairman, and CEO, and sort of all these titles; and people get too focused on titles, and then everyone wants a title. And so I think the best title is no title.").  The speciousness of the comparison underscores the generic nature of the SEC's argument.[12]

---

[12]     The SEC also cites to the district court's decision on remand in *NASA*, *see* Def.'s Mem. at 8, but that turned entirely on the "families' privacy interest in the tape," *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 633 (D.D.C. 1991).  The SEC does not assert any familial privacy interests here.

The SEC's position that an alleged infringement on privacy could flow from disclosure of audio when a transcript has already been released is also inconsistent with the government's voluntary disclosure of audio from a law enforcement interview of another public figure and senior government official.  Just days ago, the Department of Justice released audio of former President Joe Biden's ("Biden") interview with special counsel Brian Hur following release of the accompanying transcript.  Pl.'s SMF ¶ 33; *see also Jud. Watch, Inc. v. Dep't of Just.*, 1:24-cv-00700-TJK, ECF No. 66 (May 20, 2025) ("On May 19, 2025, the Department of Justice made a discretionary release of the Biden audio tape at issue in this case by posting the audio files in the Office of Information Privacy's FOIA reading room. The audio files use electric static to "redact" the same information redacted from the transcripts of the audio recordings.").  This disclosure makes clear that it cannot be true that individuals' privacy interests in their recorded interviews, even in the law enforcement context, prevail above all else.  To the contrary, the disclosure of President Biden's audio makes clear that the specific context of individual records matters.

Defendant's remaining contention is that if the Musk video was disclosed, it "could be altered and used in ways that interfere with privacy interests—such as using the recordings to create unflattering and offensive memes," Def.'s Mem. at 14. But to satisfy the foreseeable harm standard, "agencies must do more than 'rely on mere speculative or abstract fears . . . or 'generalized assertions' of harm." *Juul Labs, Inc. v. FDA*, 731 F. Supp. 3d 46, 70 (D.D.C. 2024) (cleaned up) (quoting *Reps. Comm.*

*for Freedom of the Press*, 3 F.4th at 369–70).  Defendant's bald speculation about memes or deepfakes is the sort of abstract, speculative allegation of harm that does not pass muster.[13]  Indeed, if accepted, this argument would allow the government to withhold <u>all</u> video footage containing any depiction of a human being in perpetuity, a patently absurd result.  *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided[.]").

The government's argument is particularly objectionable because even assuming the SEC's speculation were true and a third party did choose to create "unflattering and offensive memes," of Musk, Def.'s Mem. at 14, such activity is protected by the First Amendment and does not qualify as a "harm" cognizable under FOIA.  As the Supreme Court noted in *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51–54 (1988), satirical, unflattering depictions of government officials and public persons are protected and "encouraged by the First Amendment" as a feature of "robust political debate."  Any "unflattering and offensive" depictions of Musk, Def.'s Mem. at 14, are afforded protection under the Constitution and do not qualify as a "harm" to his "privacy."

The SEC's argument is also undercut by Musk's demonstrated predilection toward "memeifing" <u>himself</u>, including with AI-generated videos, and distributing

---

[13]    Defendant suggests that "advancements in video, artificial intelligence, and 'deep fake' technologies only amplify concerns about manipulation of video recordings."  Def.'s Mem. at 9.  In addition to being speculative, this purported concern is mitigated by the release of the government's certified transcript of the video at issue, which will allow anyone to verify whether a video is true.

such content to the public through his X account, where it is viewed by tens of millions of people:

 

*March 4, 2024 meme Musk posted of himself on X; August 14, 2025 AI-generated video Musk posted of himself on X, respectively,[14] reproduced from Singh Decl. ¶¶ 106, 97; Pl.'s SMF ¶ 23.*

Clearly Musk does not believe his "privacy" is harmed by his own distribution of such memes.[15]

The SEC attempts to shore up its argument with a citation to a news article discussing "deepfakes" that depict Musk, Tallarico Decl. ¶ 16, but even a cursory review of that citation shows it does nothing to support the agency's case. The article describes efforts to scam other third parties, which has nothing to do with <u>Musk's</u>

