1            THE WITNESS:  To the best of my recollection,

2   that is true.

3            BY MR. NEWELL:

4       Q    What about with respect to public statements?

5   Same answer?

6       A    All public statements?  Or related to the

7   transaction?

8       Q    Public statements relating to the transaction

9   between the period when you first sent your offer to the

10  board through and including the time that you announced

11  that you were no longer considering a transaction.

12      A    I would -- I think it would be good to review those

13  statements before answering.

14      Q    What about with respect to the statements that

15  we've reviewed up to this time, during today's testimony?

16      A    We've reviewed a lot of statements.

17      Q    Okay.  Well, we can -- do you want to take a look

18  at those documents individually, or --

19      A    Yeah, I mean, I think if there's documents that

20  you have in mind, I mean -- because we've also reviewed

21  documents that are unrelated to the transaction.  So then

22  obviously, that cannot be related to the transaction.

23      Q    Setting those aside.  I know we've looked at other

24  exhibits today.  I'm not referring to those.

25            Well, let's talk about the two documents that we've

1   been looking at in the recent past here, Exhibit 8 and

2   Exhibit 7, which are -- Exhibit 8 is the August 13th blog

3   post.  Exhibit 7 is the August 7th blog post.

4        A    Yes.  These are from the standpoint of a buyer,

5   although, as I explained -- in fact, as I articulated in the

6   blog post, this is not a buyer in any standard

7   any sense of the word.  This is more from a standpoint of

8   wanting to have a more efficiently operated company,

9   and the belief that it could be more efficiently operated

10  as private.  (b)(6); (b)(7)(C)                      So it's

11  only a "buyer" in a very technical sense of the word.

12       Q    Does that distinction mean you were also acting

13  in the capacity of CEO when you authorized publication of

14  those statements?

15       A    I mean -- obviously I cannot -- I am still the

16  CEO of the company.

17            And so there is a double duty of what is right

18  for the company, and then what is right from the standpoint

19  of what is here termed as a "buyout", although it's

20  not a buyer in any meaningful sense of the word -- not a

21  buyer in the sense of me acquiring shares.

22       Q    We've been talking about the concept of the buyer

23  hat and the CEO hat in this testimony.  Are you able to

24  distinguish between which hat you understood yourself to be

25  wearing when you authorized the publication of these

1   two blog posts?

2       A    I would not -- I'm not trying to claim I'm

3   perfectly able to separate and be in two minds.

4           I mean, one is human; you know,

5   it is difficult to completely partition one's mind.

6       Q    What about with respect to the August 7th tweets

7   that we've been discussing today?  Does the same answer

8   apply to which hat you were wearing when you wrote and

9   published those tweets?

10      A    Yeah, I think it would be fair to say that

11  aspirationally these were from the standpoint of a

12  buyer.  Essentially, I was trying to do the right thing

13  from what perspective this was operated from.

14          At the same time, I'm also the CEO of the

15  company.  So, you know, it's far from certain that I was --

16  in fact, I would not claim to be perfect in this regard.

17  I think that is a very difficult thing to do, to wear two

18  hats, and to err is human.

19      Q    Let's look back at the language we were just

20  discussing, on the 13th blog post, Exhibit 8.

21  I want to read it again:  "To be clear when I made

22  the public announcement just as with this blog post and

23  all other discussions I've had on this topic, I'm speaking

24  for myself as a potential bidder for Tesla."

25          Is there any reference in there to you speaking

```
1   while wearing other hats?
2        A    The hat analogy is really --
3        Q    If you don't like it, I imagine we can adopt
4   another one.
5        A    Is there one?
6        Q    Capacity?
7        A    Capacity, sure.
8        Q    All right.
9        A    I just cannot get the picture of
10  that.  I have the picture of a hat, and
11  somebody, you know, having a hat on a hat.  I have
12  like a very sort of visual perception of things.
13       Q    Let's use "capacity".  It's a bit more abstract.
14       A    Yeah, yeah.
15       Q    This statement in the August 13th blog post
16  begins with, "to be clear", and it ends with, "I am speaking
17  for myself as a potential bidder for Tesla."
18            Do you see that?  It's in Exhibit 8.  You're
19  looking at the wrong one.
20       A    I'm sorry, 8.
21            MR. FARINA:  Right there.
22            THE WITNESS:  Yep.  Yes.  I see it.
23            BY MR. NEWELL:
24       Q    Is that accurate?
25       A    I think that is aspirationally accurate.
```

1       Q     What do you mean by "aspirationally accurate"?

2       A     I mean, it's certainly possible -- I mean,

3    that was certainly what I intended -- that was certainly

4    what I intended and believed.  But it is

5    also possible that I made some mistakes here, you know,

6    somewhere in the process.

7            BY MR. BUCHHOLZ:

8       Q     Did you believe there were likely going to be some

9    conflicts during this process between the part of you

10   that was operating in the bidder capacity and the part

11   of you that was acting as the CEO of Tesla?

12      A     Well, I think it's important to -- like

13   my motivations for doing this were, at least

14   from my perspective, to enable Tesla to

15   execute better over time.  Because I felt that at

16   SpaceX, where we are private, we are able to execute better

17   than at Tesla, where we are public.  And I described that

18   in the blog.

19            So if you asked me in either capacity did I think

20   that there was strong merit to being private, I would have

21   said yes.

22      Q     Okay, right.  But what

23   about the question about whether you

24   believed there could be conflicts between the two

25   capacities?  Because you did understand that a transaction

Page 100

1   would ultimately have a counterparty that would be
2   involved in the financing, et cetera, correct?
3        A    Not exactly.  One of the things that we could
4   have done would just be to delist.  There's no
5   counterparty.
6        Q    Is that something that you were actively
7   considering?
8        A    Yes.
9        Q    During what time period?
10       A    From the taking Tesla private tweets -- well, you
11  know, basically, since when -- I didn't know all of the ways
12  that one could go private.
13            So in order to explore these ways and to be able
14  to do so, without creating a selective disclosure issue, I
15  felt I needed to talk to our major investors, and to
16  understand, is there a path to being private that they
17  would be -- that they would support, that they would think
18  is a good idea?  Would they be able to stay with the
19  company?  Because if they were not able to stay with the
20  company, that's a big deal.  I believe strongly in
21  loyalty.  And if they have been loyal investors in Tesla and
22  are unable to remain, that's a big factor, if they
23  wanted to.
24            So -- so one of the considerations was what if we
25  simply delist, no counterparty.

1      Q     Okay; and that came up after the August 7th tweets?

2      A     Yes.

3            MR. BUCHHOLZ:  Okay.  I think

4    we'll get back to more about the other things as

5    we try to take that chronologically.

6            MR. NEWELL:  We'll return to that.

7            Just for the record -- sorry, did I cut you off,

8    Mr. Musk?

9      A     No, no.  I mean, it's still --

10   At some point -- that's one of the

11   options in the future, is delisting.

12           MR. NEWELL:  For the record, before we move on,

13   we'll just reiterate that SEC staff does not agree with the

14   company counsel with respect to the privileged status

15   of communications between Mr. Musk and

16   company counsel.  We're not going to spend any more time

17   on that here, but we do want to make that clear for the

18   record.

19           BY MR. NEWELL:

20     Q     Mr. Musk, you referenced Mr. Teller earlier in

21   today's testimony.  What is Mr. Teller's role, briefly?

22     A     Sam Teller is my Chief of Staff.

23     Q     Did Mr. Teller contact you at some point in July

24   2018 regarding an entity called the Saudi Arabian

25   Public Investment Fund?

Page 102

1        A        Do you mean to set up a meeting or something

2    or --

3        Q        To set up a meeting.

4        A        Sam -- Sam did -- I think Sam mentioned that

5    Yasir -- I think Yasir -- I called him Yasir, of Arabia,

6    wanted to meet.

7        Q        By "Yasir", do you mean Yasir Al-Rumayyan, the

8    Managing Director of the Public Management Fund?

9        A        Yes.

10       Q        I'm going to use PIF to refer to Public Investment

11   Fund today.  You'll understand me if I do that?

12       A        Yes.

13       Q        When Mr. Teller contacted you about a potential

14   meeting with PIF, did you have any expectation that PIF

15   would be reaching out in that time frame, around July

16   of 2018?

17       A        No.  I wasn't surprised though, really.

18                I mean, Yasir has tried to meet with

19   me quite a lot over the past few years, and

20   we've had some meetings (b)(4)

21   (b)(4)

22       Q        What's Mr. Al-Rumayyan's title at the PIF, if you

23   know?

24       A        I believe he's the Managing Director or

25   he's the head guy.

Page 103

1      Q    You said that the outreach was somewhat

2  unexpected; is that fair?

3      A    Yes.

4      Q    In July 2018?

5      A    Yes.

6      Q    What was your expectation at the time that Mr.

7  Teller told you that PIF wanted a meeting, about what the

8  meeting would cover?

9      A    (b)(4)

10  (b)(4)

11

12

13

14

15

16

17  I said, "Okay, we can meet in the factory."

18  And so we met in the factory.

19      Q    (b)(4)

20  (b)(4)

21      A    (b)(4)

22      Q    Did you have separate communications with Mr.

23  Al-Rumayyan where he asked you to meet, distinct from Mr.

24  Teller telling you that PIF wanted to meet?

25      A    Specifically in July?

Page 104

1      Q    In July of 2018.

2      A    I mean, he might have sent me a text or

3  something, it's possible.

4      Q    You're not sure one way or the other?

5      A    No.

6      Q    But you do recall Mr. Teller reaching out to you and

7  saying that the PIF wanted to meet?

8      A    Yeah.

9           BY MR. BUCHHOLZ:

10     Q    (b)(4)

11  (b)(4)

12     A    (b)(4)

13  (b)(4)

14     Q    Did Mr. Teller tell you that?

15     A    Yes.

16     Q    Did he give any more specifics?

17     A    No.

18     Q    Do you remember how Mr. Teller, in what medium

19  Mr. Teller told you that PIF wanted to meet?

20     A    I think just verbally.  I didn't think -- I was

21  just -- really -- a case of, you know, (b)(4)

22  (b)(4)

23

24

25     Q    Anything else you remember discussing with Mr.

1    Teller in the lead-up to the meeting about the PIF?

2       A    No.

3       Q    Anyone else at Tesla you discussed the PIF with?

4       A    No.

5       Q    In that period, again, from the time you

6    learned the meeting request had come in until the time the meeting

7    was held?

8       A    No.

9       Q    Anyone else, setting aside folks at Tesla, that

10   you discussed the PIF with --

11           THE COURT REPORTER:  I'm sorry, counsel.

12      Q    -- in that period?

13           THE COURT REPORTER:  No one else?

14           MR. NEWELL:  Anyone else, setting aside folks from

15   Tesla, that you discussed the PIF with during that period from

16   when Mr. Teller reached out to you to let you know that they

17   wanted a meeting, until the time meeting itself was

18   held?

19      A    No.  I mean, I thought this was going to be a

20   non-meeting, like it's another like, relationship, touching base,

21   meeting, or something like that.

22      Q    It didn't stick out to you in your schedule?

23      A    No.

24      Q    When, if you recall, was the meeting held?

25      A    What time of day, you mean, or --

```
 1        Q    What date, first of all?
 2        A    I think the 31st.
 3             Is that correct?
 4             MR. FARINA:  We have documents that can address
 5   that.
 6             MR. NEWELL:  I can show you a document.
 7             Please mark this as EM Exhibit 9.
 8                  (SEC Exhibit No. 9 was
 9                  marked for identification.)
10             BY MR. NEWELL:
11        Q    Mr. Musk, you've been handed a document that's
12   been marked as EM Exhibit 9.  It appears to be a calendar
13   invitation bearing a Bates number ending 59286.
14        A    Yes.  Yeah.
15        Q    Do you recognize this?
16        A    Not really.  But I know -- I have not seen it in this
17   format before, but normally it's just a line on my phone.
18        Q    (b)(4); (b)(6); (b)(7)(C)
19   (b)(4); (b)(6); (b)(7)(C)
20        A    (b)(4); (b)(6); (b)(7)(C)
21        Q
22        A
23        Q    Does this help refresh you as to the exact date
24   of the meeting with the PIF?
25             MR. FARINA:  Just as a caution, the production, I
```

1   think, was made using a standardized time zone, which I

2   think in many instances is different than the actual time

3   zone where the event or the email --

4           THE WITNESS: Yeah.  That's why we put

5   it in the subject.  6:00 p.m.

