# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JIGSAW PRODUCTIONS, INC.,

        Plaintiff,

    v.

U.S. SECURITIES AND EXCHANGE
COMMISSION,

        Defendant.

Case No.: 24-cv-2358 (TSC)

**DECLARATION OF JAKE NOCON**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

I, JAKE NOCON, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am the Director of Security Intelligence & Security Systems Engineering ("Director of Security Intelligence") at Tesla, Inc.

2.    I respectfully submit this declaration in support of the Motion for Summary Judgment filed by Defendant U.S. Securities and Exchange Commission ("SEC") and in opposition to the Plaintiff's Cross-Motion for Partial Summary Judgment filed by Plaintiff, Jigsaw Productions, Inc. ("Jigsaw"). I make this declaration based on my personal knowledge. If called and sworn as a witness, I could and would testify competently as to the facts set forth in this declaration.

3.    In my current role as Director of Security Intelligence at Tesla, I focus on protecting Tesla's business information and Tesla's executives through proactive security initiatives, detection of exfiltration, and responding to critical insider threats and legal matters.

4.    I have direct experience working in digital privacy and data protection in my role as Director of Security Intelligence at Tesla.

5.      I've served as a security professional for over two decades.  Prior to joining Tesla in 2018, I served approximately 14 years with the Naval Criminal Investigative Service ("NCIS") between 2002-2016.  In my role at NCIS, I held Top Secret (TS) and Specialized Compartmented Information (SCI) security clearances.  From 2016-2018, I worked in private security management for another large public company.  I hold a Bachelor's Degree in Mechanical Engineering from the University of California at Santa Barbara, as well as a Masters of Business Administration from Arizona State University.

6.      Through my experience and education, I am aware that private images and videos of individuals cannot be used without consent, nor can corporate intellectual property be used without consent.  It is my understanding that there are various protections available for individual's voice, image and likeness.  For example, it is my understanding that the General Data Protection Regulation ("GDPR") requires that individuals give informed and explicit consent to the use of their image.  Similarly, it is my understanding that intellectual property laws protect against misuse of corporate and individual materials.

7.      I understand that Jigsaw, a documentary film producer, is seeking production under the Freedom of Information Act, 5 U.S.C. § 552, of the video and voice recording of Mr. Musk's compelled testimony before the SEC on August 29, 2018.

8.      I understand that the SEC compelled Mr. Musk's testimony on August 29, 2018, pursuant to a subpoena.

9.      One of my responsibilities as Director of Security Intelligence is to review and evaluate situations that involve personal privacy and/or corporate risks.  Based on my experience in this capacity, I am aware that Mr. Musk would not have voluntarily provided testimony to the

SEC absent compulsory process by subpoena. I am also aware that Mr. Musk does not and would not consent to the public release of any recordings related to his compelled testimony.

10.     In my role as Director of Security Intelligence at Tesla, I would advise Mr. Musk against consenting to public release of video testimony in an official SEC proceeding because of the significant personal privacy and corporate interests that would be harmed by any such public release.

11.     For example, based on my experience as Director of Security Intelligence at Tesla, I am aware that Mr. Musk, as a public figure, has been the subject of "deep fakes" and other malicious online postings using his image and voice. As described further below, these deep fakes and other attacks have caused Mr. Musk, as well as Tesla, economic and personal harm.

12.     Based on my experience in internet security, I use the term "deep fake" to mean false media that is generated by artificial intelligence to convince the viewer that they are watching original and true content. "Deep fakes" are often indistinguishable from original and true content, which creates a heightened risk for misuse and harm.

13.     Deep fakes are created using artificial intelligence technology, which relies on video clips and spoken words to create a vocabulary model that is used to precisely mimic the speech, mannerisms, and physical settings associated with a given speaker.

14.     The more information that is publicly available to the artificial intelligence models used to create deep fakes (including language usage, mannerisms, tone of voice, inflection, body movements, physical setting, and other indicia of authenticity), the more precise the output of the artificial intelligence models will be.

15.     Increased precision of deep fakes makes them more dangerous from both a personal privacy and corporate risk perspective, since more precise deep fakes are more convincing to

viewers who can be duped by very realistic images and videos that are extremely difficult or impossible to distinguish from authentic images or videos.

16.    As the Director of Security Intelligence at Tesla, I consider unauthorized use of Mr. Musk's voice, mannerisms and likeness to pose a substantial threat to Mr. Musk's privacy interests, because he did not authorize the publication of the underlying images and videos.

17.    As the Director of Security Intelligence at Tesla, I consider the unauthorized use of Mr. Musk's voice, mannerisms, and likeness to pose a substantial threat to Tesla's corporate interests, since Mr. Musk is the CEO of Tesla and his statements may be portrayed as attributable to Tesla and result in reputational, brand, and economic harm.

18.    Based on my education and experience with internet security, I am aware that Mr. Musk's likeness as portrayed in these video recordings could be used to create "deep fakes" that may promote false and misleading narratives.  For example, "deep fakes" could be used to create doctored versions of the true recordings, which would then broadcast fallacious versions of Mr. Musk's testimony.  Given the advancements in artificial intelligence, these "deep fakes" may be indistinguishable to the average viewer as being doctored.

19.    Tesla and Mr. Musk are frequent targets of deep fakes and other online attacks.  For example, in one recent instance, a malicious actor posted a deep fake video of Mr. Musk supposedly offering a cryptocurrency giveaway.  This scam not only featured a deep fake video of Mr. Musk purportedly saying things that he never said, but also prominently displayed Telsa's corporate logo and referenced a fake corporate news site that was intended to induce innocent consumers to send money to the scammers.  This negatively affects Mr. Musk's personal privacy interests, damages Tesla's corporate reputation and brand, and causes harm to consumers who are duped by the scheme.

20.    In another recent example, sophisticated scammers hijacked YouTube channels to deceive victims by surreptitiously changing the channel name and logo to mimic Tesla's official channel, then posting deep fake videos that purported to show Mr. Musk saying things that he never said.  This negatively affects Mr. Musk's personal privacy interests, damages Tesla's corporate reputation and brand, and causes harm to consumers who are duped by the scheme.

21.    Release of the testimonial videos never intended to be public, and which provide access to official sounding language and surroundings – would serve as a new and valuable source of information to feed artificial intelligence models that create deep fakes and other malicious attacks against Tesla and Mr. Musk, such as the examples described above.

22.    Based on my education and experience with internet security, I am aware that it is impossible to completely prevent misuse of information once it has been made publicly available. The most effective time to prevent malicious use of the information is before it is released and used by criminals and other bad actors.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed in New York, New York, on July 30, 2025.

By: _____

JAKE NOCON,
Director of Security
Intelligence & Security
Systems Engineering

TESLA, INC.