# Exhibit C

DOJ also goes beyond FOIA, apparently hoping to find an argument that sticks. Protective orders by judges presiding over criminal or civil cases are not relevant in the FOIA context. *See generally Stonehill v. Internal Revenue Serv.*, 558 F.3d 534 (D.C. Cir. 2009). Similarly, arguments that the audio recordings cannot be released because of dangers of modern technology are facile. If government records could not be disclosed because of the concern for manipulation, no record would ever be made public under FOIA. Even a printed record – like a letter, memorandum, or transcript – can be altered. JW's Counter-Statement at ¶ 53. In other words, DOJ's "concerns about malicious manipulation of audio files" (Def's Mem. at 23) have no limiting principle. They would apply to any record. In addition, it is not entirely clear why the fear of manipulation falls within FOIA's personal privacy exemption.

### ii. Public Interest.

Even if President Biden had more than a "trivial privacy interest" in his voice speaking substantive information that has already been made public, the public interest far outweighs any such privacy interest. Contrary to DOJ's assertion, Judicial Watch seeks access to the audio recording not out of "general public curiosity" (Def's Mem. at 27), but because an open question remains about whether Special Counsel Hur's conclusion that President Biden should not be prosecuted for his mishandling of classified records is supported by the evidence. Releasing the audio recordings would shed light on the Special Counsel's performance of his duties. *CREW*, 746 F.3d at 1093. Stated another way, "the relevant public interest is not to find out what [President Biden] himself was 'up to' but rather how the [Special Counsel] and the DOJ carried out their respective duties to investigate and prosecute criminal conduct." *Id.*

DOJ's assertion that the release of the audio recordings "would do little to meaningfully advance the public's understanding of Special Counsel Hur's investigation and his declination

decision" "[i]n light of the voluminous information already available to the public" is contradicted by Special Counsel Hur himself. *See* Def's Mem. at 26. Special Counsel Hur declined to recommend the prosecution of President Biden because, in part, he concluded that President Biden would "likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory." JW's Counter-Statement at ¶ 44. When asked during a Congressional hearing about that conclusion, Special Counsel Hur testified that he made his assessment and drew his conclusion based not only on the transcripts, but also on the audio recordings. *Id.* at ¶¶ 46-47. The public, therefore, has a strong interest in hearing for themselves the evidence upon which the special counsel relied. This interest alone outweighs any privacy interest President Biden has.

However, there is more. White House Counsel and President Biden's personal attorneys have publicly challenged the Special Counsel's report, including the above-described assessment and the Special Counsel's determination based on his assessment. In fact, White House counsel and President Biden's personal attorneys have jointly sent at least three letters in which they dispute the accuracy of the Special Counsel's report. *Id.* at ¶ 45. The release of the audio recordings will, therefore, assist the public in determining whether the President's or the Special Counsel's assessment was most accurate, and whether Special Counsel's conclusions were supported by the evidence. *CREW*, 746 F.3d at 1093 ("Disclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches."). President Biden's disagreement with the Special Counsel's assessment concerning the President's memory underscores the public's need for the audio recordings.

Similarly, Congress has held Attorney General Garland in contempt over his refusal to produce the audio recordings in response to two Congressional subpoenas. JW's Counter-Statement at ¶ 51. This political dispute also highlights the public interest in the audio recordings. As part of its legislative oversight function, Congress seeks the audio recordings for much of the same reason as Judicial Watch. As the report accompanying the contempt resolution explained, "The transcripts provided to the Committee are insufficient to arbitrate this dispute as to President Biden's mental state, an issue which goes directly to his culpability and whether Special Counsel Hur appropriately pursued justice by declining to bring an indictment." *Id*. at 52. In short, the Court does not have to take Judicial Watch's word that the audio recordings will provide the public with invaluable insight into whether Special Counsel Hur's conclusions are supported by evidence. Congress says so too.

Whether Special Counsel Hur appropriately pursued justice by recommending to the attorney general that criminal charges should not be brought against President Biden concerning his mishandling of classified materials is of even more import these days because another special counsel (with approval by Attorney General Garland) is currently prosecuting President Trump for allegedly engaging in similar actions. In addition to President Trump being both President Biden's former political opponent and the current Republican nominee in the upcoming Presidential election, President Trump is the only former president or vice president to be prosecuted for such actions. JW's Counter-Statement at ¶ 54. The public therefore has a significant public interest in knowing whether DOJ "had the evidence but nevertheless pulled its punches" when it came to its boss, the current president. *U.S. v. Penn*, No. 16cr1695-BEN, 2018 U.S. Dist. LEXIS 213898, *6 (S.D. Cal. Dec. 18, 2018) ("[T]he President retains the authority to

- 17 -

prosecute a criminal case acting through his subordinates . . . and their prosecutorial acts are, in terms of the law, acts of the President.").

### iii.   *N.Y. Times Co.* does not support DOJ's claims.

DOJ asserts that the D.C. Circuit's decision in *N.Y. Times Co.* supports its personal privacy claims. Def's Mem. at 21-22. DOJ is mistaken for three reasons. First, a special counsel's interview of a sitting president about actions he took related to his vice-presidency and presidency is not "an event of extreme sensitivity" (Def's Mem. at 22) like "the last seconds of [the Challenger's crew's] lives" before their shuttle exploded. *N.Y. Times Co.*, 920 F.2d at 1005. Such a comparison is repugnant. The District Court found a substantial privacy interest in the sound of the astronauts' voices because "[e]xposure to the voice of a beloved family member immediately prior to that family member's death … would cause the Challenger families pain." *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 782 F. Supp. 628, 631 (D.D.C. 1991). Such consideration does not exist here.

Second, the *N.Y. Times* court concluded that even if "some voice inflection or some background noise on the tape" "indicate[d] that the astronauts knew they were going to die," such information "sheds absolutely no light on the conduct of any Government agency or official." *Id.* at 633. Here, in sharp contrast, the audio recordings will shed light on Special Counsel Hur's conclusions and his recommendation not to press charges against President Biden. The public interest is not comparable in the slightest.

Third, "NASA has provided the public with a transcript of the tape[,] which "reveals to the public every word that was spoken in the cabin." *Id*. Here, DOJ admits that the transcripts created from the audio recordings do not contain every word that was spoken during the interviews. Weinsheimer Declaration at ¶¶ 14 ("The interview transcripts are accurate