---

[14]     *Archived at* https://perma.cc/9LBZ-J6AG; https://perma.cc/8JFH-H3LY.
[15]     *See also* Singh Decl. ¶ 66 where at 4 minutes and 35 seconds, Musk acknowledges that he "deals some memes, too."

purported "privacy" interests. *See id.* (citing Brian New, et al., *Deepfakes of Elon Musk Are Contributing to Billions of Dollars in Fraud Losses in the U.S.*, CBS News Texas (Nov. 24, 2024), https://www.cbsnews.com/texas/news/deepfakes-ai-fraud-elon-musk/). And, in any event, the article states that the "reason" for such deepfakes is the pervasiveness of Musk's audio and video from "the amount of interviews [Musk's] done." Brian New, *supra.* An individual "can have no privacy interest in information that is already in the public domain, especially when the person asserting his privacy is himself responsible for placing that information into the public domain." *Citizens for Resp. & Ethics in Wash. v. Dep't of Just. (CREW I)*, 840 F. Supp. 2d 226, 233 (D.D.C. 2012).

In fact, by only releasing the transcript of Musk's investigative testimony but not the corresponding video, the SEC has made it more likely that the asserted "harm" from "deepfakes" will emerge through fabricated recreations of the video testimony. Without the official video from the government, there is nothing for the public to compare any generated "deepfake" versions to in order to verify or dispute their accuracy. Releasing the official video would, conversely, ensure a reliable source of truth. *Cf. United States v. Alvarez*, 567 U.S. 709, 727 (2012) ("The remedy for speech that is false is speech that is true."). The SEC can and should release Musk's video to ensure accurate reporting prevails in the public sphere.

In sum, the SEC has failed to satisfy its burden that disclosing the testimonial video of Musk would foreseeably harm his privacy interests under FOIA's Exemptions 6 and 7(C). The agency's summary judgment motion should be denied.

18

B.    <u>No foreseeable harm would flow from disclosure of the SEC's video of Elon Musk.</u>

Apart from the SEC's failure to satisfy its burden under the foreseeable harm standard, the record is clear that no harm will come to Musk's "privacy" from releasing the video in question.  Musk's public status is obvious from the mountain of recorded interviews he has voluntarily subjected himself to and the multiple publications of video of him by the United States Government itself.  In repeatedly projecting Musk's visage into the public sphere, the government has conceded he does not maintain a privacy interest in his face and voice.  Summary judgment is, accordingly, proper for Plaintiff as to the portions of the SEC's video that depict Musk and for which the agency has already released its transcript.

1.    *Musk is an omnipresent public figure.*

The release of one additional video of Musk will have no effect on any purported privacy interest in light of the <u>hundreds</u> of hours of easily accessible video of him that abound on the internet—primarily and overwhelmingly of his own doing.  *Cf. CREW I*, 840 F. Supp. 2d at 233; *see also Playboy Enters., Inc. v. Dep't of Just.*, 516 F. Supp. 233, 246 n.12 (D.D.C. 1981) (concluding disclosure of information about FBI informant did not constitute an unwarranted invasion of privacy because of publicity surrounding informant's book and other personal information); *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1085 (N.D. Cal. 2015) ("If the agency fails to establish that disclosure would lead to the invasion of a non-trivial personal privacy interest . . . FOIA demands disclosure[.]" (citation omitted)). His status as a worldwide public figure and celebrity who voluntarily allows his face,

body, and voice to be recorded and broadcast by all manner of entities dispels any notion that his "privacy" would be harmed by the disclosure of video of him merely answering questions about his business dealings.[16]

The SEC insists that "[t]he body language, tone, inflection, and pauses captured on video testimony are distinct" from what a transcript can capture, suggesting that this alleged distinction is sufficient grounds to withhold the requested testimonial video. Def.'s Mem. at 8. Similarly, the SEC argues that there is an inherent privacy interest in "facial expressions[] and mannerisms" because "[t]hese sorts of personal details, captured up close and over a prolonged period of time, are not generally available in the ordinary course of daily life." Def.'s Mem. at 9. But these arguments bear no connection to Musk's irrefutable pervasive presence in the public sphere. The SEC ignores the fact that Musk's body language, tone, inflection, voice, intonation, and array of facial expressions have been captured in the legion of of video interviews Musk has given for years, freely available online to anyone who wants to see them. *See e.g.*, Singh Decl. ¶¶ 2–117; *cf. Kimberlin v. Dep't of Just.*, 139 F.3d 944, 949 (D.C. Cir. 1998) (privacy interest of individual "undoubtedly" diminished where "the public already knows who he is . . . and that he