6           BY MR. NEWELL:

7       Q    So I'll represent to you that based on

8   conversations we've had with counsel, the date of --

9   rather the time zones reflected in this document and some

10  others we may review are in UTC time, which to our

11  understanding is seven hours ahead of Pacific Daylight

12  Time, which we are in, in August 2018?

13      A    Right.

14          MR. HEALY: UTC is Greenwich Mean Time. Greenwich,

15  England.

16          MR. NEWELL:  Okay.

17          MR. HEALY:  So that's not seven hours.

18          MR. FARINA:  I think it is seven hours.

19          MR. HEALY:  Is that --

20          MR. FARINA:  For daylight.  Correct.

21  it is.  For this period, I think, we'll believe it is

22  seven hours.

23          THE WITNESS:  It's kind of amazing that it's

24  referenced off of little Greenwich.  (b)(6); (b)(7)(C)

25  The French had a real fit about that.

Page 108

1          BY MR. NEWELL:
2      Q    So the time here is 8-1-2018, at
3  1:00 a.m.  If we subtract seven hours, that gets
4  us to 7-31-18, 6:00 p.m.  Does that sound right to you?
5      A    Umm -- about right, yeah.  I'm not sure if
6  that's when the meeting actually occurred,
7  but that's certainly is what's referenced on
8  the calendar.
9      Q    When it was scheduled?
10     A    Yeah.
11     Q    Where did you work from on the day of July 31st?
12     A    The factory, the car factory.
13     Q    In Fremont, California?
14     A    Yes.
15     Q    And the meeting invite again references
16  Location: (b)(4)                 in the factory.
17  Do you see that?
18     A    Yeah.  I mean, it's just a conference room in
19  the (b)(4)
20     Q    (b)(4)        is a conference room?
21     A    Yes.
22     Q    Did you hold any meetings in the (b)(4)
23  conference room immediately prior to the meeting with the
24  PIF?
25     A    Possibly.  There's a lot of meetings in that

Page 109

1   conference room.

2       Q    No specific recollection of the meeting preceding

3   the one that's reflected in this invite?

4       A    No.

5       Q    Do you remember where you were when the PIF

6   arrived at the Fremont factory?

7       A    I think I was at (b)(6), (b)(7)(C)

8   (b)(6), (b)(7)(C)

9       Q    And did you greet the representatives from the

10  PIF at your desk, or did someone else take them to the

11  conference room?

12      A    I might have said hi, but I recall seeing them in

13  the conference room -- I might have said hi as they were

14  going in, or something. (b)(6), (b)(7)(C)

15  (b)(6), (b)(7)(C)

16

17      Q    Do you recall how many people were present from

18  the PIF?

19      A    I think three.

20      Q    The three individuals referenced on this calendar

21  invitation here?

22      A    There were three individuals.  I don't know the

23  other two, but I do know Yasir.

24      Q    You're not sure who Saad Al-Jarboa or

25  Naif Al-Mogren are?

Page 110

```
1              THE COURT REPORTER:  Say it one more --

2              MR. NEWELL:  Naif Al-Mogren.

3              THE COURT REPORTER:  Uh-huh.

4              UNKNOWN SPEAKER:  The usual spelling.

5              (Laughter.)

6              THE COURT REPORTER:  Thanks.

7              BY MR. NEWELL:

8         Q    But do you recall there being three representatives

9    from the PIF at the meeting?

10        A    Yes.

11        Q    Do you recall who escorted them to the (b)(4)

12   conference room?

13        A    No.

14        Q    Is it a long walk from the front desk at the

15   Tesla factory in Fremont to the (b)(4)         conference room?

16        A    Yes.

17        Q    Someone escorted them, you're just not sure who?

18        A    Correct.  (b)(6) (b)(7)(C)

19        Q    Who attended the meeting with PIF alongside you

20   at the outset of the meeting?

21        A    I think Sam Teller.  I mean, I know Sam Teller was

22   there.  I'm not sure if he was there or not for the entire

23   meeting.

24        Q    Do you recall approximately when the meeting

25   began?  We're looking at a calendar invite that says
```

Page 111

1   6 p.m.  Do you remember if it was 6:00 p.m. on the

2   dot?  6:15?  6:30?

3        A    No, it's like Vegas in the factory, minus the

4   fun part.  But you cannot see.  It's like you lose track

5   of time.  (b)(6); (b)(7)(C)

6   (b)(6); (b)(7)(C)

7        Q    So, but do you recall the meeting beginning at

8   some point in the evening of July 31st?

9        A    Yes.

10       Q    Did you bring anything into the meeting with you?

11       A    No.

12       Q    No phone, no --

13       A    Oh, phone, maybe, phone, yeah, sure.

14   I probably had my phone with me, but I'm not sure.

15   It might have -- it's either charging at

16   my desk, or in my pocket, usually.

17       Q    You don't remember if you had it with you or not?

18       A    No.

19       Q    What about Mr. Teller, do you remember if he brought

20   anything with him to the meeting?

21       A    Probably his phone.

22       Q    Probably meaning maybe?

23       A    I don't know for sure.

24       Q    What about the folks from the PIF?  Did

25   they have anything with them?

Page 112

1      A    I think Yasir had some kind of tablet thing.  I'm
2  not sure if it was an iPad or something else.
3      Q    Something like an iPad --
4      A    Yeah, yeah.  Some sort of tablet device.
5      Q    Any of them have physical notepads?
6      A    Maybe.  I'm not sure.
7      Q    Did Yasir, do you remember?
8      A    I don't think so.  I don't know.
9      Q    Possibly the other two?
10     A    Possibly the other two.  I do remember them, like,
11  writing things down, but I'm not sure what they wrote.
12     Q    Do you remember if they were writing things down
13  in hard copy or typing away on a laptop?
14     A    I'm not certain.
15     Q    Was anyone else present at the outset of the
16  meeting from Tesla, apart from you and Mr. Teller?
17     A    Not that I'm aware of.
18     Q    Sounds like you may have had a greeting with the PIF
19  outside the conference room; is that right?
20     A    Literally might have said "Hello" as they walked
21  in.
22     Q    Went into the conference room and closed the
23  door?
24     A    Yes.
25     Q    What happened next?

Page 113

1        A    I don't remember everything about the meeting.

2    It was like pleasantries.  We exchanged pleasantries.  And

3    then he was very excited to tell me that they had made a

4    substantial investment in Tesla, through the public markets,

5    right up to the absolute limit of just below 5 percent.

6        Q    On that -- on that point,

7    was that the first substantive comment anyone

8    made after the exchange of pleasantries?

9        A    That I recall, yes.

10        Q    Mr. Al-Rumayyan told you that the PIF had built

11    up a large stake in Tesla common stock on the public

12    markets?

13        A    That's correct.

14        Q    Did you have any prior knowledge before that

15    meeting that PIF had done that?

16        A    No, I was surprised to learn this.

17        Q    What was your reaction when he said that?

18        A    I was like, great, thank you for being a

19    shareholder, that's awesome.

20        Q    You thanked him?

21        A    As I do anyone who places their funds in our

22    trust.

23        Q    Did you say anything else in response apart from

24    expressing your gratitude for the support of the company?

25        A    No, I don't think so.

Page 114

1    Q    And then did Mr. Al-Rumayyan continue speaking?

2    A    Mm-hmm.

3    Q    What did he say?

4    A    Umm, he, as I recall, he said -- that the only

5    thing that was limiting them at 5 percent was the

6    reporting requirement.  And they wished to have a much

7    larger stake, and wanted to help Tesla go private.  Wanted

8    to take Tesla private, essentially.

9         Yeah, wanted to help take Tesla -- wanted to make

10   it happen, wanted to make Tesla -- the take private,

11   happen.

12        (b)(4)

13   (b)(4)

14   (b)(4)        I had told him I was interested in taking the

15   company private, and he  -- but he volunteered that -- he

16   volunteered that he wanted to take -- he wanted to take Tesla

17   private, and moreover that (b)(4)

18   (b)(4)

19

20

21

22

23        THE COURT REPORTER: (b)(4)

24        THE WITNESS: (b)(4)

25   (b)(4)

Page 115

1      A    And so I was like quite surprised to learn this.
2    And he said that -- yeah, he said that he had always
3    wanted to do this.  And I was like, "Really?  I thought you
4    delegated it to Masa."  And he said "Definitely not."  In
5    fact, he would not want to do a take private through Masa,
6    because then they would have to pay a percentage to Masa,
7    and they didn't want to do that.
8           I was like, okay.  That was surprising to me,
9    because in prior meetings, which I'm assuming we'll get to in
10   your questioning, I had the mistaken impression that this --
11   they had delegated this responsibility to Masa.  I was like,
12   "Okay.  Okay."  So that's quite -- that's quite exciting.
13   Is there --
14           I said, "Are you sure you want to do this?"  He was
15   like, "Definitely."
16           And then I said, "Well, are there any other
17   decision makers needed?"  He says, "No, that's the advantage
18   of PIF.  I am the decision maker.  So long as the Crown
19   Prince supports me, and he does, that's it.  It's done."  I
20   was like, "Okay.  That sounds great.  Let's try to pursue
21   this."  That sounds like a very exciting thing to pursue.
22   We should at least understand what is possible here.  So --
23      Q    You said a lot there, and I want to go back
24   and take it in pieces.
25      A    Sure.

Page 116

1        Q     Do you recall Mr. Al-Rumayyan using the specific

2   term **"take private"**, or **"going private"**, or some derivation thereof?

3        A     "Take private", "going private", this was mentioned

4   several times.

5        Q     **Did he ever use the term "investment"?**

6        A     Yes.  I mean, he mentioned that he had invested

7   5 percent -- he purchased 5 percent of the company

8   already, just on the open market, and that the only thing

9   that was inhibiting a higher ownership was the reporting

10  requirements, 4.99 percent.  And he wanted to go considerably

11  higher but did not want to do that without checking with

12  me.  And obviously, this would create a splash because of

13  the reporting requirement.

14          So -- but that's -- their interest was much

15  higher than 5 percent, by a lot.

16       Q     So did you have an understanding of whether their

17  interest was to take a larger stake in Tesla --

18       A     Yes, definitely.

19       Q     -- at some point?

20       A     They were extremely explicit that they wanted to

21  have a much larger stake in Tesla, not a slightly larger

22  stake, but a much larger stake.

23          Now this is pretty obvious, because they need to

24  figure out the plan for when oil runs out.  And so they need

25  to -- they really wanted to figure out how they can be part

Page 117

1  of energy in the future, even when it is solar power and
2  batteries and electric cars, and that kind of thing.
3          So this is of fundamental strategic importance to
4  them.  From their standpoint, their ideal situation, if
5  they could do it, would be a total acquisition of Tesla.
6  I just --
7      Q    How did you know -- I'm sorry to cut you off.
8  I didn't realize you weren't finished.
9      A    Obviously --
10     Q    How did you know they didn't want simply to
11 purchase another 5 percent, and bring their position up
12 to 10 percent?
13     A    This is not -- this sort of investment is not
14 merely a financial investment.  This is something that is
15 of a national security importance to them.  It's not just
16 a matter of getting some return on investment.  They need
17 to figure out what the hell the country is going to do
18 when they run out of oil.
19     Q    And you think that having a substantial stake,
20 short of taking Tesla private, would not further those
21 goals?
22     A    I mean, I don't want to, you know,
23 guess entirely what's in their minds.  It's pretty
24 obvious, if you are in the position of Saudi Arabia, that
25 you need to find a solution for what the hell you're going

Page 118

1   to do when the oil runs out.  Obviously, this is a very big

2   deal.

3         You know, they will run out of money.  They're

4   very dependent on oil.  This is not a good situation.  So

5   they've got to figure out something.  And energy --

6   they're currently a big provider of energy in the form of

7   oil and natural gas.  So from their standpoint, continuing

8   in the energy business, albeit renewable, seems like a

9   good thing.  And there's a wide range of things they could

10  do.

11        They've got a lot of desert, a lot of sun.  So they

12  could put a lot of solar panels up, and then transport that

13  energy to ultra high voltage, electrical connections to

14  other parts of the world.  They could have an electric car

15  factory or a battery factory.  These things are all quite

16  important.