---

[16]     On a number of occasions, the D.C. Circuit has suggested that "a citizen's status as a public figure 'might' ultimately weigh in favor of disclosure" for the purposes of Exemption 7(C). *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 18 F.4th 712, 719 (D.C. Cir. 2021) (discussing *Fund for Const. Gov't v. Nat'l Archives & Recs. Serv.*, 656 F.2d 856, 865 (D.C. Cir. 1981), and *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 n.9 (D.C. Cir. 1995)).

received a relatively mild sanction").[17]  As the Singh declaration makes clear after viewing approximately 50 hours of video interviews given by Musk, anybody who wishes to can conjure up Musk's "facial expressions[] and mannerisms" from virtually any moment in time over the last fifteen years in a matter of seconds—i.e., quite freely "available in the ordinary course of daily life."  *See, e.g.,*



*Reproduced from Singh Decl. ¶¶ 44,65 (Musk interviewed by TIME as person of the year in 2021, receiving 874,000 views; Musk interviewed by Tucker Carlson in 2023, receiving 3.2 million views); Pl.'s SMF ¶¶ 24–25.*

---

[17]    In *Fund for Constitutional Government v. National Archives & Records Service*, 656 F.2d 856, 873 (D.C. Cir. 1981) the court noted it was possible (but did not decide) that "corporate officials may have a somewhat diminished interest in personal privacy" for the purposes of Exemption 7(C).

It should not be overlooked that Musk's visage and voice are everywhere because he wants them to be.  Whether appearing on Joe Rogan's video podcast—the number one podcast on Spotify in 2024[18]—no fewer than five times[19]—acquiring a cumulative 137 million views:



*Pl.'s SMF ¶ 26; Reproduced from Singh Decl. ¶¶ 15, 26, 95, 99, 105;*

Or appearing on the Lex Fridman podcast for a total 7 hours and 14 minutes, reaching 32.8 million cumulative viewers:



---

[18]    Todd Spangler, *Joe Rogan Again Had the No. 1 Podcast on Spotify for* 2024, Variety (Dec. 4, 2024), https://variety.com/2024/digital/news/spotify-top-podcasts-2024-charts-joe-rogan-alex-cooper-1236233049/.

[19]    Each interview with Joe Rogan runs from between two to three and a half hours. Singh Decl. ¶¶ 15, 26, 95, 99, 105. *Compare id.*, *with* Def.'s Mem. at 9 (alleging that individuals' mannerisms "captured up close and over a prolonged period of time, are not generally available in the ordinary course of daily life").

  

*Pl.'s SMF ¶¶ 28; Reproduced from Singh Decl. ¶¶ 18, 22, 46, 80, 96.*

Or poking fun at himself on Saturday Night Live:



*Pl.'s SMF ¶ 29; Reproduced from
Singh Decl. ¶ 34 (accruing 10 million views);*

Or giving a more than three hour interview to "Tesla Owners Silicon Valley":



*Pl.'s SMF ¶ 30; Reproduced from Singh
Decl. ¶¶ 56–58 (accruing 1.23 million views);*

Or appearing on Bill Maher's HBO show:



*Pl.'s SMF ¶ 31; Reproduced from Singh Decl. ¶ 66*
*(accruing 9.4 million views);*

Or agreeing to sit beside world leaders for interviews:



*Pl.'s SMF ¶¶ 32, 34; Reproduced from Singh Decl. ¶¶ 76, 127*
*(accruing 2 million cumulative views);*

Or engaging in any of the other 116 video and voice interviews identified in the Singh

Declaration (or the hundreds *not* contained therein), Musk has made clear he has

made no effort to assert a privacy interest over his "facial expressions[] and mannerisms. *Cf. Citizens for Resp. & Ethics in Wash. v. Dep't of Just.* (*CREW II*), 978 F. Supp. 2d 1, 10 (D.D.C. 2013) ("[His privacy interest in [data] already known to the public is substantially diminished; all the more so because he was the person responsible for disclosing it.").