17        Now these things don't come with just a financial

18  investment in a company.  You have to really have a much

19  bigger stake in the company for that to be the case.

20    Q    **A controlling stake?**

21    A    Not necessarily controlling but certainly much

22  more influential than 5 percent.  But aspirationally, if they

23  had their druthers -- aspirationally, they would like a

24  controlling stake, but this would obviously generate

25  concern on a number of levels.

1      Q    What's your basis for saying that they would like

2   a controlling stake, aspirationally?

3      A    It's just strategically obvious.

4      Q    So based on your knowledge of the situation, not

5   something that they have said to you directly?

6      A    They would not say something like that to me

7   directly, but it's strategically obvious.

8      Q    Let's get back to the words that Mr. Al-Rumayyan

9   used.

10          Did anyone else -- did anyone else from the PIF speak

11   during the meeting?

12      A    No.  Hardly at all.

13      Q    Do you remember whether Mr. Al-Rumayyan used the

14   term "take private" or the term "go private"?

15      A    I think, "take private".

16      Q    That was the exact phraseology he used?

17      A    I'm not certain, but I think "take private".  Like

18   I said, sort of like -- obviously, like, in a typical

19   take private, as you know, the -- there is a very

20   large stake that is acquired by the entity

21   taking things private.  For example, in the case of Dell,

22   that was an acquisition of, I think, something on the

23   order of 80 percent of the non-Dell shareholders --

24   something like that.  That is a typical take private.

25          So it is an acquisition of a super majority, if

1    not all of the assuming shares of the company.  That would

2    be the typical template for a take private.

3            In my mind I was like hell no, I don't want to do

4    that.  I want to retain all the shareholders we have right

5    now, up to anyone who doesn't -- as long as they want to be

6    in the company, I want to have them be in the company.  It

7    should be a free choice.  I don't like this whole squeeze-out

8    thing.

9            So in my mind I was like -- you know, maybe

10   there's 20 to 25 percent of shareholders who would not want be

11   in Tesla as a private company, and then given that -- the

12   template -- the assumed template in a take private would

13   be more on the order of triple that number.  Certainly I

14   wouldn't be selling my shares either way.  But they were

15   thinking more on the order of potentially 80 percent; that's

16   effectively a 3X coverage of what's necessary to take

17   private.  If you have -- effectively you have a threefold

18   over subscription.  Assuming all the standard elements of

19   a take private, this is plenty of coverage to make a

20   statement like funding secured.

21       Q    So I apologize, Mr. Musk.  You lost me a little

22   bit there.  You're referencing what was in your mind.  Are

23   you talking about what was in your mind during the July 31st

24   meeting?

25       A    Yes.

Page 121

1      Q    Okay.  So let's talk a little more about what was

2   actually discussed at that meeting.

3      A    Certainly.

4      Q    Was there any discussion at the meeting of

5   transaction structure in a go private scenario?

6      A    I think I -- I think I said that I would like to

7   retain our current shareholder base; that would be

8   preferable to me.  As many shareholders as possible, I

9   would like to retain, in a take private.

10          And this would also be something that would

11  obviously make it easier from their standpoint,

12  from a capital standpoint, but that was

13  after they said the take private.  I was like basically

14  mitigating the capital needs required for take privates.

15  It's like whereas normally they would think okay, maybe we need to

16  acquire 80 percent of shares, in my opinion, it's probably

17  closer to 20 -- at most 30 percent.  Probably something on

18  the order of 25 percent.

19          So, an easier thing than what they --

20  they were advocating something -- in their mind,

21  it would have had to have been a standard

22  take private.  And I was trying to say, like, "Actually

23  I think it's going to be considerably easier

24  than what you're talking about, because I don't think we

25  will need to acquire 80 percent of the shares."

Page 122

1      Q     Did they tell you that they were proposing to
2   acquire 80 percent of the shares?
3      A     No, they were just talking about a standard take
4   private, which would imply that.
5      Q     Did they use the term "standard"?
6      A     No, but if you say take private and do not have a
7   modifier, then it's reasonable to assume standard.
8      Q     Did anyone from the PIF, at any time during the
9   July 31st meeting, bring up a dollar amount?
10     A     No.
11     Q     Did you?
12     A     Only -- there's an implied dollar amount in the
13  generalities associated with percentage.  Percentages.
14  It was an implied dollar amount.
15           Obviously, any take private where you're
16  acquiring a bunch of shares would have to have some
17  reasonable premium associated with it.  And it would have --
18  the standard template, in the absence of modifiers,
19  would be acquisition of almost all of the outstanding shares, and
20  have some premium to pay to -- have some acquisition premium
21  essentially.
22           So implicit in that is  -- were far higher numbers than
23  what I thought would be necessary in a take private.
24     Q     Do you have specific recollection of telling the
25  PIF that you anticipated they would need to purchase a

Page 123

1   certain percentage of Tesla outstanding common stock,

2   short of 80 percent?

3           (Reporter asks for clarification.)

4           MR. FARINA:  Why don't you repeat the question?

5           MR. NEWELL:  Strike that question.

6       BY MR. NEWELL:

7       Q    Do you have any specific recollection of telling

8   the PIF during the meeting that they would not need to

9   purchase 80 percent of Tesla's common stock, but would

10  instead need to purchase a smaller percent of Tesla's outstanding

11  stock, excuse me, to pursue a going-private transaction?

12

13      A    I think I made that comment after he said he wanted

14  to do the take private.  And I said the take private is

15  going to be easier than what you realize, because I think

16  most investors will continue on as shareholders.

17      Q    Do you recall quoting any percentages to the PIF?

18      A    (b)(4)

19  (b)(4)                                  .  I'm not certain if I said

20  that, but I think I said that.  But that was after they

21  said "We want to do a take private," which would have

22  implied 80 percent.  And now what I was trying to say was, this

23  take private we're talking about here is easier than you

24  realize, most likely.

25      Q    It sounds like you're not sure one way or the other

Case 1:24-cv-02358-TSC    Document 20-6    Filed 06/13/25    Page 30 of 94

1  if you did quote a specific percentage to them.

2      A  No, I'm pretty sure I said that most existing

3  shareholders would remain with the company.  That was my

4  belief at the time.  And he had some sort of quite

5  detailed list of shareholders.  So he was aware of what

6  "most shareholders" would mean.  And he had the whole -- at

7  least the publicly available capitalization table of the

8  company.  So he knew what I was talking about.

9      Q  What did "most" mean?  Did it mean the majority

10  of the shareholders of Tesla's outstanding common stock,

11  setting aside your position?

12      A  Yes.

13      Q  So over (b)(7)(C)           of the roughly (b)(7)(C)        of

14  common stock not owned by you, would support the

15  transaction?

16      A  Yes.  That's what I most thought would be likely,

17  yes.

18      Q  By "support the transaction", I mean continue to

19  maintain their positions in a private Tesla.

20      A  Yeah.

21      Q  What was your basis for the belief that the

22  majority of the current Tesla shareholders would continue

23  on in a private Tesla, at the time of the meeting?

24      A  Well, I was aware that Fidelity is

25  an investor in SpaceX.

Page 125

1          The sort of -- the idea I had in mind was like,

2    can we get to a structure similar to SpaceX, where there's

3    considerably less overhead?  We don't have massive

4    (b)(4)

5    (b)(4)                                      And Fidelity, I

6    knew, was an investor in SpaceX.  And T. Rowe and Baillie had

7    both -- had requested to be investors in SpaceX.  And they

8    are, I believe, the three largest institutional

9    shareholders of Tesla.

10          And I assumed that if those three were interested --

11   one had actually invested; the other two wanted to.

12          And that means probably that sentiment

13   is widespread amongst institutional investors.

14   That -- it would most likely enable an easier take private

15   than people would imagine.

16          MR. FARINA:  When you say those investors were

17   interested, interested in what?

18          THE WITNESS:  In SpaceX.  So T. Rowe, Baillie, and

19   Fidelity.  I think they are the three largest institutional

20   shareholders in Tesla.  Fidelity is already a

21   shareholder in SpaceX.  Baillie and T. Rowe had requested to be

22   shareholders in SpaceX.  So clearly, they're comfortable with that

23   structure.  And so I thought they would also be comfortable

24   with then Tesla taking on a similar structure.

25          BY MR. NEWELL:

Page 126

1      Q    At the time of the meeting, did you have any
2   understanding of whether institutions like T. Rowe, Fidelity
3   and Baillie might have restrictions on their ability to
4   invest in private companies?
5      A    I was aware that they had --
6   certain funds had restrictions on ownership.
7           I came to learn later, when I spoke to them, that
8   the restrictions were more arduous than I realized,
9   that I could not speak to them without creating a selective
10  disclosure issue.  So I had to get -- this news had to be,
11  you know, made broadly.  People had to be broadly aware
12  of this news.  I could not have conversation
13  with all of these investors, or some of them, and, of
14  course, it would occur sequentially.  I could not talk to
15  them all simultaneously.
16          This had to be -- there had to be transparency here,
17  there had to be some awareness of a take private
18  in order for me to have these conversations.
19          So I subsequently --
20          MR. NEWELL:  We're getting to that.  We're not
21  there yet.
22          THE WITNESS:  I subsequently learned that it was
23  much harder for them to maintain an ownership
24  stake in a private company than I had anticipated.
25          MR. NEWELL:  We'll get back to that.  I want to stay on the

1    July 31st meeting for some more time.

2              BY MR. NEWELL:

3         Q    Do you recall anyone at the meeting --

4    you, Mr. Teller, or any of the PIF

5    representatives making reference to

6    an acquisition premium that would be required in a going

7    private transaction?

8         A    Not specific numbers.

9         Q    What about a percentage premium?

10        A    No.

11        Q    You don't recall anyone raising that during the

12   meeting?

13        A    No, but, of course, in any kind of acquisition

14   like this, a premium is standard, there's going to be a non-zero

15   premium.

16        Q    But no discussion of whether that premium would

17   be 15 percent, 20 percent, 25 percent?

18        A    I think it's -- no, but I think everyone knows the

19   exact premium is unknowable, until there is a negotiation,

20   but that there is a probable premium on the order of 20

21   percent.

22        Q    But there was no discussion of that probable

23   premium during the July 31st meeting?

24        A    No.  But they would not have been

25   under the assumption that there would be no premium

Page 128

1    nor that there would be an egregious premium.
2    And so, a reasonable expectation in the absence
3    of a specific number would be 20 percent.
4        Q    What's your basis for saying that?
5        A    A typical number for, you know, take privates or
6    acquisitions is 20, 20-ish percent.
7        Q    At the time of the July 31st meeting, were you
8    aware of the dollar magnitude of the largest prior
9    standard go private transaction that had ever been
10   accomplished?
11       A    No.
12       Q    And I'm using your phraseology there.  I hope
13   that's all right.
14       A    Yeah.
15       Q    "Standard" go private to refer to a
16   leveraged buyout where all outstanding shares are
17   purchased?
18       A    No; well, I wasn't aware of it.  I don't really
19   necessarily base things I do on prior precedent.
20       Q    Do you recall any discussion at the July 31st
21   meeting regarding potential regulatory requirements to a
22   going private transaction?
23       A    Sorry, at that -- the meeting with the PIF?
24       Q    With the PIF?
25       A    No.

1        Q    Are you familiar with the Committee on Foreign
2    Investments --
3        A    CFIUS.
4        Q    We'll use the term CFIUS to refer to the
5    Committee on Foreign Investments in the United States.
6    Sounds like you're familiar with that acronym?
7        A    Yes.
8        Q    Rolls off the tongue?
9        A    Sounds like a disease, but yes.
10       Q    Did CFIUS, during July --
11       A    You've got CFIUS?  Oh, no, that's tragic.
12       Q    Let me ask it again.  Did CFIUS come up during
13   the July 31st meeting?
14       A    No.  I don't think so, the word CFIUS didn't come
15   up, but it's possible -- no, I don't think so.  I don't
16   think any restrictions -- the notion of restrictions on
17   percentage of ownership came up during that meeting.
18       Q    Did the topic of Tesla establishing a physical
19   presence in Saudi Arabia come up during the meeting?
20       A    Yes.
21       Q    Who brought that up?
22       A    Yasir.
23       Q    Do you remember roughly when in the meeting he
24   raised that?
25       A    I mean -- towards the -- maybe towards the end, I

1    think.