The government's concern about Musk's "privacy" in the testimonial video in question is all the more ridiculous given that Musk has previously spoken on national broadcast news about the <u>very SEC investigation associated with this case</u>:



*Pl.'s SMF ¶ 18; Reproduced from Singh Decl. ¶ 16
(accruing 2.2 million views).*

In a segment published by CBS on September 9, 2018, Musk told Leslie Stahl on 60 Minutes that where his "tweets" carry a probability of causing movements within the stock market they are now subject to supervisory review as part of his settlement with the SEC, and that he "does not respect the SEC." *See* Pl.'s SMF ¶ 18. Thus, while Defendant vaguely alleges that release of "video recordings would unjustifiably infringe privacy interests related to the appearance and sound of individuals during a law enforcement investigation," Def.'s Mem. at 14, Musk clearly has no problem discussing the agency's investigation and enforcement actions on a national television

show broadcast to millions of viewers.[20]   Indeed, even prior to enactment of the foreseeable harm provision, the D.C. Circuit has "recognized that 'the magnitude of [a third party's] privacy interest turns on whether disclosure might result in . . . reputational harm.'" *CREW II*, 978 F. Supp. 2d at 10 (quoting *Nation Mag., Wash. Bureau*, 71 F.3d at 894).  It is incomprehensible that release of the instant footage could do anything to harm Musk's reputation when (i) he has discussed the SEC's lawsuit publicly (including disparaging the agency); (ii) the SEC has released the transcript of Musk's testimonial interview, Pl.'s SMF ¶ 21; and (iii) the SEC brought and settled a public lawsuit against Musk in connection with the subject of the interview, *id.* ¶¶ 15–17.  *Cf. Lardner v. Dep't of Just.*, No. Civ.A.03–0180(JDB), 2005 WL 758267, at *17 (D.D.C. Mar. 31, 2005) (finding Exemption 6 did not bar disclosure of names of unsuccessful clemency applicants, given that the conviction itself was public; "it cannot be thought that the information that the individual later was denied a pardon application adds much additional embarrassment beyond the original conviction").

Disclosure of Musk's testimonial video also generates no risk of "undue public attention," one of the core harms Exemptions 6 and 7(C) were designed to protect against, *U.S. Park Police*, 126 F.4th at 715, given that Musk invites such attention on a regular basis.  *See generally* Singh Decl. ¶¶ 2–117, 127 (containing 117 links to video and audio interviews given by Musk, photos Musk has posted of himself online, and video and imagery of Musk published online by the United States Government);

---

[20]   Singh Decl. ¶ 16.

*cf.  Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1265 (10th Cir. 2021) ("any disclosure via FOIA is unlikely to be a significant further unwarranted invasion of privacy when the information disclosed is already available.").  "Because the [agency] did not meet its threshold burden under Exemption 6 and, by the same token, did not demonstrate that foreseeable harm would ensue from release of the withheld [records], the [agency] was not entitled to summary judgment." *U.S. Park Police*, 126 F.4th at 717.

Defendant relies chiefly on *Ecological Rights Foundation v. Environmental Protection Agency* for the proposition that "[t]he purpose of Exemption 7(C) is to protect the privacy of individuals identified in certain agency records such that disclosure of identifying information is a harm in and of itself."  541 F. Supp. 3d 34, 65 (D.D.C. 2021) (citation omitted); Def.'s Mem. at 13.  But *Ecological Rights* dealt with unknown names of agents from EPA's Criminal Investigation Division tasked with protecting the department head, *id.* at 41—not a celebrity and senior adviser to the President who gives, on average, two to four video interviews to members of the public and the press every month.[21]  Pl.'s SMF ¶ 13; Singh Decl. ¶¶ 2–117, 127.  And as the SEC's own brief makes clear, the video at issue here was used as part of an investigation that "resulted in the SEC bringing <u>public</u> enforcement actions against Tesla and Musk in the United States District Court for the Southern District of New

---

[21]    The estimate of 2–4 appearances per month includes approximately 1 long-form interview (e.g., podcasts or televised segments), 1.5 press conferences or public event Q&As (based on ~18–20 per year), 1 internal all-hands or company town hall (often streamed), and 0.5 miscellaneous appearances such as Twitter Spaces or spontaneous media interactions.  *See* Singh Decl. ¶¶ 2–117, 127.