2        Q    Sometime in the later part of the meeting?

3        A    Yeah.

4        Q    Do you remember what he said specifically?

5        A    He would be interested in establishing a

6    strategic relationship between Tesla and Saudi Arabia possibly

7    relating to a factory or some large Tesla presence of

8    some kind in Saudi Arabia.

9        Q    Did Mr. Al-Rumayyan indicate that the PIF support

10   of a going private transaction was subject to Tesla

11   establishing a presence in Saudi Arabia?

12       A    No.

13       Q    At the time of the July 31st meeting, had you

14   decided whether in any scenario you would be interested in

15   establishing a physical presence in Saudi Arabia?

16       A    (b)(4)

17   (b)(4)

18

19

20

21

22

23

24

25

1  (b)(4)

2

3

4

5

6         MR. NEWELL:  So we're getting close to lunch.  I

7  have about ten more minutes of questions, and I think that

8  would be a good time to take a break.

9         Is that all right with everyone?

10     A    Sure.

11     BY MR. NEWELL:

12     Q    I asked what was in your mind at the time of the

13  meeting about a potential physical presence in Saudi Arabia.

14  What did you say in response to Mr. Al-Rumayyan raising that

15  prospect?

16     A    I'm not sure what I said exactly.  I would have

17  probably said something along the lines of what I just

18  said, which is that we're open to doing something,

19  provided the time frame is not in the near term.

20         MR. BUCHHOLZ:  Did you get the sense from Mr.

21  Al-Rumayyan that that was something they wanted to discuss

22  further down the road?

23         THE WITNESS:  (b)(4)

24  (b)(4)

25

Page  132



(b)(4)

22          And then I thought, well, there's going to be --

23   I thought the vast majority of existing investors would

24   want to retain their stake, and then we would find a vehicle

25   for small investors to participate.  That latter part was

Page 133

1   a fundamental misunderstanding that I just did not know --
2   I thought there would be some way to retain small
3   investors, but there isn't.
4           And, you know, this is not part of today's
5   testimony, but I do think that some mechanism for this
6   would be advisable in the regulatory structure.  But I
7   think something where they're protected by a fiduciary,
8   like there's -- like a lot of the wealth creation that
9   occurs, occurs when companies are private.  And, but smaller
10  investors are only able to access that when the companies
11  are public.  And by that time, most of the wealth creation
12  has occurred.
13          And this is exacerbating the wealth divide.  This
14  is not good.
15          I certainly understand the intentions behind the
16  original regulations.  We do not want swindling.  This is
17  like anti-swindling regulations; these are good.  We don't
18  want people being conned out of their money.  This is bad.
19          I think if there's perhaps a trusted fiduciary
20  like a Fidelity or something like that, and very plain
21  language disclosures, then I think -- like, private company
22  money should be more accessible to investors who are
23  not already wealthy.  That million dollar limit is tricky.
24          Sorry to digress.  My apologies.
25          BY MR. BUCHHOLZ:

1       Q    That's all right.  We'll come back to that.

2       A    Yes.

3            MR. BUCHHOLZ:  Circling back to the July 31st meeting,

4    and just connecting up -- a lot of that was your thought process,

5    just to be clear, right?  You weren't discussing that at

6    the time, in that level of detail, with Mr. Al-Rumayyan?

7            MR. FARINA:  Which part?

8            THE WITNESS:  He was just saying like, he wants

9    to take the company private, let's do it. Let's go. So, I mean,

10   and it was clear to me, like, he had been like

11   yearning for this for two years.  I was like, "Really?

12   Well, okay.  I thought you delegated it to Masa."

13           Like, "No, we wanted to do it.  We have

14   always wanted to do it, and can we just do it?"

15           I'm like, "Okay, we can investigate it."

16           BY MR. BUCHHOLZ:

17      Q    Right.  But returning to the percentages; you said

18   earlier that you don't believe you talked about specific

19   percentages that would be needed to acquire, correct?

20      A    No, not specific percentages.  But he was well

21   aware of the cap table; because he had it in front of him.

22      Q    Right.  And -- yeah, I don't want

23   to get back into the testimony you already did --

24      A    Sure.

25      Q    -- on that topic.  I just wanted to clarify.

1    Did they ever mention percentages, PIF?

2        A    No.  But, for sure, it is implicit, like a take

3    private -- they are not assuming that all those people are

4    going to -- they were -- it was clear that they were not

5    under the assumption that the other investors

6    would participate.  They were not under the assumption.

7    Or that they were under the assumption that most of the other

8    investors would not participate.

9            BY MR. NEWELL:

10       Q    And your expectation at the time was that

11   most of the investors would participate, though?

12       A    Yes.

13           MR. FARINA:  And by "participate,"

14   would that be referring to staying with

15   Tesla as a private company?

16           MR. NEWELL:  Staying with Tesla as a private

17   company.

18           THE WITNESS:  Yes, that's correct.

19           BY MR. NEWELL:

20       Q    Fair to say that your perspectives were not

21   aligned with the PIF's in that respect at that time

22   of the meeting?

23       A    Yes.  I -- my own understanding

24   or impression was that they thought there would be

25   much more capital required, and they were

Page 136

1    prepared to provide it, than was actually needed in my

2    mind.  I thought that they thought a lot of capital would

3    be needed, and they would provide it.  Much more than I

4    thought the capital would be needed.

5              And that was why, in my mind, they

6    effectively oversubscribed the deal in order to take Tesla

7    private, is what -- they were prepared to put a lot more

8    money in than I thought was actually necessary.

9       Q    But they never referenced a specific dollar

10   amount or a range of dollar amounts, right?

11      A    No.  But in the absence of that, one would assume

12   that their template would be a standard take private,

13   which would certainly imply buying out those investors.

14      Q    And again, there was no reference to any specific

15   number for a premium that would be associated with the deal,

16   right?

17      A    No specific premium.  But they were also aware

18   that there would be a premium.

19             BY MR. BUCHHOLZ:

20      Q    Was there discussion about the level of control

21   or influence that they would have?

22      A    No.

23      Q    Was there any discussion about --

24      A    They were pretty clear that they wanted me to

25   stay running the company.  Yeah.

1      Q    So the concept you testified about with different

2   levels of ownership, and potentially more requirements or

3   strong --

4      A    Yeah.  I mean, they were

5   definitely going to leverage a larger investment

6   into more insistence on doing things in Saudi

7   Arabia.  That was clear.

8      Q    Yeah.  That's what I want

9   to be specific, as specific as you can,

10   about how much discussion was there about that?

11      A    You know, they weren't hard-edged about it.  It

12   wasn't like "You must do this" or "You must do that."  And

13   they were very -- I would say they were like, pretty clear

14   that they wanted me to stay in control of the company and

15   run the company, and that was very important to them.

16   They wouldn't do anything -- wouldn't do anything

17   where I would leave the company.

18          They were very flattering of me personally, and

19   they said like, they really wouldn't want to do this if I was

20   not very enthusiastic about it, saying lots of nice things.

21          So -- and then I -- I, like I said -- okay, so

22   look, I think it's actually going to take less money than you

23   realize, because I think most of these investors are going

24   to stay with the company.  And they were like, "Okay.

25   That's cool."

Page 138

1          They were just pretty much cool with anything.

2     Well, as far as I could gather.  They were just looking for help

3     transitioning their country to a different economy, you

4     know.

5          MS. CRUMPTON:  You articulated your understanding

6     about what the expectations would be from PIF, based on if it's

7     5 or 15 percent investment versus a 40 percent investment.

8     Was any of that in fact --

9          THE WITNESS:  It's sort of guess --

10    no, it's just sort of guess work.

11    I mean, this is implicit.  This is implicit.

12    You know, like if -- because they clearly said

13    it's very important for them to have -- like, they

14    articulated the strategic rationale, that is very, very

15    obvious, that they need -- they need to

16    to transition to something beyond oil.

17          They articulated that many times in prior

18    meetings.  You know, I think that's obvious.

19          So they were just like -- they wanted help in making

20    that transition.

21          And I mean it's like, you know, they

22    said they really want the factory in Saudi Arabia.

23          And so we get to the dinner -- the

24    dinner with Masa afterwards.  There were some

25    funny things in that dinner.

Page 139

1           Because Masa was insisting (b)(7)(C)
2    (b)(7)(C)
3
4
5
6
7
8           You know, he couldn't -- Masa wouldn't --
9    I don't know if he just had like a
10   dinner with Modi or somebody.
11          And he was like, "No, you've got to put
12   a factory in India."
13          I'm like, "Your investors want me to put a
14   (b)(4)
15
16          MR. BUCHHOLZ: And just to be clear,
17   you're referring to -- you're referring to
18   March of 2017?
19          THE WITNESS: Yeah, yeah, yeah.
20          MR. FARINA:  All right.
21          So -- why don't we -- we've been
22   going quite a bit.  It's ten of 1:00.  Why don't we take our
23   lunch break?
24          MR. NEWELL:  That's fine.  I think -- I think we can take
25   a lunch break now.  Let's go off the record.

Page 140

1          VIDEO OPERATOR:  Going off the record.  The time
2    is 12:49.
3                    (Lunch recess taken.)
4          A F T E R N O O N   S E S S I O N
5          VIDEO OPERATOR:  The time is 1:48.  We're back on
6    the record.
7          BY MR. NEWELL:
8      Q    Mr. Musk, during the lunch break did you have any
9    substantive discussions with the SEC staff?
10     A    No.
11     Q    You told us that you obtained a Red Bull during
12   the break, but other than that --
13     A    I was given a Red Bull.
14     Q    On the --
15     A    Sorry.
16     Q    On the topic of your July 31st meeting with the
17   PIF, we have a few more questions.
18     A    Sure.
19     Q    Do you recall the topic of the PIF's available
20   liquid capital coming up at any time during the meeting?
21     A    No.
22     Q    Did Deepak Ahuja join the meeting at some point?
23     A    Yes.
24     Q    Do you recall at what point in the meeting Mr.
25   Ahuja joined?

Page 141

1      A     I think maybe a third to half the way through,
2   or something like that.  I'm not sure exactly.
3      Q     Do you recall what was being discussed at the
4   time Mr. Ahuja joined the meeting?
5      A     No.  I can't pin the exact timing -- I suspect he
6   would be able to answer that more precisely, but --  I
7   cannot recall the exact point at which -- it wasn't
8   towards the very end and it wasn't towards the very
9   beginning.
10     Q     Do you recall whether it was before Mr.
11  Al-Rumayyan first raised the topic of taking Tesla
12  private?
13     A     I don't recall, no.
14     Q     Did you request that Mr. Ahuja join the meeting?
15     A     I'm not sure.  I might have.  I'm not sure.  I
16  don't recall doing so but it's possible.
17     Q     Do you know why he ended up attending?
18     A     Well, I think -- I'm not sure if I asked that he
19  join or not, as the reason that he joined, but I would
20  have certainly at some point asked that he join once the
21  subject of investment came up.
22     Q     Once the subject of the -- PIF's public
23  position -- if you'd let me finish.
24     A     Sorry.
25     Q     You would have asked but you don't have a

1    specific recollection of asking Mr. Ahuja to attend

2    because the PIF had disclosed they were a big

3    investor in Tesla?

4        A    I think that would have probably been -- if he

5    wasn't there already I would have requested that he join

6    upon learning that the PIF had made a multimillion dollar

7    investment into Tesla already.

8        Q    It sounds like you don't have a specific

9    recollection whether or not you

10   reached out to him or had Mr. Teller reach out to him?

11       A    That's correct.

12       Q    Do you remember if Mr. Ahuja had anything with

13   him when he joined the meeting?

14       A    I think he perhaps would have had his phone, but

15   I don't think anything else.

16       Q    Were you ever, from the time that you greeted the

17   PIF to the time they left Tesla's offices in Fremont,

18   alone with any members of the PIF?

19       A    I think I was briefly with Yasir  alone as he was

20   leaving the conference room, I think.  But just for like

21   ten seconds or something like that.

22       Q    Do you recall Mr. Teller ever stepping out of the

23   conference room at any point during the meeting before Mr.