York[,]" Def.'s Mem. at 2 (emphasis added), which were replete with public press releases, *see, e.g.* Press Release, U.S. Sec. & Exch. Comm'n, *Elon Musk Settles SEC Fraud Charges; Tesla Charged with and Resolves Securities Law Charge* (Sept. 29, 2018), https://www.sec.gov/newsroom/press-releases/2018-226. The notion that there is anything private about Musk being "identified in . . . agency records" at issue is nonsense.

Defendant similarly cites to *Amiri v. National Science Foundation* for the same proposition, but as applied to Exemption 6, 664 F. Supp. 3d 1, 21 (D.D.C. 2021). But Defendant ignores that in *Amiri*, the agency segregated and released information about individuals whose identities already lived in the public domain. *See* 664 F. Supp. 3d at 18 (explaining that the released names were of persons associated with "scientific research publications"). Here, Musk's notoriety is unequivocally more acute and universal than the student scientists at issue in *Amiri*. *Cf. Reps. Comm. for Freedom of the Press*, 3 F.4th at 370 (emphasizing that the foreseeable harm analysis "is context specific").

To put it simply, Musk is not a private person. He is a celebrity and senior government official who has consistently and voluntarily chosen to make his "body language, tone, inflection, and pauses" known to anyone who cares to look, including in connection with discussing the subject of the records in question. Because Musk has chosen to repeatedly inject his appearance into the public sphere, there is no conceivable harm to any sort of visual "privacy" that would result from disclosing the SEC's video at issue here.

2.    *The United States Government has repeatedly published videos and images of Musk, conceding he has no privacy interests in such information.*

Although the SEC maintains that Musk has a privacy interest in depictions of his face and voice, the United States government has repeatedly taken a different position.  In recent months, the government has conceded that Musk has no privacy interest in his visage by <u>affirmatively publishing</u> videos and pictures of him on official government channels discussing all manner of topics.  For instance, on February 26, 2025, the White House published video of Musk reporting from President Trump's first cabinet meeting about the affairs of DOGE.



Pl.'s SMF ¶ 11; Singh Decl. ¶ 113 (bearing approx. 9 minutes and 7 seconds of Musk's visage and voice from 9:45–18:52; receiving 470,000 views).  Then the White House did the same on April 30, 2025, broadcasting the administration's subsequent cabinet meeting where Musk is present and speaking.[22]  Pl.'s SMF ¶ 11; Singh Decl. ¶ 115

---

[22]    *Cf. Sedaghatdoust v. Blinken*, 735 F. Supp. 3d 1, 5 n1 (D.D.C. 2024) ("The Court may take judicial  notice of the contents of a government website.").

(streaming Musk's voice[23] from 1:08:10–1:10:27; garnering 271,000 views). *Compare id.*, *with Am. Oversight v. Gen. Servs. Admin.*, 311 F. Supp. 3d 327, 347 (D.D.C. 2018) (court emphasizing that where "the [information was] made public by the Trump transition team on a publicly accessible website," it negated the privacy interests asserted by agency).

In addition, the White House has published video and photographs of Musk numerous times on its official Instagram:



*Reproduced from Singh Decl. ¶¶ 100, 102–03; Pl.'s SMF ¶ 12.*

---

[23]    The same April 30 event was filmed by FOX News with a direct line of sight to Musk.    Aaron Rupar (@atrupar), Bluesky (Apr. 30, 2025, 12:45 PM), https://bsky.app/profile/atrupar.com/post/3lo2am2g6jv2y    [https://perma.cc/GS75-M3FY].    Plaintiff requests that the Court take judicial notice of this Bluesky video per Federal Rule of Evidence 201. *Cf. Cannon*, 717 F.3d at 205 n.2 (taking judicial notice of website); *Woodall v. Walt Disney Co.*, No. CV 20-3772-CBM(Ex), 2024 WL 5337348, at *4 (C.D. Cal. Nov. 1, 2024) ("With respect to the online video interview . . . and the YouTube video attached . . . to [the] Declaration, the Court takes judicial notice of the existence of the videos and the information therein for purposes of determining what was available to the public at the time[.]").