24   Ahuja had joined?

25       A    I did not notice it.

1       Q    It may have happened, but you don't have a specific
2    recollection?
3       A    Yeah.
4            MR. BUCHHOLZ:  Did you, Mr. Ahuja or Mr. Teller
5    take notes during the meeting?
6            THE WITNESS:  No. I didn't, I don't know if they
7    did.
8            MR. BUCHHOLZ:  You didn't notice them doing it?
9            THE WITNESS:  I didn't notice them doing it, if they did.
10           MR. BUCHHOLZ:  About how long did it last?
11           MR. FARINA:  The entire meeting?
12           MR. BUCHHOLZ:  Yes.
13           THE WITNESS:  I think about 40 minutes-ish.
14           BY MR. NEWELL:
15      Q    Did the PIF give you anything in writing, a
16   physical copy of anything during the course of the
17   meeting?
18      A    No.  Well -- I don't think so.  I don't think so.
19   I don't recall getting anything.
20      Q    Looked like maybe you weren't sure, you had some
21   recollection of something?
22      A    Well, every now and again people give me things
23   but -- I usually just put them on my desk and don't read
24   them.  Usually it's like some sort of generic document.
25   He didn't give me anything that was like -- I don't think

Page 144

1    he gave me anything and -- but I'm quite sure he did not

2    give me anything that was highly sensitive.

3        Q    May have given you a business card?

4        A    No, I have his business card -- so, no.

5        Q    You don't have any specific recollection of any

6    physical document being handed to you by the PIF during

7    the meeting?

8        A    No.

9        Q    What about from you, Mr. Teller or Mr. Ahuja?  Do

10   you remember anyone giving anything in writing to the PIF

11   during the meeting?

12       A    No.

13       Q    Did you send anyone from the PIF any documents

14   via electronic means during the meeting?

15       A    No.

16       Q    Didn't agree --

17       A    During the meeting?

18       Q    Didn't agree to exchange information?

19   "Can you send me this?"

20   "Sure, let me email that to you"?

21       A    No.

22       Q    And likewise going the other direction, PIF

23   didn't send you anything electronically during the

24   meeting?

25       A    I don't think so.

1    Q    Did you have any discussion with the PIF about

2    keeping your discussions about a going private transaction

3    involving Tesla confidential?

4            MR. FARINA:  At any point in time?

5    Or during that meeting?

6            BY MR. NEWELL:

7    Q    During that meeting.

8    A    Not during that meeting.

9    Q    Let's situate ourselves towards the end of the

10   meeting.  Walk us through what you recall about how the

11   meeting closed.

12   A    Sure.  I mean, from what I recall, essentially as

13   I mentioned, was that they disclosed that they had made a

14   multi-billion dollar investment in Tesla up to the limit

15   of 5 percent.  This was new information to me.

16           And that the only reason they had not gone above

17   the 5 percent was the disclosure constraint.  And they

18   obviously had done this without any written agreements or

19   without any requirements or anything at all.

20           And they had done this -- they had at one point,

21   I think in prior meetings, said that they would invest in

22   Tesla.  And I was like, hum, okay.  And they said, okay.

23   They did what they said they would do.  Okay.  These are

24   people where you can take their word, they say they're

25   going to do something they are going to do it.

1          So they were extremely clear that they wanted to
2    take Tesla private; that I could set the terms,
3    essentially any reasonable terms I could set; that they
4    had been interested in taking Tesla private for two years.
5    They corrected my misunderstanding that this had been
6    delegated to Masa, and said for two years they had
7    wanted to take Tesla private.
8          They had invested billions of dollars with no
9    written agreement, no agreement of any kind, just as a
10   good faith gesture to show that they're serious.
11         And if I just say what I wanted to do they
12   would do it.  So there was no question in my mind
13   whatsoever that the funding was secure for this deal.
14   Q    So let's go back to my question.  I asked if you
15   could walk through the close of the meetings.
16   A    Right.  That was the closing sentiment.
17   Q    Step away from sentiment.  What do you recall
18   being discussed specifically at the end of the meeting?
19   A    I recall that they wanted -- they were
20   unequivocal in their desire to take Tesla private; that
21   they were willing to take essentially whatever terms I
22   asked for within the bounds of reason, that a larger
23   investment would require a larger strategic involvement,
24   meaning factories and that kind of thing.  And so it's
25   really just a question of what do you want to -- they were

Page 147

1    saying like, how do you want us to proceed?  We want to do

2    it, let's do it.

3            MR. BUCHHOLZ:  When you say "they", do you

4    mean Mr. Al-Rumayyan?

5            THE WITNESS:  Yes.

6            MR. BUCHHOLZ:  He was the only one speaking for

7    PIF?

8            THE WITNESS:  That's correct.

9            BY MR. NEWELL:

10      Q    **Did Mr. Al-Rumayyan use the phrase whatever terms**

11   **to -- using your phrasing?**

12      A    He said just -- he said, tell me how you want to

13   do it, and we'll do it.  So not whatever terms, but, tell

14   me how you want to do it.  I think he had some language,

15   provided they're reasonable we will be fine with it.

16            So there's no -- obviously it can't be like,

17   let's go public(sic) at $8,000 a share, that's not reasonable.

18   That would not be reasonable, but within the bounds of a

19   reasonable take private transaction they were extremely certain they

20   wanted to do it, and moreover had been certain for two

21   years.  There was no question.

22            MR. FARINA:  I think in the beginning of your

23   answer -- I don't know whether you said take public or

24   take private.

25            THE WITNESS:  Sorry.  Take private.

1    MR. FARINA:  Take private.

2    THE WITNESS:  Yeah.  So you know, obviously here

3  you have an extremely wealthy -- quite arguably the

4  wealthiest fund in the world.  They had with no conditions,

5  no effort at all:  Made a multibillion dollar investment

6  up to the 5 percent point, explicitly constrained

7  only by the reporting requirement.

8    There was nothing else holding them back

9  from investing more.

10    So this was really -- it was up to me, do I want

11  to do this take private?  If I want to do it, they will

12  support it.

13    BY MR. NEWELL:

14    Q    Did you discuss any specific next steps with the

15  PIF at the close of the meeting?

16    A    Umm, they -- the onus was on me to say how I

17  wanted to do this deal.  So I just needed to tell them

18  what -- what they needed to do, and they would do it.

19    Q    That's what they said to you explicitly, or is

20  that a paraphrasing on your part?

21    A    That is -- that is almost explicit, I would say.

22  Meaning it's like -- I don't know that I can say the exact

23  words, but that is the exact meaning.

24    MR. BUCHHOLZ:  He used the word reasonable to

25  describe reasonable terms.  Was that Mr. Al-Rumayyan's

Page 149

1   term?
2           THE WITNESS:  I believe so.  It was something
3   like that, yes.  Just that it's -- it can't be like $8,000
4   a share, it can't be, you know, something completely crazy
5   and outside the bounds of a normal take private.
6           MR. BUCHHOLZ:  To the best of your ability, can
7   you describe what Mr. Al-Rumayyan said when he used the
8   term reasonable terms?
9           THE WITNESS:  He said like, tell me how you want
10  to do it and we'll do it.  And there was like just some --
11  I think it was reasonable but may have been -- it may have
12  been a synonym of reasonable, but it was like tell me how
13  you want to do it and as long as the terms are
14  reasonable -- I don't know if it was exactly the word
15  reasonable.  If not it was something of an equivalent
16  meaning and we'll do it.
17          MR. BUCHHOLZ:  Did you have any more discussion
18  about what that meant, what reasonable meant?
19          THE WITNESS:  No.  No.
20          BY MR. NEWELL:
21      Q   Was there any discussion of what you would do as
22  a next step if you elected to continue speaking with the
23  PIF about a potential transaction?
24      A   The next step would be for me to tell them what
25  terms I wanted.

1      Q    None of those terms had been ironed out during

2    the meeting?

3      A    No, but they were very clear that it was up to me

4    to -- it was very clear to me, this deal is done.  Tell us

5    what terms you want, and this deal is done on your terms,

6    provided those terms are not outrageous, in another way of

7    saying.  Doesn't use the word outrageous, if the terms are

8    not out of bed with what a normal take private would be, this

9    is a done deal.

10          MR. BUCHHOLZ:  And they would if it was

11   reasonable?

12          THE WITNESS:  Yes, but they were pretty clear

13   that that was not some narrow definition of reasonable.

14   As long as they didn't feel like they were getting ripped

15   off they would be fine with it.

16          MR. BUCHHOLZ:  So in that sense it was  going

17   to be a negotiation with parties on both sides, right?

18          THE WITNESS:  No.  No.  It would just be --

19   unless these terms are unreasonable.  It's not like some

20   fancy definition of reasonable -- as long as the terms are

21   not a rip off and are fair, and under the normal,

22   structure of -- as long as they're not out of bounds of a

23   a normal take private, this is a done deal.

24          MR. BUCHHOLZ:  Right.  But the PIF would get to

25   decide that and make the final decision.

Page 151

1          THE WITNESS:  No.  They were telling me
2    explicitly in the meeting I could have whatever terms I
3    wanted provided they're not crazy.
4          BY MR. NEWELL:
5    Q    Did you have any concern that there was no
6    context discussed about what was and what wasn't a
7    crazy term?
8    A    No.  No.  I mean it was very clear that they
9    wanted this to happen.  The only thing that would inhibit
10   this is if I demanded crazy terms or unreasonable terms,
11   otherwise it's a done deal, case closed.
12   Q    Do you have any understanding at the time of the
13   meeting of whether the PIF had ever taken a publicly
14   traded U.S. company private in the past?
15   A    No.
16   Q    Didn't know one way or the other?
17   A    No.  It's important to bear in mind that they had
18   already invested billions of dollars.  They spoke with
19   their money, okay?  And if somebody invests billions of
20   dollars up to the 5 percent point and the only thing
21   stopping them is the reporting number, not anything else,
22   and obviously there wasn't even a verbal or written deal,
23   they just did it.  These people mean what they say.  They
24   have the resources, you can take them at their word.
25   They're going to do it.  They really wanted to increase

Page 152

1    their investment in Tesla by whatever means necessary.

2         MR. BUCHHOLZ:  So just to be clear, is it your

3    testimony that you did not believe that PIF would be able

4    to assess the terms that you decided on and decide if they

5    were reasonable?

6         MR. FARINA:  Can you repeat the question?

7         MR. BUCHHOLZ:  Did you understand the question?

8         MR. FARINA:  I would like to hear the question

9    again.  I'm not sure I understood it.

10        MR. BUCHHOLZ:  Is it your testimony that you did

11   not believe at the end of the July 31st meeting that PIF

12   would not be able to assess the terms that you came back

13   with and decide if they were reasonable and wanted to go

14   through with the deal?

15        MR. FARINA:  I honestly don't understand the

16   question.  There's two negatives in there and I'm not sure

17   what -- can you try and rephrase it?

18        MR. BUCHHOLZ:  Sure.  I can try.

19        Did you believe at the end of the July 31st

20   meeting that PIF would assess the terms that you came back

21   with and decide if they were reasonable?

22        MR. FARINA:  Thank you.

23        THE WITNESS:  Umm, I mean -- I think the right

24   way to view this is that this was unequivocally a done

25   deal provided I did not come back with outrageous terms.

1          MR. BUCHHOLZ:  Right.  And that's the provision
2    that I'm asking about.
3          THE WITNESS:  Yes.  So as long as I didn't demand
4    like something egregious, it was a done deal.
5          MS. CRUMPTON:  Who would decide whether
6    something you demanded was egregious?
7          THE WITNESS:  Presumably they would decide.  But
8    I mean there's a natural framework for whether a take
9    private is egregious in the price premium or not.  I mean,
10   really -- if I say, for example, demanded all shares
11   must be -- I must own all shares, they may have objected
12   to that.  That's not something that I would have required,
13   but that could have been an inhibitor.
14          If I had said that that's, you know, there must
15   be like some huge sum of money that comes to me personally
16   as a result of that, that would be egregious.
17          If I had said instead of a typical premium on a
18   take private acquisition that instead of 20 percent it was
19   200 percent, that would be egregious.  But anything within
20   the framework of an ordinary take private would not be
21   considered egregious.
22          MS. CRUMPTON:  Are any of these examples you
23   gave examples that you discussed with PIF?
24          THE WITNESS:  No.
25          BY MR. NEWELL:

Page 154

1       Q     What about if you had come back to the PIF and
2    told them that the structure you wanted was for them to
3    take a total hypothetically ten percent stake in Tesla and
4    be part of a group taking Tesla private, what is your
5    understanding of whether or not that would constitute an
6    egregious term that they could have rejected?
7       A     No, they were fine with that.  They already had 5
8    percent.  They have 5 percent of the public markets with
9    no terms or conditions at all. And they were explicit that
10   that 5 percent limit was just due to reporting
11   requirements, not due to anything else.
12             So let's say for reporting requirements in the
13   U.S. started at, probably ten percent, they would have
14   acquired ten percent in the public markets --
15      Q     Was there --
16      A     Something on that order.
17      Q     Sorry to break in.  Were you finished with your
18   answer?
19      A     Yes.
20      Q     Do you know whether there's a minimum amount of
21   ownership in Tesla that they would have required to move
22   forward with the going private transaction at the time of
23   the July 31st meeting?
24      A     I do not believe there was any minimum.
25      Q     What's your basis for that?