The government cannot regularly place Musk's likeness in the public domain and simultaneously attempt to withhold it under FOIA. *Cf. Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (explaining that an agency may be entitled to summary judgment in a FOIA case on the basis of a sufficiently detailed declaration so long as it is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith."); *accord, e.g.*, *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (stating same); *Knight First Amend. Inst. v. CIA*, 11 F.4th 810, 818 (D.C. Cir. 2021) (stating same). The Court should, accordingly, grant partial summary judgment in favor of Plaintiff.

## II.    Defendant has failed to comply with FOIA's segregability mandate.

"[A]n agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977); *see also* 5 U.S.C. § 552(b).  FOIA's duty to segregate exempt from non-exempt information prevents agencies from issuing "sweeping, generalized claims of exemption for documents." *Mead Data*, 566 F.2d at 260. "In order to demonstrate that all reasonably segregable material has been released, the agency must provide a detailed justification for its non-segregability." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citation omitted).

In 2016,

> Congress re-emphasized this point in the FOIA Improvement Act, which—in addition to making foreseeable harm a precondition for withholding—requires agencies to "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible"

> and to "take reasonable steps necessary to segregate and
> release nonexempt information."

*Savage*, 2024 WL 2880438, at *11 (citing 5 U.S.C. § 552(a)(8)(A)(ii)(I)–(II)). Thus, as

the Court of Appeals has recently explained, the "segregability requirement thus

extends to both steps of FOIA's sequential inquiry: Even if an exemption covers an

entire agency record, the agency still must release any reasonably segregable

information within the record that could be disclosed without causing reasonably

foreseeable harm to an interest that the exemption protects." *Leopold*, 94 F.4th at

37.

Here, Defendant's violation of FOIA's segregability mandate is clear after even

a cursory review of the SEC's official transcript of Musk's interview. Even assuming,

*arguendo*, that Musk has some privacy interest that might be implicated by the

release of some portions of his interview (which to be clear, he does not), that

purported interest cannot and does not extend to every second of every innocuous

comment he made to the SEC. To raise just a few examples, the SEC has withheld

video of Musk acknowledging his familiarity with one of his tweets, Singh Decl. Ex.

E, at Tr. 69, acknowledging a public blog post that was posted on tesla.com, *id.* at Tr.

83, recounting the contents of a Wikipedia article on the etymology of "4:20," *id.* at

Tr. 193, and confirming that "rockets have a lot of fire," *id.* at Tr. 237. Indeed, the

transcript contains information ranging from innocuous to <u>favorable</u>. *See, e.g.*, *id.* at

Tr. 65 (Musk explaining "Nobody has even burned a finger in a Tesla, ever. Zero fire

injuries, ever. . . . [T]he Model S has the lowest probability of injury of any. . . . car

ever tested by NTSA."). There is no conceivable privacy interest in the video of these

responses, and yet the SEC treats every single moment of the Musk video as if it were the same.  FOIA demands otherwise.  *See* 5 U.S.C.  § 552(a)(8)(A)(ii)(I)–(II).

The SEC's failure to abide by its segregability obligations also becomes manifest by comparing the SEC's official transcript of Musk's testimonial interview to public comments he has previously made on video that are freely available. Compare, for example:

・Singh. Decl. Ex. E, at Tr. 25:19–20 (Musk stating he was born in Pretoria, South Africa), *with* Pl.'s SMF ¶ 35; Singh Decl. ¶ 5 (2012 video interview where Musk states within first minute that he was born in Pretoria);

・Singh Decl. Ex. E, at Tr. 26:2–5 (Musk stating he "came out to California to do a Ph.d in Applied Physics and Empirical Sciences at Stanford, but ended up putting that on hold to start an internet company"), *with* Pl.'s SMF ¶ 36; Singh Decl. ¶ 6 (2013 recorded speech of Musk stating at the three-minute mark: "I ended up at Stanford with the idea  of studying applied physics and empirical science . . . and I ended up putting that on hold to start an internet company");

・Singh Decl. Ex. E, at Tr. 33:16 (Musk stating he is Tesla's "overall Head of Engineering or Design"), *with* Pl.'s SMF ¶ 37; Singh Decl. ¶ 10 (2016 video interview where Musk states at 16 minutes and 40 seconds he spends most of his time on "engineering and design").