Page 155

1       A     They already had -- spoken with their funds and
2    invested 5 percent.
3       Q     Do you think they might have had reason to want a
4    larger stake in Tesla and that a smaller stake would have
5    been less attractive to them?
6       A     I think no, because they already had a smaller
7    stake in Tesla, and that the only thing that inhibited
8    their stake from being more than 5 percent, was the
9    reporting requirement.  So they were clearly willing to
10   have a larger stake in the company but -- it just happens
11   that U.S. reporting requirements start at 5 percent.
12             So that's what they would -- they were clearly
13   happy to have 5 percent with no terms and conditions or
14   requirements, nothing.
15      Q     So from your perspective it would not have been
16   an egregious term to them for you to come back and propose
17   anything from 6 percent of Tesla up to and including the
18   entire market cap of Tesla?
19      A     Umm, yes.
20      Q     Did you show Mr. Al-Rumayyan and his PIF
21   colleagues out of the Tesla factory after you left the
22   (b)(4)      conference room?
23      A     No.  I think I spoke to Yasir for maybe ten
24   seconds as he was leaving the conference room, and the
25   substance of that conversation was just, more repeating,

1    let us know how you want to do this.  We want to do this.

2    Something to that effect.

3         Q    That's what he said?

4         A    Yes.

5         Q    What did you respond?

6         A    I said, I'll get back to you.

7         Q    Did you pick a specific timeframe during which you'd

8    get back to him?

9         A    No.

10        Q    Do you remember any specific timeframe for you

11   getting back to the PIF being discussed at any point

12   during the July 31st meeting?

13        A    No.

14        Q    Do you recall if Mr. Ahuja showed the PIF

15   representatives out of Tesla facilities?

16        A    Umm -- I think he did.

17        Q    Did he subsequently relay to you any

18   conversations he'd had with them as he walked them out?

19        A    I don't think so.

20             MR. BUCHHOLZ:  Did he tell you how long he spent

21   with them?

22             THE WITNESS:  No.

23             MR. BUCHHOLZ:  Did you learn at some point that

24   they had toured part of the facility?

25             THE WITNESS:  Yeah.  I heard they saw -- I had

Page 157

1  heard that -- yeah, that -- at some point that they had --
2  he had given them a tour, yeah.
3            MR. BUCHHOLZ:  Did he tell you that, Mr. Ahuja?
4            THE WITNESS:  No.
5            MR. BUCHHOLZ:  Who did?
6            THE WITNESS:  I think counsel, counsel told me.
7            MR. BUCHHOLZ:  So you didn't have any
8  discussions though with Mr. Ahuja about the details of
9  what happened?
10           THE WITNESS:  I don't recall any discussions, no.
11           BY MR. NEWELL:
12      Q    Did you have any further communications with Mr.
13  Teller or Mr. Ahuja on the night of July 31st about the
14  going private transaction or the PIF?
15      A    I don't recall.  I think I may have had some
16  brief conversations.  I don't recall right now what those
17  conversations were.  I might have had some but -- I
18  probably had some, but I do not call the substance of
19  them.
20      Q    Fair to say it's a pretty big deal to be
21  considering taking the company private?
22      A    Yeah, of course.
23      Q    So it sounds like you may have had some
24  conversations in that vein with Mr. Teller and Mr. Ahuja,
25  but you're not sure?

Page 158

1       A      Yeah.   I mean I do not recall anything
2    substantive.   I think we most certainly had conversations
3    of some sort, but I don't recall anything substantive
4    apart from the obvious.
5       Q      The obvious -- sorry.  I didn't follow you.
6       A      (b)(4)
7    (b)(4)
8
9       Q      You recall discussing that with Mr. Teller or Mr.
10   Ahuja on the night of July 31st?
11      A      I recall something to that effect.
12      Q      Remember any discussion of potential --
13      A      (b)(4)
14   (b)(4)
15      Q      Recall discussing the going private transaction
16   or the PIF, setting aside Mr. Ahuja or Mr. Teller, after the
17   meeting concluded?
18      A      Yes, with Egon Durban on Monday night, I think it
19   would have been, before the Tuesday tweet.
20      Q      Okay.
21           MR. FARINA:  So your question was on the 31st,
22   did he discuss his meeting with the Saudis with anyone
23   other than Sam and Deepak?
24           MR. NEWELL:  It may have been a bad question.  I
25   don't know.  We don't need to do a read back, let's just

Page 159

1    ask another question, and we'll go to his conversation

2    with Mr. Durban.

3          Q    I'll ask the question that Mr. Farina asked, if I

4    didn't ask it originally.

5               Setting aside Mr. Ahuja and Mr. Teller, do you

6    recall having communications of any kind with anyone on

7    the night of July 31st after the meeting that had concluded

8    regarding the PIF or a going private transaction?

9          A    I recall having some brief conversations with

10   Sam, maybe Deepak briefly, pretty brief.  Just, you

11   know --   (b)(4)

12   (b)(4)

13

14

15

16               BY MR. NEWELL:

17          Q    Those conversations you're referencing,

18   you recall being with Mr. Ahuja and/or Mr. Teller?

19          A    I think both of them, I'm not sure.

20          Q    Anyone else at Tesla or otherwise you recall

21   discussing the PIF or a going private transaction with after

22   the meeting concluded on July 31st?

23          A    No. On that night?

24          Q    Yeah, post July 31st meeting, the night of

25   July 31st or evening of July 31st.

1      A    Well, there was -- a call with Steve Rosenblum --

2    are you talking about at any point subsequent -- to be precise,

3    what date are you referring to?

4         MR. FARINA:  I think all he's trying to do is

5    exhaust July 31st, and then he's going to get into between

6    July 31st and August 7 who did you talk to?  I think some of

7    the folks you're mentioning are in that period, but he

8    wants to know is there anyone else on July 31st that you

9    spoke with.  Is that fair?

10         BY MR. NEWELL:

11      Q    That's correct.

12      A    I don't think so.  It's possible, but I don't

13    recall.

14      Q    Let's now step forward -- strike that.  Sorry.

15    One more question about the July 31st meeting with the

16    PIF.

17         Do you recall anyone at any time during the

18    meeting discussing the board approval process at Tesla?

19      A    I don't recall that, no.

20      Q    Okay.  We're now past July 31st.  Let's now

21    situate ourselves in the period from August 1st 2018

22    through the morning of August 7th 2018 at about 9:00 a.m.

23    Pacific time.  Okay.  Follow me so far?

24      A    Sorry.  Which date?

25      Q    It's a long period, it's about a week, but I

1   think it's going to be more effective if we do it this way,

2   and we can show you documents --

3       A    That would be helpful.  If there's some documents

4   that would help anchor specific dates that would be

5   helpful.

6       Q    Okay.  Why don't we do a couple of things here.

7   Let's, if we could, Mr. Musk, before we start showing you

8   documents, you had referenced that you have some recollection

9   of discussing the PIF or a going private transaction with

10  some individuals at some time.  Do you recall discussing

11  those topics with anyone in the period from August 1st,

12  2018 through the morning of August 7, 2018?

13      A    My recollections are, my conversation with Steve

14  Rosenblum, a conversation with -- which is on the

15  Saturday, I believe, a conversation with Egon Durban on

16  the Monday before the tweet.  I think I talked to Michael

17  Dell on Saturday, as well, but did not mention anything

18  specific about the Saudis -- I was really asking him about, did he

19  find being private was good.  Like -- did he think that --

20  did he regret going private?  Did he thinks it was a good

21  idea?  Yeah.

22          MR. FARINA:  You've already asked about the board

23  meeting, so the board would obviously be included in that

24  time period?

25          MR. NEWELL:  Let's set aside the board meetings

Page 162

1  for now. That's a good carve out, and I appreciate it.

2  Let's set aside anyone on Tesla's board, individual

3  communications or official board communications. We're

4  still in that period from August 1st, 2018 through the

5  morning of August 7, 2018, when you published the tweets

6  we've been discussing today.

7       Q    Do you recall having a conversation with Steve

8  Rosenblum -- and for the record can you refresh us on who

9  Mr. Rosenblum is?

10      A    He was the legal counsel that Michael Dell used

11  in the take private.

12      Q    Do you recall having communications with Egon

13  Durban right?

14      A    Yes.

15      Q    Where does Mr. Durban work?

16      A    Silver Lake.

17      Q    You recall having conversations or communications

18  with Michael Dell?

19      A    Just a conversation.

20      Q    A phone conversation?

21      A    Yes.

22      Q    Anyone else you recall, setting aside individual

23  members of Tesla's board or board meetings or groups of

24  Tesla's board having discussions with -- strike that.

25           Did you have discussions during the period from

Page 163

1    August 1st, same period we've been discussing, through the

2    morning of August 7, 2018, with Mr. Teller about a going

3    private transaction with PIF?

4        A    I probably had a few conversations with Sam

5    discussing the pros and cons of a take private and a

6    larger Saudi investment.

7        Q    What about Mr. Ahuja, same period?

8        A    I don't recall having any conversations but --

9    there might have been a few.  I don't recall anything

10   substantive.

11       Q    Do you recall having any conversations during

12   that period about a going private transaction with the PIF

13   [(b)(6); (b)(7)(C)]

14       A    No.

15       Q    Anyone else you remember talking to during that

16   period in any form, emails, texts, phone calls, in person

17   conversations about a going private transaction with PIF?

18       A    No.

19       Q    Did you have any further communications of any

20   kind with Mr. Al-Rumayyan or other representatives of the PIF

21   from the time the July 31st meeting closed through the

22   time you first tweeted on the morning of August 7, 2018?

23       A    It's possible that there was some texting; he sent me

24   a text or something, but I don't think

25   I had a phone call.  I do not recall certainly

1    anything substantive.

2        Q    You're not sure if he texted you during that

3    period?

4        A    It's possible he may have, but I do not think it

5    was substantive.  I don't think so.

6        Q    Do you know if anyone else at Tesla had any

7    communications with representatives of the PIF during that

8    same period?  And I'll specify again, I apologize for

9    making this so back and forth, but I do want to take now

10   the period from the time that the July 31st meeting closed

11   through the time on August 7, 2018, when you first tweeted

12   that morning.

13            Are you aware of any other conversations that

14   anyone from Tesla had with representatives of PIF during

15   that period?

16       A    No.

17       Q    Same answer with respect to anyone who is

18   affiliated in any way with any of your companies?

19       A    No.

20       Q    Taking that same period, did you retain any

21   advisors to help you with the potential going private

22   transaction?

23       A    Sorry.  At what period of time?

24       Q    Sorry.  I know it's ponderous and I'll just try

25   and define it every time, I think it will be easier.

Page 165

1          From the time the July 31st meeting ended

2    through the morning of August 7th, when you first tweeted

3    about a going private transaction, did you retain any advisors

4    to assist you with the going private transaction?

5          A    No.

6          Q    Let's talk a little bit about your conversation

7    with Egon Durban.

8               Sounds like your recollection is that

9    conversation took place the Monday before August 7th?

10         A    Yes.

11              MR. FARINA:  I think there's an entry in the

12   phone log that does pin it down.

13              MR. NEWELL:  Please mark this as EM Exhibit 10

14                   (SEC Exhibit No. 10 was

15                   marked for identification.)

16              BY MR. NEWELL:

17         Q    Mr. Musk, we're handing you a document that's

18   been marked as EM Exhibit 10.  It is an exhibit, a multi

19   page printout of a spread sheet that was produced to the

20   SEC in this matter bearing Bates number ERM underscore SEC, AVG 7

21   underscore, series of zeroes and then 6.  I'll represent to you

22   that's the same Bates number associated with the entire

23   document.  We've not altered it but we've blown it up for

24   purposes of today's testimony.