A particularly striking example of such information mirrored in public video of Musk is available at pages 29–31 of the SEC's transcript, where Musk explains the origins of Tesla:

in 2003, . . . [he] had lunch with J.B. Straubel and another fellow . . . . [and he] mentioned that [his] Ph.D. at Stanford would have been in . . . high energy density [and] electric energy storage[ ] for electric vehicles . . . . And so J.B. suggested that [he] have a test drive of the T-0 vehicle . . . . that had essentially the properties of what related to the Tesla with the Roadster where it had about a 250-mile range, a zero to 60 time was under four seconds . . . . So it was sort of, improve upon the concept prototype. And [he] talked to Tom Gage and Al Cocconi . . . and tried to convince them to commercialize the T-0 and sa[id] the world needed to see what electric cars were capable of. . . . So after a few months of trying to convince them to do that, "If you guys are not going to, to recreate a productized commercial version of the T-0, then would you mind if I did that?" And they said "Sure."

And it's important to note that the T-0, while it was a two-seater electric sports car, it also didn't have any doors or air bags, or any safety features . . . . So there's quite a big gap between a prove the concept prototype and a car that meets all of the regulatory requirements, and is safe and reliable[.]

Singh Decl. Ex. E, at Tr. 29–31. Compare the aforementioned testimony to the public

video of Musk speaking to the Third Row Tesla Podcast, where he explains that:

2003 is when Rosen and JB Straubel called me out and said, "hey we wanna have lunch." . . . He was a pioneer in space technology and electric vehicles. . . . We had lunch . . . in El Segundo where SpaceX started. Straubel and Rosen and I were talking about space stuff. And started talking about electric calls. I said I was gonna work on electric car technology at Stanford . . . . JB said we should take a drive in the T-0 from AC Propulsion . . . . which had specs similar to . . . . the Tesla Roadster . . . so I got a ride in the T-0 and I tried to convince Al Cocconi and Tom Gage to commercialize the T-0 . . . It didn't have doors or a roof. Clearly you needed to add . . . . safety systems . . . and it was very unreliable. It was so "proof of concept" basically. . . . It literally didn't have . . . any airbags or an effective cooling system for the battery. It was not safe. . . . Nonetheless it did get zero to 60 in under four seconds

34

> [with a] 250 mile range . . . . So then eventually I said if you
> guys are not going to commercialize the T-0 do you mind if
> I do it? And they [said] that'd be totally fine.

Singh Decl. ¶ 23 at 2 hours 48 seconds.

It is inconceivable that any harm, whatsoever, would flow from the disclosure of video of Musk that mirrors video he has provided the press and the public about his life and career. *Cf. Bernhardt*, 15 F.4th at 1265 ("[The agency] relies upon speculation, provides no evidence [of harm] from the submitters themselves, and fails to link its evidence of publicity to evidence that the submitters will be personally targeted, contacted, or harassed. Further, . . . the fact that similar information is already public, bolster our conclusion.").

Accordingly, Plaintiff is, at minimum, entitled to summary judgment as to the segregable portions of the Musk video and the agency's failure to comply with its corresponding obligations under FOIA.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion for summary judgment in part and enter partial summary judgment in favor of Plaintiff.

Dated: June 13, 2025                    Respectfully submitted,

                                        */s/ Adam A. Marshall*
                                        Adam A. Marshall
                                        DC Bar No. 1029423
                                        Gunita Singh
                                        DC Bar No. 1601923
                                        REPORTERS COMMITTEE FOR
                                         FREEDOM OF THE PRESS
                                        1156 15th St. NW, Suite 1020
                                        Washington, DC 20005

Phone: 202.795.9300
Facsimile: 202.795.9310
Email: amarshall@rcfp.org
Email: gsingh@rcfp.org

*Counsel for Plaintiff*