25         A    Sorry.  The second page --

Page 166

1           MR. NEWELL:  No page yet, just some throat clearing at
2    the outset.
3           MR. FARINA:  This is not something Mr. Musk would
4    have seen in this form obviously.
5           This was something prepared by us
6    on Mr. Musk's behalf to produce the text related to these
7    issues.  And this has the same issue with the times being
8    set to UTC.
9           MR. NEWELL:  Thank you.  So we'll be doing some
10   ongoing math here and subtracting seven hours again.
11      Q    Mr. Musk, recognizing you may not have seen this
12   exact document, do these appear to be text messages that
13   you sent and received?
14      A    Yeah.  I've not seen this format before, but yes.
15      Q    The substance of the text is familiar to you?
16      A    Yes.
17      Q    Let's turn to Page 3 of the exhibit and I want to
18   direct your attention down there toward the bottom of the
19   page, looks like there's a series of texts between you
20   and contact Egon.  Do you see those?
21      A    Yes.
22      Q    Is that Egon Durban that you've been referencing?
23      A    Yes.
24      Q    Is this series of text exchanges to schedule the
25   call that you were just referencing?

1     A    Yes.

2     Q    Did you have any calls with Mr. Durban about a

3   going private transaction before August 6, 2018?

4     A    Pardon? What? Sorry.

5     Q    So it appears from this document, let me know if

6   you're reading it differently, that there's communications

7   here between you and Mr. Durban to set up a conversation.

8   Am I reading that right, high level?

9     A    Yes, of course.

10    Q    Did that conversation ultimately take place on

11  August 6th?

12    A    Yes.

13    Q    Before we get into what you discussed, did you

14  have any prior conversations with Mr. Durban before

15  August 6th about a going private transaction?

16    A    Yes.

17    Q    What's the first time you recall discussing a going

18  private transaction with Mr. Durban?

19    A    This was some months earlier this year, I think.

20  We met at SpaceX and I said, you know, I've always wanted

21  to consider taking Tesla private. That was it pretty

22  much.

23         And he said, well, if you're ever thinking about

24  doing that seriously you should give me a call.

25    Q    Anything else you remember about that

1  conversation with Mr. Durban?

2      A    Yeah. I mean, he said a bunch of nice things

3  about the me and the companies and that's it.  And he told

4  me a little about his prior experience with take

5  privates and like -- I should give him a call if I ever

6  think about this seriously.

7      Q    Did you ask him to prepare any analysis for

8  you coming out of that meeting or that conversation?

9      A    Umm -- I think in that meeting, that first

10 meeting that I had with him earlier this year he gave me

11 some kind of like document that was like, these are people

12 who would be interested in, I think, in a take private --

13 somewhat generic, here's a bunch of people with money that

14 he knows that would be interested in a potential take

15 private and something that -- he would be happy to support

16 if we wanted to go in that direction.

17     Q    Not specific to Tesla?

18     A    No, it was specific to Tesla.

19     Q    He had prepared it for the purposes of the

20 meeting to give to you?

21     A    Yes.  I really didn't consider it to be

22 especially -- I mean it's like here are bunch of people I

23 know with tons of money and would be interested, he

24 thinks, would be interested in a take private situation.  I don't

25 consider that to be of particular note, because, sure, I

1    kind of already knew that.

2            MR. BUCHHOLZ:  Did he ask them before giving you

3    the list if they would be interested?

4            THE WITNESS:  No.  That was his opinion.

5            BY MR. NEWELL:

6        Q    Any other communications of any kind, text

7    messages, emails, calls, in-person conversations you can

8    recall with Mr. Durban between that conversation at SpaceX

9    you just relayed to us and the conversation you had here

10   on August 6, 2018?

11       A    No in-person meetings.  I don't think there were

12   any calls.  It's possible there were kind of like some

13   touch base texts or emails sent but nothing substantive.

14       Q    Sounds like you're not sure if there were the

15   touch base emails or text sent.  It could have happened, it may

16   not have happened?

17       A    Yeah.

18       Q    What about this call on August 6th?  Looks like

19   you proposed -- how about 7?  And trying to subtract on

20   the fly here I believe that message was sent by you, based

21   on this document at around 3:38 Pacific time on

22   August 6th.  Is my math right there?

23       A    Yeah, that's about right.

24       Q    Did you end up having that call with Mr. Durban

25   around 7:00 that night?

1       A    I did.

2       Q    What did you tell him?

3       A    I told him about the -- that the Saudis wanted to

4   take Tesla private; that they were super supportive, like

5   they wanted to do this deal, that I could pretty much

6   dictate the terms and -- but I did say that my preference

7   would be to have a broader investor base, and not have too

8   much -- not have the Saudis be too large of a shareholder,

9   you know, and I think I actually did say like, I think,

10  maybe something on the order of 15 percent, maybe up to 20

11  percent would be okay.  But from my standpoint -- not from

12  theirs, purely from my standpoint, and that -- but I told

13  Egon, look, I think most of our investors are going to

14  remain in the company, and so what does he think about

15  bringing other investors in to have a more diversified

16  investor base, so there wouldn't be excessive influence

17  from any one investor.

18      Q    And what did he say in response?

19      A    He said absolutely, there's a lot of interest,

20  and he's confident that there's many others that would step up

21  and join this take private.

22      Q    Do you know whether he had communications with

23  any other potential investors at the time of your call?

24      A    I don't.  I don't think so but -- he did not

25  mention it.  So he was going -- I think he was going

Page 171

1    entirely on the basis of the people that he knew, and that
2    had been, say part of the Dell take private and other
3    transactions that he had been involved in.  So he -- I
4    don't know if he had conversations with them about it, but
5    he did not convey that he had.
6            He did convey that he was confident that there
7    would be many other investors who would be interested in
8    participating in a take private and that was later borne
9    out when they were asked -- when those investors were
10   asked, I believe every one of them said yes.
11       Q    Anything else you remember about that August 6th
12   call with Mr. Durban?
13       A    No.  He was just very supportive and like I
14   said -- like this is up to me if I want this done it will
15   be done.
16       Q    Did you execute a nondisclosure or
17   confidentiality agreement with Mr. Durban at that time?
18       A    No, it's possible he signed something before the
19   meeting that we had at SpaceX, but I did not know -- there
20   was no -- I didn't personally sign anything with him, but
21   (b)(4)
22
23   But obviously he's someone whose confidence can be
24   trusted.
25            MR. BUCHHOLZ:  Did you have any discussion with

1    Mr. Durban about the structure of the transaction?

2              THE WITNESS:  Yeah, I actually did.  That's a

3    good question because his initial assumption was more

4    along the lines of the Dell deal, which is -- essentially

5    his assumption was more along the standard template of a

6    take private, where all of the investors besides me or

7    almost all would be bought out.  And I took pains to

8    emphasize this is not what I wanted.

9              In fact he said something to the extent, well,

10   they will be a squeeze out of small investors.

11             I do not want a squeeze out.  I don't want anyone

12   being forced to sell.  This is not what I want.  I was just

13   trying to find a way to execute better.  This is not about

14   trying to increase my ownership in the company.  I don't

15   care if there's zero change in my ownership, but I need to

16   build cars and to scale this company and do so with a

17   minimum distraction and this seems like this might be

18   a good way to do that.

19             So he was a bit, I think, taken aback by that,

20   sort of surprising.  I think he said, well, that's a noble

21   principle.  I was like, well, just trying to get things

22   done here, trying to be useful.  And I said I can put the

23   situation with SpaceX, which is very little overhead --

24   this does not involve lots of difficult short-term

25   optimization pressure and that kind of thing.  And, you

Page 173

1   know, we don't have all these like class action lawsuits.

2   Like every time the stock moves they -- they assume

3   correlation is causation and then file a bloody lawsuit,

4   (b)(4)

5

6

7

8

9

10

11       Q    Do you recall Mr. Durban, during that August 6th

12   discussion, expressing any uncertainties as to whether

13   small retail investors would be able to continue on in a

14   private Tesla?

15       A    No.

16       Q    Do you recall expressing any other concerns

17   about -- strike that.

18           Do you recall him expressing any concerns about

19   your proposed transaction strategy?

20       A    No.  He, actually was, as I recall he said, well

21   that's going to make it a lot easier yes, if lots of

22   investors remain, that's going to be a lot easier than what

23   was done with Dell.  And he said, it actually means that

24   you may actually need less capital than Dell, ironically

25   despite being a more valuable company than was required in

Page 174

1   the Dell transaction.

2           I told him, I believe, most, if not all of our

3   major investors would retain their ownership. And I

4   thought that most -- most investors, not even the large

5   ones, but the small ones too would retain their ownership.

6   And he said, in that case, this is really going to be --

7   even though it is nominally a very large take private on a

8   dollar value, the actual amount of capital needed to take

9   it private may be relatively small compared to other

10  deals.

11          BY MR. NEWELL:

12      Q   Based on the assumption that particularly large

13  shareholders would continue on in a go-private scenario?

14      A   Large and -- shareholders in general. The

15  concern -- the concern of like, can non-high net worth

16  small retail investors remain with the company was not

17  raised. This was -- you know, in terms of -- you know, my

18  counsels advise me, don't get into mistakes and

19  everything -- but like a fundamental misunderstanding that

20  I had was that there would be some means of retaining the

21  small shareholders. That was a fundamental

22  misunderstanding on my part.

23      Q   No one ever, setting aside the conversation with

24  Mr. Durban, no one ever conveyed to you from the time of

25  the July 31st meeting to the time you sent your tweets on

Page 175

1  August 7th, that there might be some issue with the

2  ability of the small retail investors to remain in a

3  private Tesla?

4      A    No.

5      Q    Did the topic of short sellers come up in your

6  call with Mr. Durban on August 6th?

7      A    No.

8      Q    You referenced a conversation with Steve

9  Rosenblum.  Do you remember when that one took place?

10     A    I don't want to mis-remember this, but I think

11 it was the Saturday before the Tuesday tweet, if I am

12 not -- is that correct?  I'm not sure exactly.

13     Q    Was Mr. Rosenblum your attorney at the time you

14 reached out to him?

15         MR. FARINA:  Hang on.  The conversation is -- I

16 am going to assert a privilege over that conversation.  He

17 was reaching out to him for purposes of ultimately

18 engaging him as his legal counsel.  He did engage him as

19 his legal counsel.  So any communications with Mr.

20 Rosenblum are privileged.

21         MR. NEWELL:  Okay.

22     Q    So you were reaching out to Mr. Rosenblum for the

23 purpose of seeking legal advice?

24     A    Yes, as -- as a lead or co-lead counsel on a potential

25 take private, on the advice of Michael Dell.  I had actually

1    talked to Steve Rosenblum I think almost two years ago.  I
2    had a brief conversation with him then.
3        Q    Mr. Dell advised you in the conversation you had
4    with him that you referenced a few minutes ago to talk to
5    Mr. Rosenblum?
6        A    He did.
7        Q    During this same time period -- strike that.
8            At what point -- let me ask you this, Mr. Musk.
9    At the time the August -- strike that.
10           At the time the July 31st meeting with the PIF
11   concluded had you made a decision one way or the other as
12   to whether you were going to make an offer to Tesla's
13   board to take the company private?
14       A    I'm sorry.  The first part of that -- can you
15   repeat?
16       Q    Absolutely.
17           At the time that the PIF left Tesla on the
18   evening of July 31st, had you made a decision as to
19   whether you were going to make an offer to Tesla's board
20   to take Tesla private?
21       A    No.
22       Q    When did you decide to make that offer?
23       A    On Friday when I wrote the email.  I think it was
24   a Friday.
25       Q    Before we get to Friday --

Page 177

```
1              MR. BUCHHOLZ:  Do you mean August 2nd?
2              THE WITNESS:  I'm not sure -- actually, maybe it
3    was a Wednesday instead.
4              MR. FARINA:  He can show you the email.
5              THE WITNESS:  Yeah.  Essentially the point at
6    which I decided to make the offer was when I sent the email --
7    I make a decision and then I take action.
8              BY MR. NEWELL:
9         Q    So when was Tesla's -- strike that.
10             Did Tesla hold an earnings call on August -- let
11   me start over.
12             Did Tesla hold an earnings call on August 1st,
13   2018?
14        A    I believe so.
15        Q    You participated in that earnings call as Tesla's
16   CEO?
17        A    Yes.
18        Q    At the time of that earnings call had you made a
19   decision one way or the other as to whether you were going
20   to make an offer to take Tesla private?
21        A    No.
22        Q    You didn't make that final determination any time
23   on August 1st?
24        A    No.
25        Q    At what point in the day, you can pinpoint it on
```

1   August 2nd, did you make that decision?

2           MR. FARINA:  Can you show him the email?

3           THE WITNESS:  Oh, yeah.

4           MR. NEWELL:  I'd just like to ask for Mr. Musk's

5   recollection and then we'll bring the email and let him

6   take a look.

7           THE WITNESS:  Part of what would inform my

8   decision for any potential take private would be the

9   results of how the market would react to the earnings

10  call.  If the price went stratospheric then a take private

11  would not be feasible.

12          It did increase quite a lot, but not to the

13  degree it would make a take private, you know, impossible

14  or at like some crazy price.

15          BY MR. NEWELL:

16      Q   Why did you think that a substantial increase in

17  Tesla's share price in the wake of the earnings call would

18  put a take private transaction out of reach?

19      A   Well, if there was a very big spike in the stock,

20  I don't know.  Like let's say the stock went to $500 or

21  something crazy -- or went into like just a very steep day

22  over day change, then it's -- there's -- not realistic to

23  do any kind of take private transaction, because people

24  would want to see, is this -- where does this steep

25  increase level off?  Where does it stop?  How, you know --

Page 179

1   like we couldn't be at -- there are times in Tesla's
2   history where we've had these quite big spikes in the value of
3   the company, including times when I thought the value of
4   the company was -- the serial price was way too high, and
5   I said that publicly. And I thought this could be one of
6   those times.
7          And it's -- it wouldn't be reasonable to expect a
8   take private to take place -- if there was
9   a premium on a spike, like if the stock
10  spiked and on top of that you had a premium. Then you've
11  got like -- that wouldn't be feasible.
12      Q   Do you think that wouldn't be feasible from the
13  perspective of the PIF?
14      A   Or anyone really. Like -- it would exceed the
15  bounds of reasonability. If the stock had spiked say 50
16  percent instead of 15 percent then it would not have been,
17  I think, viable to consider take private.
18      Q   Your recollection is that Tesla's price, stock
19  price ultimately increased by something on the order of 15
20  percent on the trading day after the earnings call?
21      A   Yes.
22      Q   Did you contact anyone at the PIF to determine
23  whether in light of the increase in Tesla share price they
24  were still interested in the going private transaction?
25      A   No.

1      Q    It sounds like -- and let me know if I'm not
2   characterizing this correctly -- I'm just trying to understand
3   your testimony.
4           At the time of the August 1st earnings call you
5   hadn't made a decision one way or the other whether you
6   would make the decision to take Tesla private; is that
7   right?
8      A    Correct.
9      Q    You were considering it but you hadn't reached a
10  final resting place?
11     A    That's correct.
12     Q    Was the only thing that you were waiting to see
13  before making your final decision was how the Tesla stock price
14  performed on the next trading day after the earnings call?
15     A    That was the biggest factor. I mean, there's
16  just generally -- I think it's good to sort of sleep on
17  these decisions, you know. And it's hard to say like --
18  like in sort of -- in our minds kind of -- the kind of
19  neuro network that is our brain, what feels like the right
20  decision, what seems like the right judgments. And there
21  are many -- often many small factors that weigh into
22  ultimately a decision, and it's difficult to say exactly
23  what led to that decision. Therein lies judgment.
24     Q    A substantial factor in your evaluation of
25  whether it made sense to make an offer or not was how

1    **Tesla stock performed on August 2nd, right?**

2        A    Yes.  Yes, definitely.  I mean, as I said, if

3    there's -- if there had been some massive jump it would

4    have not been realistic or at least at that time.  It would

5    have at least -- it's not to say there wouldn't -- that a

6    take private was off the table, but we would have to wait

7    for the spike to subside.

8            MR. BUCHHOLZ:  And understanding that it may be

9    difficult to come up with all the others, are there other

10   factors that you can describe in addition to the stock

11   price?

12           THE WITNESS:  Umm --  well, I think certainly what

13   level of -- since I had not done a take private before, I

14   mean it's sort of -- I knew there would be some

15   overhead -- there would be necessarily a short-term spike

16   in overhead of managing a take private.

17           And that was a factor in like how risky is -- how

18   much is it going to affect our short-term performance, and

19   will it be too much of a distraction such that, you know,

20   we would not achieve our targets of being cash flow

21   positive and at least slightly profitable in Q-3 and Q-4.  That

22   was a big concern.

23           So I certainly thought that this is something we

24   need to decide quickly or not at all or -- quickly or

25   postpone to some point past the next few quarters, which

Page 182

1    are of pivotal importance.

2            MR. FARINA:  Can we -- are we at a breaking

3    point?

4            MR. NEWELL:  Sure, I think that's --

5            MR. BUCHHOLZ:  Just -- are there any other

6    factors?

7            THE WITNESS:  I had that Red Bull, so -- I've got

8    a lot of energy.

9            MR. BUCHHOLZ:  I just want to make sure we've

10   finished this line.

11           THE WITNESS:  Sure.

12           MR. BUCHHOLZ:  Any other factors you can

13   enunciate at that time before the August 2nd offer?

14           THE WITNESS:  No.  I think those -- I'm really

15   trying to think hard about it and give you an accurate

16   answer as possible.  I think it's important to

17   emphasize -- and I describe this in the blog pieces,

18   really, it's like the point of Tesla is to advance the

19   sustainable transportable energy and so -- my mental

20   framework, was, you know, (b)(4); (b)(7)(C)

21   (b)(4); (b)(7)(C)

22   (b)(4); (b)(7)(C)            It's very arduous running two

23   companies.  And so what is the area under the curve of

24   the least pain?  Because there would certainly be

25   something on the order of months to maybe a year of

1    significantly increased pain, but then presumably

2    decreased for the following four years.  So, you know

3    what's the net present value of pain, if you will, and

4    on ahead?  And lastly that was like very difficult to

5    know.

6            So I tried to put some uncertainty bounds

7    around that and -- this was definitely uncharted territory for

8    me.  So -- well, it's charted in the sense that obviously

9    I know what SpaceX is like, but it's not charted in like

10   how do we get from Tesla to a SpaceX scenario.  How

11   feasible is that?  You know, will the -- will a set of

12   private investors even post-deal make onerous demands?

13   Even if your deal is clean but you have a board that's

14   maybe is -- has strategic -- has like motivations are

15   nonfinancial.  I had this experience with my first

16   company, and it was a difficult situation.  We had

17   Knight Ridder Hearst --

18            (Reporter seeks clarification.)

19            What we had as investors for my first company

20   that I created, Zip2 -- terrible name -- worse name

21   every -- but  we did do the first maps and directions on

22   the Internet among other things --

23            (Reporter seeks clarification.)

24       A    My first company that I created was Zip2 -- such

25   a bad name.

Page 184

1          That's what happens when you let advertising

2    agencies choose your name.  It's brutal. We had Knight Ridder --

3          (Reporter seeks clarification.)

4          THE WITNESS: -- and Hearst and the New York Times

5    Company.  And we did do the first maps and directions on

6    the Internet, which was cool.  First white pages, first

7    yellow pages and we helped to bring a lot of smaller

8    newspapers on line.  We helped enhance the websites of the

9    major newspapers, but we did have those -- we had Knight

10   Ridders and Hearst, Hearst and New York Times company

11   board members --

12          So they did have these the strategic objectives

13   which were not necessarily aligned with -- Zip2

14   -- and I felt -- we had this incredible technology but

15   wasn't effectively applied.

16          So I had some concern.  I didn't want to be in

17   that situation again.  And although SpaceX is private we

18   (b)(4)

19

20

21   (b)(4)        -- Google's an investor in SpaceX (b)(4)

22   (b)(4)

23   rockets and space craft and make them better and -- we

24   don't really worry whether something is on one side or the

25   other of the quarterly boundary or like a rocket blows

Page 185

1   up -- God be with me that doesn't happen again -- we don't like

2   having some class action lawsuit saying that we should

3   have known that our rocket would blow up.  If we had known

4   would we really have launched the thing?  This is crazy.

5           So, okay like much less headache.  Can we get

6   there with Tesla?  I don't know.

7           So there's a lot of uncertainty, but it was worth

8   investigating.

9           (b)(4)

10  (b)(4)

11          So the calculus changed and I was like,

12  okay, we're going to stay public.  Not ideal but

13  nonetheless on balance probably the right move.  Hopefully you

14  guys don't torture me too much.

15          MR. NEWELL:  We'll give you a break.  Off the

16  record.

17          VIDEO OPERATOR:  Off the record.  The time is

18  2:58.

19          (Recess taken.)

20          VIDEO OPERATOR:  We're back on the record.  The

21  time is 3:19.

22          MR. NEWELL:  Please mark this as EM Exhibit 11.

23                  (SEC Exhibit No. 11 was

24                  marked for identification.)

25          BY MR. NEWELL:

Page 186

1        Q     I'm handing you, Mr. Musk, a document we marked as

2   EM Exhibit 11 and it appears to be an email that you sent

3   bearing Bates number 59230.

4             Let me know when you've had a chance to look at

5   that.

6        A     Got it.

7        Q     Is this the offer that you sent to the Board of

8   Directors that we've been discussing during today's

9   testimony?

10       A     Yes.

11       Q     Prior to the time you sent this email had you

12  discussed with any individual board members, or groups of

13  board members, the possibility that you might make an

14  offer to take Tesla private?

15       A     I think I may have had a conversation with

16  (b)(6),(b)(7)(C)                in this regard, I think.

17            Certainly not the whole board

18  but I may have had conversations with some of the board

19  members, yeah.

20       Q     Do you remember anyone else, setting aside (b)(6),(b)(7)(C)

21  (b)(6),(b)(7)(C)  that you discussed the going private transaction

22  with before you sent this email?

23       A     I do not recall.

24       Q     What did you tell (b)(6),(b)(7)(C)        in that

25  conversation about the going private transaction?

Page 187

1      A    I think I said -- I think I said that we should
2   investigate going private now, and I think I conveyed to
3   him the Saudi interest.  I think he, as I recall the
4   conversation, he was not -- he was reluctant to
5   investigate a take private, as I recall from the
6   conversation, or at least he was certainly not
7   enthusiastic about doing it.  That was my take away from
8   the conversation.  So it wasn't a no, but he wasn't
9   opposed to it, but he was like, didn't think it was like
10  the greatest idea.
11     Q    Do you remember roughly when that conversation
12  took place?
13     A    I don't know.  I think Wednesday night or
14  Thursday morning.  I'm not sure exactly when.  We could
15  look at the call records to confirm, I suspect.
16     Q    It was a phone call?
17     A    I think so.  I do not recall him being there, but
18  he has been at Tesla to help out many times.
19     Q    It wasn't a written discussion?
20     A    I don't think so.
21     Q    Did you just have that one conversation with
22  (b)(6),(b)(7)(C)          in the July or August 2018 time
23  period about a going private transaction or --
24          MR. FARINA:  Before the email?
25          MR. NEWELL:  Thank you.

Page 188

1      Q      Before sending this email, did you have a single

2   conversation with (b)(6),(b)(7)(C)      about going private

3   transaction or did you have multiple conversations?

4      A      Over the course of the years I've had many

5   conversations with (b)(6),(b)(7)(C)      members of the board

6   individually, and even members of the board collectively

7   about going private.

8      Q      I'm sorry.  I dropped the ball on my question.

9   Let my try it one more time.

10          Before you sent this email, did you have any

11   conversations, apart from the one we've been discussing

12   with (b)(6),(b)(7)(C)      about a going private transaction in

13   July or August of 2018?

14      A      Not that I can recall.

15          It's possible I might have, but I don't -- there

16   was a lot going on.

17          MR. BUCHHOLZ:  You don't have a specific

18   recollection, as you sit here today?

19          THE WITNESS:  No.  I mean, I remember having a

20   conversation with (b)(6),(b)(7)(C)      about wanting to investigate the

21   take private at this time -- I had many conversations in

22   months and years past, of course, with (b)(6),(b)(7)(C)      and many

23   other members of the board with potentially going private.

24   But, you know, just so you know -- there's so much going

25   on.  I'm trying my best to remember it's not like I --